THE O'MARA LAW FIRM, P.C.
WILLIAM O. O'MARA  (Nevada Bar No. 0837)
DAVID C. O'MARA (Nevada Bar No. 05899)
311 East Liberty Street
Reno, NV  89501
Telephone:  775/323-1321
775/323-4082 (fax)

Attorneys for Plaintiff

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| FRANK J. FOSBRE, JR., Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> LAS VEGAS SANDS CORP., SHELDON G. ADELSON and WILLIAM P. WEIDNER, <br><br> Defendants. | No. <br><br> <u>CLASS ACTION</u> <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff alleges the following based upon the investigation of his counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Las Vegas Sands Corp. ("Las Vegas Sands" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This federal securities class action is brought on behalf of purchasers of the common stock of Las Vegas Sands between August 1, 2007 and November 6, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Frank J. Fosbre, Jr., as set forth in the accompanying Certification, incorporated by reference herein, purchased the common stock of Las Vegas Sands during the Class Period and was damaged thereby.

6.      Defendant Las Vegas Sands is a Nevada corporation whose principal executive offices are located at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Las Vegas Sands and its subsidiaries own and operate resort and gaming properties in Las Vegas, Macao and Singapore. Before the start of the Class Period, these properties included The Venetian Resort Hotel Casino and The Sands Expo and Convention Center in Las Vegas, and The Sands Macao Casino (the "Sands Macao"). At that time, the Company was in the process of developing additional properties in Las Vegas and Macao, including The Palazzo Resort Hotel Casino in Las Vegas and The Venetian Macao Resort Hotel Casino (the "Venetian Macao") and other casino resort properties on the Cotai Strip in Macao. Las Vegas Sands' common stock is publicly traded on the New York Stock Exchange (the "NYSE") under the symbol "LVS."

7.      (a)      Defendant Sheldon G. Adelson ("Adelson") is and has been a Las Vegas Sands director since 2004. In addition, he has served as Chairman of the Company's Board of Directors (the "Board"), Chief Executive Officer ("CEO"), and Treasurer since 2004. Adelson has served as Chairman, CEO and a director of the Company's wholly-owned subsidiary Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) since 1988, when it was formed to own and operate the former Sands Hotel and Casino. Adelson has also served as President and Chairman of Interface Group Holding Company, Inc. since the mid-1970s and Chairman of the Company's affiliate, Interface Group-Massachusetts, LLC and its predecessors, since 1990. At all relevant times, he beneficially owned a majority of the Company's outstanding common stock and had the

ability to elect the entire Board, which rendered Las Vegas Sands a "controlled company" under the NYSE listing standards. As a result of the events described herein, Adelson perpetuated his majority ownership and control over the Company during, and after, the Class Period.

    (b)  Defendant William P. Weidner ("Weidner") served as a member of the Board, as well as the Company's President and Chief Operating Officer ("COO"), from August 2004 to March 2009. He also served as President and COO of Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) from December 1995 to March 2009, and as a director of Vegas Sands, LLC since August 2004. Although Weidner was complicit in, and responsible for, the misconduct alleged herein, he purportedly resigned his positions at the Company as a result of "outstanding differences" with Adelson.

    (c)  Defendants Adelson and Weidner are collectively referred to herein as the "Individual Defendants," and, together with Las Vegas Sands, as the "Defendants."

  8.  Because of their positions with the Company, the Individual Defendants had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

  9.  It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Las Vegas

Sands, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. These Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

10.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Las Vegas Sands, each of

the Individual Defendants had access to the adverse undisclosed information about Las Vegas Sands' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Las Vegas Sands and its business issued or adopted by the Company materially false and misleading.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Las Vegas Sands common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Las Vegas Sands' business, operations, management and the intrinsic value of its common stock, and caused Plaintiff and other shareholders to purchase Las Vegas Sands common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the common stock of Las Vegas Sands during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Las Vegas Sands common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Las Vegas Sands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Las Vegas Sands; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS[1]

20.     The Class Period commences on August 1, 2007. On that date, Las Vegas Sands issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2007. At that time, the Company reported that net revenue had increased 18.6% to a record $612.9 million, compared to $517.0 million for the same quarter in the previous year. Moreover, with respect to its operations in Macao, the Company reported that "second quarter casino revenues increased 21.6% to an all-time quarterly record $373.5 million versus $307.1 million in the 2006 period."

21.     Commenting on these results, Weidner, Las Vegas Sands' President and COO, emphasized the enormous significance the Company placed on establishing an enduring presence in Macao, stating, in pertinent part, as follows:

> *We are now approaching a signal moment in the history of both our company and Macao.* After over five years of planning and preparation, we are now less than four weeks away from the grand opening of The Venetian Macao, and *the beginning of a new era in the long and vibrant history of Macao.* With the opening of The Venetian Macao, the anchor of the Cotai Strip(TM) and Macao's first true integrated destination resort, with the complete set of assets and service offerings needed to

---

[1]     All emphasis is added unless otherwise noted.

generate multi-night visitation from both the region and around the world, *Macao will begin in earnest to realize her true potential as a world-class business and leisure destination*.

*            *            *

*We have continued to execute our development plans for the Cotai Strip in all areas*. We recently commenced our international marketing programs, which are designed to transform Macao into a multi-night stay international destination . . . . We have advanced the leasing of our retail space on the Cotai Strip . . . . Our convention, tour and travel, and corporate meetings businesses are each ready to begin operations concurrently with the grand opening of The Venetian Macao. In addition, *our construction, design and development work on each of our other six sites on the Cotai Strip continued to progress*, and we continued to advance our master-plan to develop a complementary trade-fair, convention, and leisure destination on Hengqin Island, in Zhuhai of the People's Republic of China and adjacent to the Cotai Strip. Finally, *we completed a $5.0 billion credit facility which simplified our administrative reporting requirements and significantly increased our flexibility to move quickly to take advantage of emerging development opportunities worldwide*.

22.     The following day, the Company's stock price increased $6.63 per share, or 7.74%, to close at $92.31 per share, on heavy trading volume. The stock price climbed a total of $15.84 per share, or 16.1%, to close at $108.15 per share, over the next five trading days, also on heavy trading volume.

23.     On September 5, 2007, Las Vegas Sands issued a press release entitled "The Venetian Macao Establishes Itself as the Region's Top Must-See Destination," in which it continued to emphasize its prospects in Macau and represented to the market that business would prosper there. For example, Adelson stated, in pertinent part, that "[t]he enormous response to the opening of The Venetian Macao is very gratifying to us and it unequivocally validates our vision and the rationale behind the development of our multi-property Cotai Strip . . . ." Moreover, the Company claimed that "[s]ince opening to the public, The Venetian Macao-Resort-Hotel has continued to attract an unprecedented amount of visitors . . . . Transportation to and from the property has run smoothly making it easy for guests from across the region to come see Asia's first truly integrated resort."

8

24.     Thereafter, the Company's stock price steadily continued to climb on heavy trading volume.  In fact, the stock price rose from $102.98 per share on September 6, 2007 to $144.56 per share on October 2, 2007.

25.     Then, on November 1, 2007, Las Vegas Sands issued a press release announcing its financial results for its third fiscal quarter ended September 30, 2007.  At that time, the Company reported that net revenue for the quarter had increased 19.5% to a record $661.0 million, compared to $553.2 million in the third quarter of the previous year, along with a decrease in operating income as a result of pre-opening expenses associated with "preparations for the opening of The Venetian Macao" and other properties slated to open in Macau, Singapore and the U.S.  According to Las Vegas Sands, its adjusted net income and GAAP net income respectively decreased $75.7 million and $145.8 million as compared to the third quarter of the previous year, "principally driven by the increases in pre-opening expenses, operating costs, depreciation and amortization expense, net interest expense, and the lower table games win percentage."

26.     Focusing on the Company's Macau operations, Weidner claimed that "[w]e remain confident, and The Venetian Macao's operating results confirm, that the execution of our strategy will deliver tremendous economic benefits to Macao and the entire region, as well as industry leading returns to our shareholders."  According to Weidner, the Macau operations positioned the Company to continue its upward trajectory:

> Looking ahead, *we remain extremely confident* that the world class product offerings of The Venetian Macao will allow us, as the market continues to evolve and mature, to convert our strong visitation, hotel occupancy and retail sales figures into market and industry leading gaming and non-gaming *revenue growth* and, ultimately, *superior financial performance*.
>
> *             *             *
>
> *We expect the maturation of all the property's elements to continue over the coming months,* and we expect to increasingly drive revenue and margin from the

property as the maturation process for all our businesses continues in the months and years ahead.

27.     Although the Company's stock price suffered a string of consecutive declines, the stock price was nevertheless buoyed by Defendants' statements concerning the Macau operations. Thus, several trading days after Las Vegas Sands announced the launch of a high-speed ferry service between Hong Kong and Macau on November 30, 2007, the stock price began to rebound. In the press release announcing the launch, "Weidner said the additional arrival point in Macao will help to alleviate a portion of the current traffic congestion on the Macao peninsula and enable increasing levels of visitation to both Macao and the wider region for years to come."

28.     On December 11, 2007, however, Las Vegas Sands was forced to report that the newly launched ferry service had been suspended due to legal proceedings concerning the Macau government's decision to grant a concession for the service's operation. Although the Company disclosed on January 17, 2008 that the Macau court had lifted the suspension, the Company's stock price was adversely impacted by a steady decline, except on a handful of trading days, until after the announcement had been made. In fact, while the stock price closed down on January 17, 2008 at $74.46 per share, it closed far higher – at $85.80 per share – on January 23, 2008, several days later.

29.     In the interim, Las Vegas Sands announced its entry into a credit agreement for financing of up to SGD $5,442,604,530 for the development of the Marina Bay Sands in Singapore. As Weidner stated in a January 4, 2008 press release, "[t]he completion of this Singapore Dollar-denominated facility, which was considered the largest private Singapore Dollar-denominated financing in Singapore's history, was accomplished on very favorable terms in a challenging global credit environment."  He added that "[t]he vote of confidence we have received from the international financial community, including leading Singapore-based financial institutions, is a testament [] to our track record of successful Integrated Resort development worldwide . . . ." On

January 15, 2008, Las Vegas Sands announced that it had completed initial funding of SGD $2 billion under the credit facility, with Adelson describing it as "the largest private Singapore Dollar-denominated financing ever completed . . . ."

30.     On February 4, 2008, Las Vegas Sands announced its financial results for its fourth fiscal quarter ended December 31, 2007. Specifically, the Company reported that "[n]et revenue for the fourth quarter of 2007 increased 64.8% to a record $1.05 billion, compared to $636.3 million in the fourth quarter of 2006." However, the Company claimed that a "decrease in operating income of $32.8 million was driven principally by increases in operating costs" associated with the execution of its "global growth plans," including pre-opening expenses related to The Palazzo "and other properties to be opened in the future in Macao, Singapore, and the United States."

31.     In the press release, Weidner stated, in pertinent part, as follows: *"We remain pleased with both our current performance and our long-term market positioning at the Sands Macao*. In the face of high- quality competitive product, including The Venetian Macao on the Cotai Strip, the Sands is generating strong cash flow and market-leading cash on cash returns." He also noted that "[l]ooking ahead, our ongoing investments in Macao's transportation infrastructure will continue to drive visitation and improve the customer experience for Macao's visitors."

32.     During an investor conference call following the issuance of the press release, the Individual Defendants continued to emphasize that the environment in Macau was favorable to Las Vegas Sands and, further, that the Company was successfully executing its plans. In this regard, Weidner said, in pertinent part, as follows:

> And with *the steady consistent execution of our vision* to lead the transformation of Macao to the destination of (inaudible). *The big picture everything is working*. Any concern that the elements that make Las Vegas so successful as an international resort destination somehow wouldn't work in Macao *have been resoundingly dispelled*.

33.     Although the Company's stock price had declined on February 4, 2008, it increased
9.15% to close at $88.90 per share the very next day, on nearly double the volume.

34.     On April 30, 2008, Las Vegas Sands issued a press release announcing its financial
results for its first fiscal quarter ended March 31, 2008. According to the Company, net revenue for
the first quarter of 2008 increased 71.8% to $1.08 billion as compared to the same period during the
year before. Operating income again decreased, however, this time by $34.4 million, purportedly as
a result of increased operating costs associated with, among other things, the Company's growth
plans and operations in Macao. In addition, the Company's adjusted net income and GAAP net
income respectively decreased $91 million and $102.1 million as compared to the first quarter of the
previous year, which it also attributed to its growth plans.

35.     Commenting on these results, Weidner focused on Las Vegas Sands' Macau
operations, stating, in pertinent part, as follows:

> *In Asia, our efforts to transform Macao into Asia's premier business and leisure
> destination continue to move ahead.* The strong and consistent visitation to the Cotai
> Strip's anchor property, The Venetian Macao, and the solid early performance of the
> property's hotel, retail, and group meeting businesses, *reflect that we are continuing
> to deliver on the fundamental goal and commitment* we share with the people of
> Macao -- the transformation of Macao into Asia's premier business and leisure
> destination. The recent announcements by the government of Macao regarding
> gaming regulation appear to be consistent with that vision and support our conviction
> that the execution of our Cotai Strip development strategy will deliver significant
> economic benefits to Macao and the entire region, as well as industry-leading returns
> to our shareholders.

36.     In addition, while acknowledging that competition in Macau was on the rise, he noted
that Las Vegas Sands had implemented appropriate measures to ensure that its operations in Macau
would continue to thrive:

> While our VIP gaming volumes were down sequentially due to the increasingly
> competitive environment that has developed in this market segment over the last few
> months, *we have taken actions that we believe will enable us to grow both our
> share of the market and our cash flow generated from this segment of our business*

*in the future*. We remain confident that the world-class product offerings of The Venetian Macao, together with our continuing investments along the remainder of the Cotai Strip, will allow us to deliver industry-leading returns and superior financial performance.

*     *     *

While the results of the Sands Macao clearly reflect the increasingly competitive environment on the Macao peninsula, we remain pleased with both the competitive resilience and the long-term market positioning of the Sands. The introduction of high-quality competitive product, including The Venetian Macao on the Cotai Strip, has been significant in the last year, but will slow dramatically from this point forward, particularly on the Macao Peninsula. *In the face of this competition, the Sands continues to generate strong cash flow and market-leading cash-on-cash returns. While admittedly down year over year, both our VIP and mass volumes reflect healthy play, and our visitation statistics remain strong.* Looking ahead, we expect to further reduce the cost structure at the Sands Macao as we allocate our human resources more efficiently across the larger asset and revenue base of The Venetian Macao, the Four Seasons Macao, and additional properties on the Cotai Strip.

37.     Moreover, Weidner noted that Macau's improving transportation infrastructure would continue to drive business:

> *Looking ahead, our ongoing investments in Macao's transportation infrastructure will continue to drive visitation and improve the customer experience for Macao's visitors*. We expect our CotaiJet ferry service, which is operated by our partner Cotai Chu Kong Shipping Management Services Co., Ltd., to be expanded in the months ahead. Over time, we expect to offer regional ferry service into Taipa's temporary Pac-On ferry terminal with more frequency and on a 24 hours per day, seven days per week basis. The expansion of this service, which carries passengers from Hong Kong's Shun Tak ferry terminal directly to Taipa and the adjacent Cotai Strip, should enhance the customer experience for visitors to Macao, particularly for customers who are attending multiple day conventions and exhibitions, or evening entertainment events. *Ongoing investments in Macao's transportation infrastructure*, including expanded ferry services, local and regional busing programs, and aviation services *should not only expand the number of visitors to Macao and the Cotai Strip and improve the customer experience of visitors to the region, but also provide opportunities for important new customers* with high discretionary incomes from around the region to visit the market for the first time. *These new visitors and first-time customers will allow us to drive increases in both gaming and non-gaming revenue and operating income yield per visitor, and we expect our additional integrated resorts on the Cotai Strip to enhance and drive this strategy in the future* . . . .

38.     On July 30, 2008, Las Vegas Sands issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2008. According to the Company, "[n]et revenue for the second quarter of 2008 increased 81.4% to $1.11 billion, compared to $612.9 million in the second quarter of 2007." Again, however, Las Vegas Sands reported a decrease in operating income – this time, of $13.0 million – purportedly as a result of increased operating costs associated with, among other things, the Company's growth plan and operations in Macao.

39.     Commenting on these results, Weidner stated, in pertinent part: "Our second quarter results reflect both solid operating performance in Macao and Las Vegas and the measured execution of our global growth and development strategy. In Asia, our efforts to transform Macao into Asia's premier business and leisure destination *steadily march forward*."

40.     The above-referenced statements concerning Las Vegas Sands' business and operations were false and misleading when made because, among other things: (i) increasing competition in Macau was steadily eroding the Company's foothold in the region, which undermined Defendants' representations that everything was proceeding according to plan; (ii) the Company was facing a significant liquidity crisis as a result of its ongoing expenditure of capital in Macau and Singapore, which forced the Company to divert funds from other operations to develop its Asian properties; (iii) the Company could not, in fact, weather the economic downturn, because the credit markets were drying up and Las Vegas Sands had failed to timely access those markets; and (iv) increasing visitor restrictions in Macau, which Defendants represented would not impact the Company as significantly as its competitors (or otherwise publicly dismissed), were expected by Defendants to have just as devastating an effect on Las Vegas Sands.

41.     On August 22, 2008, Las Vegas Sands held a conference call with analysts in which Adelson strongly implied that he would ensure that the Company would not face liquidity problems.

Analysts, however, were skeptical. Shaun Kelley, a Bank of America analyst, downgraded Las Vegas Sands to a "sell," reasoning that "the casino operator has greater funding needs than investors may recognize." A *Forbes.com* article, entitled "Chips are Down for Las Vegas Sands," quoted Kelley as saying, in relevant part, that Las Vegas Sands "has 'significant funding needs' across the company over the next 12 months. 'In addition to the well-known capital raising process in Macau [seeking $5.25 billion], we believe the U.S. and Singapore also face funding needs that are larger than most investors currently realize[.]'" Kelley attributed his funding concerns to a leverage covenant in the U.S. that begins in the third quarter and a requirement for 20% equity in Singapore that had been funded from the U.S. until that time.

42.     Less than a week later, on the one-year anniversary of The Venetian Macau, Adelson informed reporters that the Company would prosper despite the weaker economic environment and insisted that its *"entire strategy avoids the possibility of an economic slowdown, a recession."* He and other Las Vegas Sands executives also reportedly "argued that possible stricter visa rules for mainland Chinese tourists, who make up the majority of Macau visitors, would affect them less than their rivals. That's because company's Macau properties are less reliant on Chinese visitors than other casinos, they contended."

43.     Despite deepening concern about the Company's economic outlook and financial stability, on September 4, 2008, Las Vegas Sands announced that it had reached an agreement with Starwood Hotels & Resorts to open The St. Regis Residences at the Venetian Palazzo, Las Vegas, a collection of 398 private luxury residences that would "introduce[e] the renowned St. Regis brand to Las Vegas, Nevada." According to the Company's press release, Adelson attempted to allay concerns that the extensive (and expensive) endeavor would not survive in the challenging economic environment: "Addressing would-be skeptics, Adelson said quality and luxury sell in any type of

financial environment and, when combined with the premium location of these residences, he believes the company has a surefire winner."

44.     On September 10, 2008, the Nevada Gaming Control Board released a report in which it disclosed that Las Vegas Strip revenue had declined by approximately 14.7% in July 2008, and slot win (the amount casinos keep from their slot machines) was off by 9%. In reaction to this news, Las Vegas Sands stock fell 10.8%. Furthermore, Jake Fuller, a Thomas Weisel Partners analyst, expressed concern about the Company because of financing concerns, high stock prices, and supply-side risk.

45.     Less than a month later, on September 30, 2008, the Company announced that Adelson and his family had completed a $475 million private transaction investment in convertible senior notes due October 2013, which purportedly prevented the Company from violating lender covenants. According to the terms of the transaction, the debt pays an interest rate of 6.5% and converts into common stock at a price of $49.65 per share.

46.     Despite this cash infusion, the very next day, Standard & Poor's Rating Services announced that it was keeping the Company's ratings under "review for a potential downgrade." Though Adelson's $475 million investment appeared to address near-term liquidity concerns, it did little to allay Standard & Poor's concern over Las Vegas Sands' "overall liquidity position, continued weak performance on the Las Vegas Strip and a possible 'significant' slowdown in the Chinese gambling enclave of Macau." Standard & Poor's also noted that the Company was still borrowing significant sums of money for development purposes.

47.     On October 2, 2008, Las Vegas Sands' stock was downgraded due to concerns about the slowing growth in Las Vegas and new travel restrictions in Macau. On this news, Las Vegas Sands stock fell 15.4%.

48.     On October 3, 2008, Fuller again expressed concern and cut the Company's price target, commenting that Adelson's cash infusion did not cancel ongoing concerns regarding funding, the Las Vegas market and the Macau market. Fuller said that although Adelson's investment afforded the Company "some time," the Company still needed to raise money for its Cotai Strip development plans.

49.     In fact, an October 20, 2008 *Marketwatch.com* article reported that Las Vegas Sands was still attempting to secure $2 billion in financing for expansion in Macau, even though, according to the *South China Morning Post*, the Company had completely scrapped plans to raise money for the Macau expansion. Nevertheless, Adelson contested reports that Las Vegas Sands had abandoned efforts to expand in Macau. Indeed, on October 22, 2008, Adelson announced he was seeking to raise $2 billion in debt financing from Asian banks to complete work on expansion projects in Macau that the Company had already planned.

50.     Only two days later, Adelson announced plans to participate in a capital raising program with an unnamed investment banking firm. In reaction to this news, investors sent Las Vegas Sands shares down 15.1% in midday trading. In fact, on October 23 and 24, 2008, Las Vegas Sands shares lost 29.9% and 23%, respectively. Adelson's participation in the program raised concerns, according to Stifel Nicolaus & Co. analyst Steven Wieczynski, who believed "that the company's faltering financial position has been the biggest overhang on the stock." In an October 24, 2008 article entitled "Adelson to partake in capital program," the *Las Vegas Sun* reported that Wieczynski "believes investors are selling shares because the current credit crisis has raised fears that 'Las Vegas Sands is in jeopardy of running out of cash and going bankrupt.'"

51. On October 29, 2008, *Reuters* reported that the opening of the Company's Marina Sands Casino in Singapore could be delayed due to construction issues. However, on October 30, 2008, the Company reaffirmed that it was on track to meet the previous target date for the opening.

52. Nevertheless, as Sterne Agee analyst Nicholas Danna noted, the Company was still in need of further financing, "but at the same time [was] in danger of violating leverage ratios." Moreover, on November 6, 2008, the Company's auditor, PricewaterhouseCoopers LLP ("PwC"), expressed doubt about the Company's ability to continue as a going concern, prompting PwC to issue a going concern qualification which alerted shareholders to the true extent of the Company's perilous condition. In response, the trading price of Las Vegas Sands common stock plummeted nearly 33%.

53. A November 6, 2008 *Reuters* article confirmed the marketplace's concern regarding the Company's financial condition. Specifically, the article noted that "[b]ased on current estimates, [the Company] expects it will not be in compliance with its maximum leverage ratio covenant for the fourth quarter and subsequent quarters." The article pointed out that "[n]oncompliance would result in defaults, which raises substantial doubt about the [C]ompany's ability to continue as a going concern."

54. In an attempt to detract attention from the negative press, on November 7, 2008, Las Vegas Sands announced that Adelson had met with government officials in Singapore to discuss financing and completion of Singapore's first casino, The Marina Sands, amid concern regarding the credit markets. The Company also sought to reassure investors by announcing the hiring of a new CFO and Senior Vice President, Kenneth J. Kay, as of December 1, 2008. Despite its attempts to deflect the negative press and alleviate investors' concerns, Las Vegas Sands was forced to announce that it was likely to violate debt covenants if it could not obtain more financing. This concern raised

the very real possibility that the Company would not survive the economic crisis and revealed that its cash flow was not enough to cover the Company's fixed charges. In reaction to this news, Las Vegas Sands' share price fell 11%.

55.    Compounding shareholders' fears were additional statements that the Company issued which suggested that it would not weather the economic environment. On November 10, 2008, Las Vegas Sands announced its third quarter 2008 financial results, in which the Company disclosed that it was significantly cutting back development and reducing capital expenditures by $1.8 billion. The Company also revealed that it would delay plans to build as many as eight more hotels in Macau because of a lack of financing options. Weidner was quoted as saying that the Company was slowing its development pace in Macau as it concentrated on "current efforts on maximizing our cash flow and our returns on invested capital from our existing properties in Macau." The Company also announced that it would suspend work on the St. Regis project in Las Vegas and would instead focus on building a scaled-down version of a new casino on the site of the old Bethlehem Steel plant in Pennsylvania, as well as finishing the $5 billion Marina Sands resort in Singapore.

56.    In addition, on November 10, 2008, Las Vegas Sands disclosed that it had formed an Executive Committee whose role was "to exercise the powers of the board of directors in between scheduled board meetings, including the power to resolve disagreements among management." The Company detailed the formation of the Executive Committee in its Form 10-Q, filed with the SEC on November 10, 2008, noting that the Executive Committee's purpose was "to address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer [Adelson] and other Senior Management Members and in response to a loss of confidence by certain Senior Management Members in the management of the

Company and our governance process." The Executive Committee was "comprised of Irwin Chafetz, Michael A. Leven and Irwin A. Siegel, with Mr. Leven being the Chairman of the Executive Committee."

57.    That same day, the Company also revealed that Goldman Sachs had successfully arranged $2.14 billion in new capital, including a multimillion dollar investment from Adelson – his second personal investment in the Company in as many months. Adelson retained a majority stake in the Company.

58.    By the end of the day on November 11, 2008, shares of Las Vegas Sands plummeted 17% after it announced that it would suspend construction activity in Macau to help preserve cash and try to raise money for projects underway in Singapore and Pennsylvania. The Company also announced that it would make a public offering of 182 million shares of stock, along with nearly 92 million shares of preferred stock, in an attempt to raise more than $2 billion in capital. Adelson participated in the offering, thereby ensuring that his majority stake in the Company remained safe and secure. Despite that the offering more than doubled the number of outstanding shares and significantly diluted the minority shareholders' interests, the Company took the unprecedented step of not seeking shareholder approval, which it acknowledged the NYSE rules would have required. Instead, the Company attempted to justify its refusal to obtain shareholder approval on the purported basis that "any delay caused by securing shareholder approval . . . would seriously jeopardize the ability to complete the offerings as well as the financial viability of the company."

59.    The Company's high debt load and generally negative trends in Las Vegas caused Moody's Investors Service to cut the Company's credit ratings on November 12, 2008 into junk territory. In addition, at the corporate level, Moody's Investors Service cut several other ratings, including the probability of default, from "Ba3" to "B2."

60. On the heels of the Company's worse-than-expected third quarter results, Las Vegas Sands announced that it would lay-off as many as 11,000 construction workers after a "cash crunch" forced it to halt construction on a number of projects, including two sites in Macau.

61. On November 17, 2008, PwC revised its outlook concerning its doubt of Las Vegas Sands' ability to continue as a going concern when it was confirmed that the $2.14 billion in capital raised would support the Company's operations. In an *Associated Press* article entitled "Las Vegas Sands Says It's Ready for Future," Defendant Weidner was asked why the Company did not raise the sorely needed capital earlier, to which he responded: "It was a matter of robust debate within the organization. There are several of us who have very strong opinions . . . . *It was pretty much a monumental screw-up*."

62. Subsequently, the price of Las Vegas Sands stock, as well as its prospects, continued to decline. In fact, as of November 21, 2008, Las Vegas Sands' stock price sunk to an all-time low of $3.23 after it was revealed that BMO Capital analyst Jeffrey Logsdon slashed the Company's 2009 and 2010 adjusted earnings estimates following the latest capital infusion: he dropped his 2008 adjusted profit forecast to 6 cents per share from 9 cents per share, cut his 2009 estimate to 6 cents per share from 43 cents per share, and reduced his 2010 prediction to 21 cents per share from 66 cents per share.

63. On November 24, 2008, the Company issued a press release in which it announced that Andrew R. Heyer had resigned from the Company's Board and that the Company was now deficient in meeting the NYSE's minimum listing requirements because he had also resigned from the Board's Audit Committee.

64. Thereafter, Las Vegas Sands announced that it was planning to also cut 216 full-time employees from its Las Vegas properties. The Company also suspended various development

21

activities as a result of a lack of capital. For example, although Las Vegas Sands indicated that it would complete construction of the casino component of the Bethlehem Sands, construction on associated components – including "a 300-room hotel, an approximate 200,000-square-foot retail facility, a 50,000-square-foot multipurpose event center and a variety of additional dining options" were "temporarily suspended" The Company noted that development would not recommence until "capital markets and general economic conditions improve," which, at that time, was not expected to occur until the second quarter of 2009 at the earliest.

65.     The Company also confirmed that it continued to suspend construction of the St. Regis Residences and that it did not intend to recommence construction until conditions improved. The Company further warned that "it will take approximately 18 months from when construction recommences to complete the project."

66.     Then, on March 9, 2009, Las Vegas Sands issued a press release announcing that effective April 1, 2009, Leven would assume the positions of President and COO of Las Vegas Sands, and that Weidner was no longer with the Company. In fact, Weidner reportedly had resigned from all of his positions with the Company and its affiliates, including as a member of the Board.

67.     On March 10, 2009, Moody's Investors Service cut Las Vegas Sands' corporate family and probability of default rating from "B2" to "B3," meaning that an investment in the Company is speculative and undesirable.

68.     Then, on March 13, 2009, the Company announced that Schwartz had been appointed to the Board to replace James Purcell, who had resigned on March 9, 2009. According to Purcell's March 9, 2009 resignation letter, reprinted in the March 13, 2009 Form 8-K, Purcell resigned from the Board and its Audit and Compensation Committees after "conclud[ing] that continued service in those capacities ha[d] become untenable."

69.     On March 24, 2009, Brad Stone, Executive Vice President and President of Global Operations and Construction for Las Vegas Sands, also resigned.

70.     Accordingly, Defendants successfully implemented their scheme to artificially inflate the price of Las Vegas Sands common stock, which had the intended effect of stimulating the purchase of the Company's shares and buoying the stock price so as to fund various extraordinary transactions, described herein. When the scheme began to falter, however, Adelson utilized his stranglehold over the Company to oust Weidner, whom he publicly blamed for the Company's failings. For his part, Weidner engineered a lucrative exit from the Company, characterizing his departure as a resignation for good cause, as the scheme imploded.

71.     The market for Las Vegas Sands common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Las Vegas Sands common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Las Vegas Sands common stock relying upon the integrity of the market price of Las Vegas Sands common stock and market information relating to Las Vegas Sands, and have been damaged thereby.

72.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Las Vegas Sands common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

73.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Las Vegas Sands' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Las Vegas Sands and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

74.      As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. By virtue of their receipt of information reflecting the true facts regarding Las Vegas Sands, their control over, and/or receipt and/or modification of Las Vegas Sands' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Las Vegas Sands, Defendants participated in the fraudulent scheme alleged herein.

75.      In fact, the Individual Defendants acknowledged that they had access to undisclosed, material information concerning the business, operations and prospects of Las Vegas Sands during the Class Period. In a July 22, 2008 press release, for example, Las Vegas Sands announced that it would not pursue a gaming opportunity in Kansas, purportedly "after a thorough evaluation of the

24

impact of proposed statutory changes in the neighboring Missouri gaming marketplace . . . ." Weidner noted that Defendants' evaluation of the Company's plans resulted in this decision, stating, in pertinent part, that "[a]s we pursue our development plans and evaluate potential opportunities around the globe, *we constantly review those plans* to determine which ones are the most beneficial for the company, its shareholders, and our employees, as well as the communities in which we intend to operate . . . ."

76.    In addition, during the Class Period, Defendants caused Las Vegas Sands to engage in various extraordinary financial transactions which would not have been possible in the absence of its fraudulently inflated stock price. While certain of these transactions purported to further Las Vegas Sands' business prospects, these transactions by and large benefitted Adelson and would not have been possible absent the fraud.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

77.    At all relevant times, the market for Las Vegas Sands common stock was an efficient market for the following reasons, among others:

(a)    Las Vegas Sands stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Las Vegas Sands filed periodic public reports with the SEC and the NYSE;

(c)    Las Vegas Sands regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Las Vegas Sands was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for Las Vegas Sands' common stock promptly digested current information regarding Las Vegas Sands from all publicly available sources and reflected such information in Las Vegas Sands' stock price. Under these circumstances, all purchasers of Las Vegas Sands' common stock during the Class Period suffered similar injury through their purchase of Las Vegas Sands common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Las Vegas Sands who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

80.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

81.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Las Vegas Sands common stock. Plaintiff and the Class would not have purchased Las Vegas Sands common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

84.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Las Vegas Sands common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

85.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of Las Vegas Sands within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Las Vegas Sands, and their ownership of Las Vegas Sands stock, the Individual Defendants had the power and authority to cause Las Vegas Sands to engage in the wrongful conduct complained of herein.

87.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative, and Plaintiff's counsel as Lead Counsel, under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: May 24, 2010

THE O'MARA LAW FIRM, P.C.
WILLIAM M. O'MARA
DAVID C. O'MARA

DAVID C. O'MARA

311 East Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
775/323-4082 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF ALFRED G. YATES, JR., P.C.
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 1521

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

FRANK J. FOSBRE, JR. ("Plaintiff") declares:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|
| LVS | Purchase | 8-17-07 | $94.8899 |

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this __//__ day of May, 2010.

FRANK J. FOSBRE, JR.