1

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

8

FRANK J. FOSBRE, JR., individually and on
behalf of all others similarly situated,

9

Plaintiffs,

10

v.

11

LAS VEGAS SANDS CORP., et al.,

12

Defendants.

13

Case No. 2:10-cv-00765-APG-CWH

**ORDER GRANTING IN PART AND DENYING
IN PART MOTIONS TO DISMISS**

**(Dkt. Nos. 92, 94)**

14

15   **I.      BACKGROUND**

16          Pending before the Court are two motions.  Defendants Las Vegas Sands ("LVS" or the

17   "Company") and Sheldon Adelson ("Adelson") (collectively, the "LVS Defendants") filed a

18   motion to dismiss with attached exhibits.[1]  (Dkt. Nos. 94–95.)  Plaintiff Frank J. Fosbre Jr.,

19   individually and on behalf of all others similarly situated ("Plaintiffs"), filed responsive briefs

20   with their own exhibits.  (Dkt. Nos. 97, 99–100.)  LVS filed a reply brief, one new exhibit, and an

21   errata to replace an exhibit in its motion to dismiss.  (Dkt. Nos. 102, 104, 105.)  Likewise,

22   defendant William P. Weidner ("Weidner") filed a motion to dismiss.  (Dkt. No. 92, the "Weidner

23   Motion.")  Weidner also requested that the court take judicial notice of various publicly-available

24

25

26

---

27          [1] The Court looks only to documents cited in the Second Amended Complaint (Dkt. No. 87) to
     assess the motions to dismiss, thereby avoiding the need to treat the motions to dismiss as ones for
28   summary judgment.  FED. R. CIV. P. 12(d).

1  LVS filings with the Securities and Exchange Commission ("SEC"). (Dkt. No. 93.)[2] Plaintiffs

2  responded to the Weidner Motion, and Weidner timely replied. (Dkt. Nos. 97, 106.)

3      The Court's prior order on Defendants'[3] first motion to dismiss sets forth the pertinent

4  facts of this case. (Dkt. No. 55.) In brief, LVS operates resorts and gaming properties in Las

5  Vegas, Macao, and Singapore. Plaintiffs contend that they purchased LVS stock at artificially

6  high prices between August 2, 2007 and November 6, 2008 because during that period LVS made

7  various false and misleading public statements about its development plans, liquidity, and equity

8  offerings.

9      This is a class action. Plaintiffs bring claims under section 10(b) of the Securities

10 Exchange Act of 1934 (the "Act")[5] and SEC Rule 10b-5[6] (section 10(b)'s implementing

11 regulation) against LVS, Adelson and Weidner, and under section 20(a) of the Act[7] against

12 Adelson and Weidner individually for "control person" liability. In two prior orders, the Court

13 partially granted Defendants' first motion to dismiss and granted class certification under Fed. R.

14 Civ. P. 23 for the so-called "Later Class Period"—February 4, 2008 through November 6, 2008.

15 (Dkt. Nos. 55, 86.)[8] The so-called "Earlier Class Period" is from August 2, 2007 through

16 February 3, 2008. The Court held that the claims related to the Later Class Period were

17 sufficiently pled. The Court also held, however, that Plaintiffs had not pled scienter with

18 sufficient particularity for the Earlier Class Period, and dismissed the related claims with leave to

---

20     [2] The Court grants this request. *Metzler Inc. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,
21 1064 n.7 (9th Cir. 2008).

    [3] Weidner and the LVS Defendants are collectively referred to as "Defendants."

22     [5] 15 U.S.C. § 78j.

23     [6] 17 C.F.R. § 240.10b-5.

24     [7] 15 U.S.C. § 78t.

    [8] The Court defined the Class as follows:

25
"All persons or entities who purchased or otherwise acquired the common stock of Las Vegas Sands Corp.
26 ('LVS' or the 'Company') from February 4, 2008 through November 6, 2008, inclusive (the 'Class
Period') who were damaged by the Defendant's alleged misconduct. Excluded from the Class are
27 defendants, the officers and directors of the Company at all relevant times, members of defendants'
immediate families and their legal representatives, heirs, successors or assigns and any entity in which
28 defendants have or had a controlling interest." (Dkt. No. 86 at 21.)

amend. (Dkt. No. 86 at 19.) The Court struck some of the alleged misrepresentations as within the "safe harbor" of the Private Securities Litigation Reform Act of 1995 ("PSLRA")[9] and/or for being vaguely optimistic. Lastly, the Court stated that it would entertain a motion to expand the class period if Plaintiffs amended the pleadings with sufficient particularity for the Earlier Class Period. (*Id.* at 20.)

Plaintiffs filed their Second Amended Complaint ("SAC") on September 7, 2012. The SAC includes additional allegedly false statements and new factual allegations for both the Earlier Class Period and Later Class Period. (Dkt. No. 87.) The pending motions to dismiss followed. (Dkt. Nos. 92, 94.) Plaintiffs argue that the Court's sole focus should be on the Earlier Class Period because the Court has already certified the class for the Later Class Period. Defendants counter that the Court should review the entire SAC because Plaintiffs newly cite to documents that contradict various allegations concerning both the Earlier and Later Class Periods. Defendants are correct that the Court need not deem as true factual allegations that are contradicted by materials cited in the SAC or that are subject to judicial notice. *Colony Cove Props, LLC v. City of Carson*, 640 F.3d 948, 957 (9th Cir. 2011). The Court thus reviews the entire SAC.

On September 27, 2013, Plaintiffs filed a notice of supplemental authority, attaching a recent order by this Court in *In re MGM Securities Litigation*, No. 2:09-cv-01558-GMN-VCF, Dkt. No. 207, Sep. 26, 2013 (the "MGM Order"). (Dkt. No. 115.) Plaintiffs argue that the MGM Order is relevant because the underlying facts are similar -- concerning the progress of a construction project and access to capital -- and the Court interpreted the "safe harbor" of the PSLRA in a way that favors Plaintiffs. (*Id.*) Defendants respond that the facts are not as similar as Plaintiffs allege and that the MGM Order fails to properly account for Ninth Circuit precedent concerning the scope of the PSLRA's safe harbor. (Dkt. Nos. 116, 117.)

---

[9] Pub. L. 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections of Title 15 of the U.S. Code).

1    For the reasons set forth below, the Court partially grants the motions to dismiss. The

2 SAC pleads the claims related to the Earlier Class Period with sufficient particularity. Thus, the

3 first date of actionable alleged misconduct is August 2, 2007. The Court, however, strikes as

4 inactionable some of the allegedly false statements as being within the PSLRA's safe harbor,

5 vaguely optimistic, immaterial, and/or unchallenged statements of historical fact.

6

7  **II.    ANALYSIS**

8       **A. Applicable Law**

9          **1.    Section 10(b) and Rule 10b-5**

10   Under Securities Exchange Act § 10(b) and SEC Rule 10b-5, a plaintiff must allege

11 sufficient facts showing:

12          (1) a material misrepresentation or omission by the defendant;
             (2) scienter;
13          (3) a connection between the misrepresentation or omission and the purchase or
                 sale of a security;
14          (4) reliance upon the misrepresentation or omission;
             (5) economic loss; and
15          (6) loss causation.

16 *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1191–92 (2013). Only

17 the first and second elements—material falsity and scienter—are presently at issue.

18   As to falsity, a statement or omission is misleading if "it would give a reasonable investor

19 the impression of a state of affairs that differs in a material way from the one that actually exists."

20 *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks

21 and citation omitted). For § 10(b) claims, "a statement of opinion or belief is false or misleading

22 'if (1) the statement is not actually believed [by the speaker], (2) [it is believed by the speaker,

23 but] there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts

24 tending to seriously undermine the statement's accuracy.'" *In re Appollo Group Inc. Sec. Litig.*,

25 509 F. Supp. 2d 837, 844 (D. Ariz. 2007) (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir.

26 1994)).[10] "To satisfy the materiality requirement, a plaintiff must allege a statement or omission

27

28          [10] LVS twice cited the incorrect legal rule for statements of opinion or belief. (Dkt No. 92 at
12:16–18; Dkt No. 94 at 19:17–20.) LVS cited the rule for Securities Exchange Act § 11 rather than § 10.

1  that a reasonable investor would have considered significant in making investment decisions."

2  *City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1060–61

3  (N.D. Cal. 2012). Likewise, "an omission is material if there is a substantial likelihood that the

4  'disclosure of the omitted fact would have been viewed by the reasonable investor as having

5  significantly altered the total mix of the information made available.'" *Id.* at 1061 (quoting *TSC*

6  *Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

7      Scienter is "the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v.*

8  *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

9  > Scienter can be established by intent, knowledge, or certain levels of recklessness.
> . . . Scienter requires either deliberate recklessness or conscious recklessness—a
10 > form of intent rather than a greater degree of negligence. . . . The ultimate question
> is whether the defendant knew his or her statements were false, or was consciously
11 > reckless as to their truth or falsity."

12 *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation

13 marks and citation omitted).

14     Weidner does not offer any arguments as to his individual liability under § 20(a). Adelson

15 argues only that he is not liable under § 20(a) because there is no primary liability under § 10(b),

16 a prerequisite to § 20(a) liability. The Court thus assesses only the § 10(b) claims.

17     **2.   PSLRA Safe Harbor**

18     Certain types of statements are inactionable as falling within the statutory "safe harbor" of

19 the PSLRA for forward-looking statements. 15 U.S.C. § 78u-5(c)(1). There are two relevant

20 circumstances that provide safe harbor protection: (1) under § 78u-5(c)(1)(A)(i), if the forward-

21 looking statements were identified as such and accompanied by meaningful cautionary language;

22 and (2) under § 78u-5(c)(1)(B), if the plaintiffs fail to prove the forward-looking statements were

23 made with actual knowledge that they were materially false or misleading. *Id.*; *In re Cutera Sec.*

24 *Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010). The statute is written in the disjunctive as to

25 these two subparts. *Id.* at 1112. Accordingly, "[u]nder subsection (A)(i) … , if a forward-looking

26

27 The rule for § 11 is that the plaintiff must allege that the statement is both objectively *and* subjectively
false. Defendant's incorrect rule places a much higher burden on the plaintiff because objective *and*
28 subjective falsity must be shown, while the correct rule (§ 10) requires only objective *or* subjective falsity.

1    statement is identified as such and accompanied by meaningful cautionary statements, then the

2    state of mind of the individual making the statement is irrelevant, and the statement is not

3    actionable regardless of the plaintiff's showing of scienter." *Id.* A cautionary statement is

4    "meaningful" if it "identifi[es] important factors that could cause actual results to differ materially

5    from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

6            The Court previously held that LVS provided meaningful cautionary statements on calls,

7    in press releases, and in the other relevant documents. (Dkt. No. 55 at 10.) Plaintiffs do not

8    assert that the allegedly forward-looking statements were not identified as such. Thus, the Court

9    examines only whether the statements were forward-looking. In pertinent part, a "forward-

10   looking statement" is:

11           (A) a statement containing a projection of revenues, income (including income
             loss), earnings (including earnings loss) per share, capital expenditures . . . , or
12           other financial items;

13           (B) a statement of the plans and objectives of management for future
             operations . . . ;
14

             (C) a statement of future economic performance . . . ; [or]
15

             (D) any statement of the assumptions underlying or relating to any statement
16           described in subparagraph (A), (B), or (C) . . . ."

17   15 U.S.C. § 78u-5(i)(1). "A present tense statement can qualify as a forward-looking statement as

18   long as the truth or falsity of the statement cannot be discerned until some point in time after the

19   statement is made." *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal.

20   2012); *In re Copper Mountain Secs. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004).

21           Courts have routinely held that statements of expectations of capital expenditures are

22   forward-looking even if those statements are prefaced by present tense phrasing such as "we

23   expect." *Harris v. Ivax Corp.*, 182 F.3d 799, 804–06 (11th Cir. 1999); *In re Lyondell Petrochem.*

24   *Co. Sec. Litig.*, 985 F.2d 573 at *3 (9th Cir. 1993) (unpublished) ("we expect" signifies forward-

25   looking statement under the "bespeaks caution" doctrine, the judicially-created predecessor to the

26   PSLRA's safe harbor); *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1197–98 (D.

27   Nev. 2011) (The "statements . . . fall[] squarely within the definition of forward-looking

28   statements protected under the PSLRA's safe harbor, and were identified as such due to the use of

6

1  language such as 'we expect[.]'"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 479 n.156

2  (S.D.N.Y. 2010); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1045–46 (N.D.

3  Cal. 2007); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1154 (W.D. Wash. 2006).

4  On the other hand, courts are split as to whether forward-looking statements combined

5  with current or historical elements fall within the safe harbor. *Szymborski*, 776 F. Supp. 2d at

6  1198–99. In the case at bar, the Court previously held that such statements are *not* forward-

7  looking, and sees no reason to depart from that stance at this time. (Dkt. No. 86 at 3.)

### 3.  Inactionable Optimism

9  Statements that are vaguely optimistic are likewise inactionable. *See In re Cutera Sec.*

10  *Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Such statements are immaterial because they are so

11  exaggerated or vague "that a reasonable investor would not rely on [them] in considering the total

12  mix of available information." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200–01

13  (3d Cir. 1990) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Such

14  statements are often so subjective that they defy objective verification; feel-good monikers such

15  as "well-regarded," "robust," "well-positioned," "solid," "improved," "better than expected," and

16  "unfolding as planned" are too generalized and amorphous for a reasonable investor to rely upon.

17  *In re Cutera*, 610 F.3d at 1111; *In re Wet Seal Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal.

18  2007); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001).

### 4.  Applicable Pleading Standard

20  "At the pleading stage, a complaint stating claims under section 10(b) and [SEC] Rule

21  10b-5 must satisfy the dual pleading requirements of [Rule] 9(b) and the PSLRA." *Zucco*

22  *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Because the requirements

23  under the PSLRA are "more exacting" than under Rule 9(b), however, the Court need only assess

24  the SAC under the PSLRA's requirements. *See id.* Under the PSLRA, the complaint must

25  "specify each statement alleged to have been false or misleading, [and] the reasons why the

26  statement is misleading." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

27  For scienter, "the complaint shall, with respect to each act or omission alleged to violate

28  this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted

7

with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The Supreme Court has interpreted "strong inference" to mean that a claim "will survive . . . only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added). In other words, the "tie goes to the Plaintiff." *Comm'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007). The court still must deem all well-pleaded factual allegations as true, but the court also must "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . , but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. On a Rule 12(b)(6) motion to dismiss, the court shall consider the complaint, "documents incorporated into the complaint, and matters of which a court may take judicial notice." *Id.* at 322. The court must review "'all the allegations holistically'" rather than tallying each individual allegation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (quoting *Tellabs*, 551 U.S. at 326).

Where the plaintiff claims that a top manager or executive acted with scienter, it is insufficient to merely allege that she knew the true facts by virtue of her hands-on position and involvement in the day-to-day management of the company. *In re Peerless Systems, Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 983 (S.D. Cal. 2002). Corporate knowledge may be imputed to a top manager in three instances:

> First, the allegations [regarding management's role in a company] may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S.Ct. at 2510. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information[.] . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. *See Applied Signal*, 527 F.3d at 988 (internal quotation marks omitted).

8

1    *South Ferry*, 542 F.3d at 785–86. Some incidents alone are insufficient, such as signing an SEC

2    filing, publishing inaccurate accounting figures, or sitting on an internal committee. *In re*

3    *REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010); *In re Hansen Natural*

4    *Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158–59 (C.D. Cal. 2007). A manager's role viewed in

5    its totality, however, is sufficient if her job positions, job duties, and access to corporate reports

6    and information systems give rise to a strong inference of scienter. *In re Countrywide Fin. Corp.*

7    *Sec. Litig.*, 588 F. Supp. 2d 1132, 1194 (C.D. Cal. 2008).

8    Finally, falsity and scienter are generally a unitary inquiry, as the two are inferred from

9    the same set of facts. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002),

10   *abrogated on other grounds as recognized by Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir.

11   2010).

12   **B. Application of Law to Facts**

13   **1. Weidner's Motion to Dismiss**

14   Weidner contests his primary liability under § 10(b) with three challenges to scienter:

15   (i) Plaintiffs' attempt to impute corporate knowledge to him fails; (ii) Plaintiffs' allegations do

16   not support a strong inference of scienter; and (iii) the opposing inferences of scienter are more

17   compelling. (Dkt. No. 92.)

18   As to the imputation of corporate knowledge, Weidner's argument fails. Plaintiffs rely

19   primarily on Weidner's position as President, Chief Operating Officer ("COO"), and Board

20   member with hands-on, day-to-day management; standing alone, this is insufficient. But

21   Plaintiffs also allege that (i) Weidner participated in various conference calls concerning project

22   costs and budgeting (and thus would have been aware of the substance of the calls);

23   (ii) Weidner's e-mail of September 5, 2007 discussed an alleged misquote of 40% cost overruns

24   (implying that Weidner was aware of projected construction costs); (iii) Weidner's e-mail of

25   November 11, 2008 shows knowledge of "recently announced" financing; (iv) an *Associated*

26   *Press* article quoted Weidner as saying that the topic of raising capital was "a matter of robust

27   debate" (implying that Weidner had knowledge of the capital situation); (v) Weidner had

28   knowledge of internal LVS documents, including investment banking materials; and (vi) Weidner

1   acknowledges contemporaneous awareness of the LVS documents cited in the SAC by arguing

2   that those documents gave him a reasonable basis to make his allegedly false statements. Taken

3   together, these allegations give rise to a sufficiently "strong inference" of scienter. 15 U.S.C.

4   § 78u-4(b)(2). Moreover, it would be difficult to believe that Weidner, as COO and board

5   member, was not aware of the capital and budget situation of multi-billion dollar projects at the

6   core of LVS's expansion plans.[11]

7           The new factual allegations supporting the alleged misrepresentations that Weidner made

8   during the Earlier Class Period sufficiently plead falsity and scienter. The Court previously held

9   that falsity and scienter were sufficiently pled for the Later Class Period; that reasoning stands

10  and now extends to the Earlier Class Period. (*See* Dkt. Nos. 55, 86.) Weidner made a series of

11  public statements on material issues that appear inconsistent with what he allegedly knew

12  (actually and by imputation).

13          As to the competing inferences of innocent conduct, Weidner argues that (i) the internal

14  documents relied upon by Plaintiffs provided Defendants with a reasonable basis for their

15  statements concerning financing and development programs; (ii) LVS thoroughly disclosed its

16  financing, budgeting, and associated risks; and (iii) he had no personal motive to deceive. As

17  discussed in more detail below, the internal documents that Weidner references do not carry the

18  day as he asserts. While they contradict some of Plaintiffs' allegations, they do not give rise to an

19  inference of innocent behavior that is more compelling than the inference of scienter. Lastly, that

20  Weidner may not have had a clear motive is of little import at this stage, as the absence of a

21  motive allegation is not fatal. *Tellabs*, 551 U.S. at 308.

22          The claims under § 10(b) and § 20(a) against Weidner will proceed.

23

24

25

26          [11] In reaching this conclusion, the Court has not considered the allegations of scienter raised in
    Plaintiffs' opposition to the Weidner Motion. *See Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194,
27  1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look
    beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's
28  motion to dismiss (emphasis in original)).

1

2. **The LVS Defendants' Motion to Dismiss**

2

3

    a.   **Contradictions: Factual Allegations and Newly-Cited Documents**

4

     LVS asserts that the allegedly false statements about debt financing and LVS's flexibility

5

in obtaining financing (i.e., LVS's liquidity) should be dismissed because the documents newly-

6

cited in the SAC contradict the facts necessary to sufficiently allege falsity and scienter regarding

7

those statements. (Dkt. No. 94 at 17–25.) LVS challenges what it labels as Plaintiffs'

8

"foundational allegations": (i) LVS sought and was denied significant financing (up to $10

9

billion) in 2007; (ii) LVS knew (as early as August 2007 and no later than early 2008) that it

10

would not be able to obtain debt financing to complete the Cotai Strip project; (iii) LVS knew (as

11

early as August 2007 and no later than early 2008) that it would have to issue equity to avoid a

12

liquidity crisis and covenant breach; and (iv) LVS therefore knew that its development projects

13

were not financially sustainable. (*Id.* at 18–19.)

14

     LVS first counters these "foundational allegations" by asserting that the documents show

15

that financing was available in 2007 in the U.S., Macao, and Singapore. These documents

16

demonstrate that LVS obtained $800 million in Macao financing in early 2007. But they do not

17

contradict Plaintiffs' allegation that LVS could not obtain the $7.5–$10 billion that it needed and

18

sought. A factual issue remains as to what amount of funding LVS actually sought, not just what

19

it obtained. LVS argues that Exhibits I and J to its motion to dismiss show that bankers were

20

confident about future financing in the U.S. Plaintiffs successfully counter that the potential

21

adverse events listed in Exhibit I as preclusive of any new debt financing had already come to

22

pass. In other words, the bankers' confidence was illusory and/or unreasonable because the

23

events that could make the potential deal a nullity had already occurred. As to additional debt

24

financing in Asia, LVS contests that Exhibit L shows that bankers were similarly confident. But

25

the precise phrase LVS relies upon is quite general: "the Asian loan market has been relatively

26

insulated where ample liquidity remains available, although the bank market here is also

27

exercising more caution in terms of underwriting, structure, and pricing." (Ex. L at 30797.) The

28

factual issue remains as to whether LVS was in a good position to access this credit market.

11

1          LVS next argues that debt financing was available in 2008.  LVS relies on Exhibit Q to

2    assert that Goldman Sachs appeared to believe that more credit was available, but this document

3    speaks more to need than to ability and admits that the dollar amount at issue would only fund

4    three of the remaining six project sites in Macao.  A similar Citigroup document states that the

5    $5.0 billion in play would only fund about half of the $10 billion allegedly needed.  (Ex. R.)

6    Another Goldman Sachs document states the need for $5.7 billion through 2011, and that an

7    amendment to the Macao credit facility would be "very difficult."  (Ex. N.)  While Plaintiffs rely

8    heavily on this document for the allegation that Goldman Sachs directly advised LVS to slow

9    development in Macao, LVS is correct that Goldman Sachs only suggested that LVS *consider*

10   slowing down.  Thus, the court does not deem as true the allegation that Goldman directly

11   advised LVS to slow down.  Another document by Goldman Sachs states that bank and bond

12   markets remained challenging, and that liquidity was "more scarce and costly."  (Ex. O, April 9,

13   2008.)  At that time, Goldman Sachs recommended only $2.0–$3.0 billion in the short term and

14   more financing later when the markets rebounded (assuming of course they would rebound in

15   time).

16         LVS points to various public statements in SEC filings and conference calls to assert that

17   LVS adequately warned the public that additional financing was needed yet not guaranteed.  But

18   LVS is not inoculated against liability by blanket disclaimers of "no guarantee" in the face of

19   more specific statements.  *Cf. In re Am. Apparel, Inc. Shareholder Litig.*, ("General, nonspecific

20   cautionary statements are insufficient" for the PSLRA safe harbor.)  For example, a reasonable

21   investor could have relied upon LVS's more specific statement during the April 30, 2008 earnings

22   call that "[w]e believe we have ample access to the credit markets" instead of a more generalized

23   warning in a previous SEC filing.  (Dkt. No. 87 ¶ 375.)

24         The newly-cited documents sharpen the factual issues but do not directly contradict the

25   assertion that LVS knew or recklessly disregarded that it did not have access to sufficient

26   liquidity.  Even if LVS obtained additional debt financing and was working with banks to acquire

27   even more—which appears to be true—the documents do not counter Plaintiffs' allegations that

28   the financing actually obtained was insufficient to fund the projects and that the reduced revenues

1    and EBITDA from LVS's operations were insufficient to prevent violations of the loan
2    covenants.

3                        **b.      Third-Party Statements**

4           The SAC includes several statements by third parties such as the press and securities
5    analysts. (Dkt. No. 87 ¶¶ 296, 298, 300, 422.) If a company intentionally misleads securities
6    analysts and the press, then their reports are relevant to determine the company's securities fraud
7    liability under Section 10(b) and Rule 10b-5. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th
8    Cir. 1996). A company "cannot escape liability simply because it carried out its alleged fraud
9    through the public statements of third parties." *Id.* However, a company is liable for false or
10   misleading statements by a third-party only "if the [company] either expressly or impliedly adopts
11   or endorses the statements . . . or provides the [third-party] with false or misleading information
12   with the intent that the [third-party] will communicate that information to the market." *In re*
13   *Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (citing *Cooper v.*
14   *Pickett*, 137 F.3d 616, 624 (9th Cir. 1997); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th
15   Cir. 1996)). Put differently, a third-party statement is actionable under the conduit theory of
16   liability only if the company has placed its "imprimatur" on the statement such that it is
17   attributable to the company. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d
18   1226, 1234–35 (9th Cir. 2004).

19          Paragraphs 296 and 422 are actionable because they directly cite Weidner and Adelson as
20   sources, respectively. The information is thus attributable to them as individuals and to LVS.
21   Although intent to deceive is not directly alleged, the Court infers it from the totality of the
22   alleged misrepresentations and supporting factual allegations. *See Tellabs*, 551 U.S. at 326.

23          Paragraph 298 includes several media reports from August and September 2007 stating
24   that the cost of the then-recently completed Venetian Macao Resort Hotel on Cotai was $2.4
25   billion. (Dkt. No. 87 ¶ 298.) Plaintiffs contend the $2.4 billion figure was materially false and
26   misleading because Defendants knew that the true cost of the Venetian Macao was above $3.0
27   billion, as evidenced by an approved construction budget from May 2007. (*Id.* ¶ 299.) Plaintiffs,
28   however, fail to sufficiently explain how these press reports are attributable to Defendants.

1     Plaintiffs allege only that LVS "represent[ed] to the media that the Venetian Macao cost $2.4

2     billion." (*Id.*) On this generalized allegation alone, the $2.4 billion figure did not "clearly

3     originate[]" from any of the Defendants. *Nursing Home Pension Fund*, 380 F.3d at 1235. Nor is

4     there any indication that any of the Defendants expressly or impliedly adopted or endorsed the

5     third-party statements. The third-party statements in ¶ 298 are thus inactionable.

6             Paragraph 300 includes a *Bloomberg News* report from August 28, 2007 stating that the

7     Singapore project may incur a cost increase of 40 percent. *Bloomberg News* apparently relied on

8     a *Straits Times* report which in turn cited Weidner as the source of the cost data. Although the

9     *Straits Times* was an intermediary reporter, the direct citation to Weidner is sufficient to attribute

10    the *Bloomberg News* report to Weidner and to LVS. Weidner appears to have used the press as a

11    conduit for the cost data. The LVS Defendants argue that the *Bloomberg News* statement should

12    be struck because Plaintiffs do not allege that it was false or misleading. Plaintiffs, however, use

13    the *Bloomberg News* statement not for its own truth or falsity but rather to support the contention

14    that LVS later falsely stated that Weidner was misquoted in the *Bloomberg News* article. (*Id.*

15    ¶¶ 301–303.) Consequently, the *Bloomberg News* statement in ¶ 300 is actionable.

16                            **c.      Earlier Class Period**

17            In contrast with the First Amended Complaint, the SAC includes detailed allegations of

18    both the falsity of Defendants' statements made during the Earlier Class Period and Defendants'

19    scienter for those statements. The Court previously identified three categories of Defendants'

20    alleged misrepresentations: (1) costs for planned development projects; (2) LVS's liquidity, cash

21    flow, need for equity, and ability to obtain financing to complete its planned projects; and (3)

22    operating conditions in Macao. (Dkt. No. 55.) The Court explained that Plaintiffs had

23    sufficiently pled falsity and scienter for the Later Class Period, and that reasoning now applies to

24    the Earlier Class Period in light of the new allegations for the Earlier Class Period. The first date

25    of actionable alleged misconduct is thus August 2, 2007. As noted below, however, some of the

26    allegedly false and misleading statements are struck as forward-looking, vaguely optimistic,

27    immaterial, and/or unchallenged statements of historical fact.

28

                                                      14

#### d.    Later Class Period

The Court previously certified the class for the Later Class Period, and that determination stands. Plaintiffs have sufficiently pled falsity and scienter for nearly all of the newly-added statements made during the Later Class Period. With particular respect to the Four Seasons apartment sales, the Court strikes several allegations in their entirety because falsity is not sufficiently pled. Plaintiffs contest that these statements were misleading because LVS could not sell the apartments in time to fund ongoing construction and because internal LVS documents showed that zero revenue was expected from the sales. However, the related statements in the SAC do not actually assert that the sales proceeds would be used to fund ongoing construction.

#### e.    Reconsideration of Previously-Stricken Statements

Plaintiffs argue that the Court should reconsider various statements it struck as vaguely optimistic because objective facts now show the statements were false. The legal standard, though, is not whether any facts contradict the statement, but whether the form of the statement is such that a reasonable investor would not rely on it, generally because there is no objective standard by which the statement could be measured. *In re Cutera*, 610 F.3d at 1111; *Hoxworth*, 903 F.2d at 200–01. The Court will not disturb its prior determinations of vague optimism.

Plaintiffs next argue that some of the forward-looking statements should be "unstruck" because they were mixed statements of current or historical elements and future projections. As Plaintiffs recognize, the Court previously held that those statements are actionable (e.g., that a company is "on-track" to achieve a certain goal.) (Dkt. No. 86 at 3.) "On-track" implies a present, verifiable condition. (*Id.*)

In particular, Plaintiffs want to "unstrike" statements asserting that a certain dollar amount was needed to complete a project. Plaintiffs' theory is that "LVS's actual funding needs and the level of funding it had sought to obtain are not forward-looking statements." (Dkt. No. 97 at 33.) Plaintiffs are correct that the amount sought is not forward-looking, but the amount expected to be sufficient to complete a project is forward-looking because the amount ultimately needed to complete a project cannot be known until project completion. Any statement by Defendants as to

1   an amount sought would be actionable, but Defendants' statements as to expected future

2   expenditures or needs do not amount to assertions of amounts sought.

3          To the extent that Plaintiffs contend that a statement of future expectation should be

4   understood as an inherent statement of present condition -- in that a future expectation must be

5   based on some form of present knowledge -- the policy underlying the PSLRA safe harbor and

6   the Ninth Circuit's interpretation of the safe harbor statute in *In re Cutera* counsel against that

7   understanding.

8          The policy objective of the PSLRA safe harbor is to "encourage disclosure of forward-

9   looking information by reducing the very real threat of expensive litigation (regardless of its

10   outcome). . . . In other words, Congress was seeking . . . to eliminate [strike suits] that were

11   'muzzling' corporate managers." Ann Morales Olazábal, *False Forward-Looking Statements &*

12   *the PSLRA's Safe Harbor*, 86 IND. L.J. 595, 628–29 (2011) (citing the PSLRA's legislative

13   history). The House Conference Committee stated:

14          Abusive litigation severely affects the willingness of corporate managers to
            disclose information to the marketplace. . . . Shareholders are also damaged due to
15          the chilling effect of the current system on the robustness and candor of
            disclosure. . . . Understanding a company's own assessment of its future potential
16          would be among the most valuable information shareholders and potential
            investors could have about a firm.
17
            Fear that inaccurate projections will trigger the filing of securities class action
18          lawsuits has muzzled corporate management.

19   H.R. Rep. No. 104-369, at 42–43 (1995) (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 741–

20   42 (internal quotation marks omitted). The Senate Report similarly stated:

21          Private securities class actions under 10b-5 inhibit free and open communication
            among management, analysts, and investors. This has caused corporate
22          management to refrain from providing shareholders forward-looking information
            about companies. . . . *As a result, investors often receive less, not more,*
23          *information, which makes investing more risky and increases the cost of raising*
            *capital.*
24

25   S. Rep. No. 104-98, at 5 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 684 (emphasis added).

26          In short, Congress designed the safe harbor to allow companies to safely share future

27   expectations by minimizing the risk of frivolous "fraud by hindsight" lawsuits. Congress'

28   apparent understanding was that the investing public obtains a net benefit from the increased

16

1    information, even if there is some risk of forward-looking statements being inaccurate. Thus,

2    proper disclosure and meaningful cautionary statements put the investing public on notice of

3    issues it should consider and/or investigate before investing.

4         "Meaningful cautionary statements" serve to temper the risk that a company will use

5    misleading forward-looking statements to stir investor frenzy and drive up share prices. *See*

6    Olazábal, *False Forward-Looking Statements*, *supra*, at 640–41. To do this, "meaningful

7    cautionary statements" must provide "'substantive information about factors that realistically

8    could cause results to differ materially from those projected in the forward-looking statement,'"

9    as opposed to mere boilerplate warnings. *Id.* (quoting H.R. Rep. No. 104-369, at 43 (1995)

10   (Conf. Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 742). The enacted statute states: "meaningful

11   cautionary statements identify[] important factors that could cause actual results to differ

12   materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

13        To the extent that Plaintiffs argue that LVS's cautionary statements were not

14   "meaningful" because they did not warn that certain risks were either highly likely to occur or

15   had already come to pass, that is inherently an inquiry into the speaker's state of mind. *See*

16   *Slayton*, 604 F.3d at 771 ("In order to assess whether an issuer has identified the factors that

17   realistically could cause results to differ, we must have some reference by which to judge what

18   the realistic factors were at the time the statement was made. We think that the most sensible

19   reference is the major factors that the defendants faced at the time the statement was made. But

20   this requires an inquiry into what the defendants knew because in order to determine what risks

21   the defendants faced, we must ask of what risks were they aware.").

22        This inquiry would impermissibly collapse the two, separate safe harbor provisions of 15

23   U.S.C. § 78u-5(c)(1)(A)(i) and (B) into one. *In re Cutera*, 610 F.3d at 1112 ("[T]he plain

24   language of the statute . . . is written in the disjunctive as to each subpart."). As *In re Cutera*

25   held, the speaker's state of mind is irrelevant if a forward-looking statement is identified as such

26   and accompanied by meaningful cautionary language. *Id.* at 1113. Analyzing the

27   meaningfulness of cautionary language by inquiring into the speaker's state of mind thus violates

28   the Ninth Circuit's holding in *In re Cutera*. *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp.

2d 1052, 1067 (C.D. Cal. 2012); *Szymborski v. Ormat Tech., Inc.*, 776 F. Supp. 2d 1191, 1198 n.2 (D. Nev. 2011); *City of Marysville Gen. Employees Retirement Sys. v. Nighthawk Radiology Holdings, Inc.*, 2011 WL 4584778 (D. Idaho 2011). The speaker's state of mind is relevant only for the separate inquiry under subpart (B). If a forward-looking statement is unprotected under subpart (A)(i) because it was not identified as forward-looking or not accompanied by meaningful cautionary language, it is actionable only if the plaintiff proves that it was made with actual knowledge of falsity.

The facts of *In re Cutera* shed light on its holding. There, the plaintiffs claimed that the defendant, Cutera, provided false and misleading revenue projections and failed to disclose material information about the shortcomings of Cutera's junior sales staff concerning a new product roll-out. *In re Cutera*, 610 F.3d at 1106. The plaintiffs alleged that Cutera knew that the junior sales program was insufficient to sell the product yet still projected healthy earnings. The Ninth Circuit held that Cutera's knowledge was irrelevant under subpart (A)(i). Cutera's warning that success depended on the ability of its sales force to sell new products to new customers and upgraded products to current customers was sufficient. The court thus implied that even if Cutera knew that its junior sales force was not up to snuff, the warning that success depended on the ability of that same sales force was sufficient for the PSLRA safe harbor.

Here, the cautionary statements meet the statutory requirements. LVS warned of specific potential risks, such as: (i) LVS's substantial debt could impair its financial condition; (ii) LVS was highly leveraged; (iii) LVS was dependent on cash flow from properties in two markets, putting it at greater risks than a gaming company with more operating properties in more markets; (iv) the lack of a fixed-price construction contract would put the risk of cost overruns on LVS directly rather than on a separate general contractor; and (v) the terms of its then-present credit instruments could restrict its current and future operations. (Dkt. No. 37-7 at 26–28.) LVS's cautionary statements identified the important factors that could cause actual results to differ from the projections. 15 U.S.C. § 78u-5(c)(1)(A)(i). The investing public had sufficient notice and information to independently determine whether the warned-of risks rendered LVS stock an unwise investment at the time. Similar to the cautionary statements upheld in *In re Cutera*, LVS

1    provided specific warnings about various possible pitfalls, including construction cost overruns,

2    liquidity problems, and cash flow problems, and those warnings encompassed the risks that

3    Plaintiffs allege had already come to pass.[12]

4           In sum, the § 10(b) and § 20(a) claims survive, albeit in modified form.  The Court strikes

5    portions of the alleged misrepresentations as forward-looking, vaguely optimistic, immaterial,

6    and/or unchallenged statements of historical fact.  Several statements are struck in their entirety as

7    insufficiently pled as to falsity and/or scienter.  Attached hereto as Exhibit 1 are the Court's edits

8    to the statements pled in the SAC.

9

10   **III.    CONCLUSION**

11          Plaintiffs' claims under Securities Exchange Act § 10(b) and § 20(a) survive.  Plaintiffs

12   have sufficiently pled falsity and scienter for the Earlier Class Period such that the first date of

13   actionable alleged misconduct is August 2, 2007.  Accordingly, the Court hereby **ORDERS**:

14          1.  The LVS Defendants' motion to dismiss (Dkt. No. 94) is **GRANTED in part and**
15              **DENIED in part**.

16          2.  Weidner's motion to dismiss (Dkt. No. 92) is **GRANTED in part and DENIED in**
                **part**.

17          3.  The allegedly false statements identified in the Second Amended Complaint are
18              actionable as modified in Exhibit 1 of this Order.

19          4.  The Court will entertain a motion to expand the Class Period in accord with the first
                date of actionable alleged misconduct identified in this Order.
20

21          DATED this 7th  day of November, 2013.

22

23

24                                                  ANDREW P. GORDON
                                                    UNITED STATES DISTRICT JUDGE
25

26

27          [12] The Court has reviewed Plaintiffs' Notice of Supplemental Authority and the LVS Defendants'
     Response thereto (which Weidner joined).  (Dkt. Nos. 115–17.)  The Court is not persuaded by Plaintiffs'
28   arguments and relies on *In re Cutera* as binding Ninth Circuit precedent.  610 F.3d 1103.

## **EXHIBIT 1**

### **THE STATEMENTS AS MODIFIED**

A double strikethrough indicates the statement was stricken in the court's prior order (Dkt. No. 86). A single strikethrough indicates the statement is newly stricken in this Order. The paragraph numbering is from the SAC. Some statements include bracketed numbers for clarity; the numbering is based upon, but is not identical to, LVS Exhibit B. (Dkt. No. 94-2.) As appropriate, the Court explains the reason for striking a statement; such explanations are in bold face, italicized, and in brackets. Where unchallenged statements of historical fact are necessary for context, the Court leaves them in. *See South Ferry*, 399 F. Supp. 2d at 1129.

¶ 289. [Weidner:] We have continued to execute our development plans for the Cotai Strip in all areas. We recently commenced our international marketing programs, which are designed to transform Macao into a multi-night stay international destination . . . .

We have advanced the leasing of our retail space on the Cotai Strip . . . . Our convention, tour and travel, and corporate meetings businesses are each ready to begin operations concurrently with the grand opening of The Venetian Macao. In addition, our construction, design and development work on each of our other six sites on the Cotai Strip continued to progress, and we continued to advance our master-plan to develop a complementary trade-fair, convention, and leisure destination on Hengqin Island, in Zhuhai of the People's Republic of China and adjacent to the Cotai Strip. Finally, we completed a $5.0 billion credit facility which simplified our administrative reporting requirements and significantly increased our flexibility to move quickly to take advantage of emerging development opportunities worldwide.

¶ 293. ~~Currently, we expect the total cost of development on the Cotai Strip to be in the range of $9.0 billion to $11.0 billion.~~ *[forward-looking]*[13]

¶ 294. ~~[W]e expect [improvements to Sands Macao] to be completed in September 2007 and to cost approximately $100.0 million.~~ *[forward-looking]*

¶ 295. [1] ~~We expect the cost to develop and construct the Marina Bay Sands integrated resort will be approximately $3.6 billion,~~ [2] ~~inclusive of $811.7 million paid in 2006 for the land premium, taxes and other fees.~~ *[Part [1] is forward-looking. Part [2] is stricken as a statement of historical fact that is unchallenged and immaterial without part [1].]*

---

[13] The Court's notation that a statement is "forward-looking" indicates that the statement falls within the PSLRA safe harbor for forward-looking statements that are identified as such and accompanied by meaningful cautionary statements. 15 U.S.C. § 78u-5(c)(1)(A)(i).

¶ 296. [1] Las Vegas Sands won't slow down its development in Macau, the company's president and chief operating officer, William Weidner, said in an interview today.

[2] "We think it's a big mistake," Weidner said of Wynn's strategy. "~~We'll build more and more and more~~." *[forward-looking]* He didn't elaborate. *[This statement survives, but Plaintiffs may not rely on the allegations in ¶ 297(a) and (b) because the August 31, 2007 LVS internal profit and loss statements postdate this statement by four days.]*

¶ 298. [*Associated Press Wire*:] ~~American billionaire Sheldon Adelson and his wife Miriam inaugurated the $2.4 billion Venetian Macao Resort Hotel on Cotai by smashing a bottle of champagne against a gondola, which will float down one of three indoor canals, compared with only one at the Venetian in Las Vegas.~~

[Bear Sterns' Analyst Report:] ~~The Venetian Macao opened for business today with tens of thousands of guests and more than 1,200 members of the media in attendance. The $2.4B facility is the largest hotel in Asia and second largest building in the world.~~

[*Associated Press Wire*:] ~~The $2.4 billion Venetian Macao opened late last month, and has been widely cheered by analysts for its initial performance~~.

*[third-party statements not attributable to any of the Defendants]*

¶ 300. [*Bloomberg News*:] Las Vegas Sands Corp. said building costs for its Singapore gaming resort may be as much as 40 percent higher than projected, the Straits Times reported, citing William Weidner, the casino operator's president.

The Marina Bay Sands casino may cost as much as $1.4 billion more than the initial $3.6 billion estimate because of higher construction and sand prices, as well as design changes, the newspaper said.

¶ 302. [1] We're working our way through [Singapore capital expenditure budgets], Joe. [2] We have some challenges in Singapore, in terms of the cost structure that is happening in that country. I think it's well documented that certain materials—I think at one point Bill was misquoted as saying, you know, the costs are up 40%. There are items and line items in our construction budget, particularly as it relates to concrete and things of that and sand because of raw materials that are up significantly.

[3] We're dialing in on that now. [4] ~~It's going to be above our original budget by a reasonable number,~~ [5] but we think that, as we work our way through, we are finding that certain aspects, particularly superstructures of the building, we are paying a premium for, whereas many of the things like mechanical/electrical finishes and all are being rationally priced in the marketplace. [6] ~~So we will be coming out with some color on that,~~ [7] but we're working through those issues as we speak. [8] ~~But you can expect to see that project go up in price because of the realities of that marketplace.~~ *[forward-looking]*

¶ 305. [Weidner:] [1] ~~We remain confident~~ [2] ~~and The Venetian Macao's operating results confirm, that the execution of our strategy~~ [3] ~~will deliver tremendous economic benefits to Macao and the entire region, as well as industry-leading returns to our shareholders.~~[4] We expect the maturation of all the property's elements to continue over the coming months, and [5] ~~we expect to increasingly drive revenue and margin from the property as the maturation process for all our businesses continues in the months and years ahead.~~" *[Vague optimism; the remainder is unchallenged statement of historical fact.]*

¶ 306. [Weidner:] [1] ~~Our corporate meeting and convention businesses are also off to a strong start,~~ [2] ~~our Non-Rolling table drop has increased by 32% in October compared to September, and~~ [3] ~~volumes in our VIP gaming business have been outstanding and have clearly exceeded our expectations~~. *[Parts [1] and [2] are uncontested statements of historical fact.]*

* * *

[4] ~~Importantly, the Macao gaming market continues to expand~~ [5] ~~in response to the addition of high-quality capacity,~~ [6] ~~with gross gaming win increasing by over 50% in the Macao market overall for the quarter ended September 30, 2007, compared to the same quarter in 2006. This continuing strong growth in the Macao marketplace,~~ [7] ~~coupled with the overwhelmingly positive reception the public has show the Venetian Macao, provide positive momentum~~ [8] ~~as we expand our tradeshow, convention, corporate meeting, entertainment and retail offerings and amenities in the weeks and months ahead.~~ *[The newly-stricken portion of part [4] is immaterial. Part [6] is an uncontested statement of historical fact. Part [8] is uncontested.]*

* * *

[9] With the Venetian Macao now successfully open, [10] we have continued to steadily execute our development, marketing and promotional plans for the Cotai Strip, Macao, Hong Kong and the wider region.

* * *

[11] Our success in each of our business segments – Hotel, Retail, Entertainment, Group Meeting, Convention, and Gaming, [12] ~~provide a fertile ground for us to begin to orchestrate these elements for maximum utility.~~ *[vague optimism]* [13] ~~As each of these businesses continues to grow, we expect to tailor our services to increase our total revenue and maximize our operating income yield from the multiple business and customer segments we serve.~~ [14] ~~In October, our Non-Rolling chip table games drop increased by 32% compared to September. This positive upward trend in Non-Rolling chip table games drop at The Venetian Macao is consistent with the Non-Rolling chip table games drop trends reflected in the early days and weeks of the Sands Macao,~~ *[unchallenged statement of historical fact]* [15] ~~and is an indication that the mass gaming floor of the property is beginning to mature.~~ *[vague optimism]* [16] ~~We expect the maturation of all the~~

1   ~~property's elements to continue over the coming months~~ *[forward-looking, vague*
2   *optimism]*, and [17] ~~we expect to increasingly drive revenue and margin from the property as the maturation process for all our businesses continues in the months and years ahead.~~

3   [18]~~In addition, our construction, design and development work on each of our other six~~
4   ~~sites on the Cotai Strip has continued to progress.~~

5   \* \* \*

6   [19]~~We continue to see strong performance across the board at The Venetian Las Vegas,~~
7   ~~continued Weidner~~ . . . [20] "~~Although~~ our quarterly results were negatively impacted by a ~~lower than normal hold percentage,~~ [21] ~~the benefits of our targeted capital investments~~
8   ~~have continued to contribute to growth.~~ [22] ~~Our gaming volumes were strong,~~ [23]~~as~~
9   ~~table games drop increased nearly 35% year over year.~~ *[Parts [20], [22], and [23] are uncontested and unnecessary for context.]*

10  ¶ 308.  [Weidner:] [1]~~Finally, our VIP volumes have significantly exceeded our expectations,~~
11  ~~and~~ [2] ~~our non-rolling table game drop [is] steadily increasing just as it did at The Sands~~
12  ~~in the early days . . . .~~ *[Part [2] is an unchallenged statement and unnecessary for context.]*

13  ~~So the transformation of the market is coming on strong, and the Venetian Macao is~~
14  ~~paving the way. As dramatic as this transformation is, we're clearly just at the top of the~~
15  ~~first inning. We're quite literally just getting started.~~

16  ¶ 310.  [Adelson:] ~~[1] The bottom line is that~~ the Sands has not been negatively impacted by []
17  the opening of the Venetian and ~~[2] that~~ the Venetian, from its first full month in September to the second month in October, ~~is~~ we are extremely happy with the progress in
18  all directions *[The newly-struck portions are unchallenged statements.]*

19  ¶ 312.  [Adelson:] I'd like to repeat, a quarter does not a trend make.. . .

20  [T]here is nothing structural, there's nothing fundamental that's changed anything. We
21  just didn't have a good quarter, that's the end of it. We think that a bad quarter is no lasting. We'll see what's going on in April, things are up . . . sorry, October. When things
22  are up, things are up good. It's just the nature of the business. It makes a good trading opportunity for day traders and hedge funds.

23

24  ¶ 314.  [Adelson:] ~~I'd like to extend what [Brad] said earlier about that~~ if ~~we are cooking, we are~~
25  ~~firing on all cylinders. The mall is going on all cylinders.~~ In the month of September— ~~that's in the third quarter~~—there were even some stores that would have been in over
26  ~~[endurance] if you extrapolate what they were doing in the first couple of~~ two weeks of the month.

27  \* \* \*

28

1   The good thing about this is, since this is the original vision, [it was] mine, I can tell you
    that it's clear that we're cooking on all cylinders. The convention, the Congress Center,
2   the restaurants, the shopping, the anticipation of the shows, the sports arena—everything
    being sold out. We are truly cooking on all cylinders, and I would say the vision of the
3   Cotai Strip with the opening of the Venetian Macao is emphatically validated. *[Once the*
4   *vague optimism is removed, the remainder is immaterial.]*

5   ¶ 316.  [Q-Celeste Brown:] Couple of questions for you—you gave the timing for the additional
6           openings on the Cotai Strip. Could you give us an updated capex forecast, please?

7           [A-Adelson:] How much time have you got?

8           [Q-Harry Curtis:] Well, last year I think you said the range was 9 to 12. Maybe if you
            could give us another range.
9
            [A-Stone:] I think that range is still valid—you know, probably towards the higher end
10          that range as we go through it.

11          We've expanded—part of it is we see opportunity. Not only do we fill what we have but
12          we add additional capacity to these elements. So whether we're adding more Cirque du
            Soleil showrooms, more entertainment venues, the projects are very fluid but we are still
13          probably not moving ahead of that range at the $12 billion level . . . . *[Once the vague*
14          *optimism is removed, the remainder is immaterial.]*

15  ¶ 318.  [Q-Celeste Brown:] We've heard some pretty positive things about the anticipation for the
16          Four Seasons service department. When do you think you will be marketing these?

17          [A-Adelson:] What we're in the process of, Celeste, is now the government has invited
            our comment and our development of the regime for individual ownership. Currently, in
18          Macao, you can essentially sell a leasehold right but you can't really have title. So, we are
19          in the process now of developing a regime which will allow us to sell that title.

20          At our last meeting with the Chief Executive, he confirmed once again that [it will be]
            moving through the legislature and our lawyers are now working on that regime. The
21          value of that regime is some sort of a premium to as much as 35% or more on a sale, if
            you can deliver title. So we are working closely with the government to develop that
22          regime. We won't go into the marketplace until we get a better handle on the timing of
23          that process here.

24          As Brad said, the product itself will be completed somewhere around the end of the year.
25          We are certainly pre-marketing. We have hundreds of prospects that have indicated
            interest. We just need to be able to deliver the regime before we can formally begin
26          actually signing contracts. *[Falsity not sufficiently pled as to use of proceeds from*
27          *condo sales.]*

28

¶ 320. [1] ~~As of September 30, 2007, and December 31, 2006, we held unrestricted cash and cash equivalents of $1.68 billion and $468.1 million, respectively~~. [uncontested statement of historical fact] [2] ~~We expect to fund our operations, capital expenditures at The Venetian, The Sands Expo Center, the Sands Macao and The Venetian Macao, and debt service requirements from existing cash balances, operating cash flows and borrowings under our Las Vegas and Macao revolving credit facilities~~.

¶ 322. ~~Currently, we expect the total cost of development on the Cotai Strip to be in the range of $11.0 billion to $12.0 billion~~. *[forward-looking]*

¶ 323. [1] ~~We expect the cost to develop and construct the Marina Bay Sands will be in excess of the previously disclosed $3.6 billion,~~ *[forward-looking]* [2] ~~inclusive of $811.7 million paid in 2006 for the land premium, taxes and other fees~~. *[unchallenged statement of historical fact]*

¶ 326. [Weidner:] [1] We are pleased to have completed this important financing for our Marina Bay Sands development. [2] The completion of this Singapore Dollar-denominated facility, which is the largest private Singapore Dollar-denominated financing in Singapore's history, was accomplished on very favorable terms in a challenging global credit environment.

. . . [3] Our Marina Bay Sands development remains on track for a late 2009 opening, and [4] ~~we look forward to continuing to work closely with the Singapore authorities as we complete the final design components of this iconic development in the coming months~~. [forward-looking]

¶ 329. [1] ~~We remain pleased with both our current performance and our long-term market positioning at the Sands Macao.~~ [2] ~~In the face of high-quality competitive product, including The Venetian Macao on the Cotai Strip, the Sands is generating strong cash flow and market-leading cash on cash returns~~. . . . [3] Our construction, design and development work on each of our other six sites on the Cotai Strip has continued to progress, [4] with ~~construction of our second property on the Cotai Strip, The Four Seasons Macao, which is adjacent to The Venetian Macao, scheduled to be completed in June~~. *[forward-looking as statement of management's objectives for future operations]*

¶ 333. [Stone:] [1] ~~Parcels five and six that's known as the Shangri-la, St. Regis, Sheraton, Trader's complex, that is roughly going to come in about 6600 total rooms, made up of the mix of the various brands.~~ *[unchallenged statement of management's plans and objectives]* [2] ~~It's a huge building just about 13.7 million square feet.~~ *[unchallenged statement of management's plans and objectives]* [3] ~~Right now, I'm just going to give the heart of the construction costs, which includes the actual construction, the what we call built-in [inaudible] including guest room furnishings and designer's cost it's roughly about $3.3 billion.~~ *[forward-looking]* [4] ~~We're still working on the final FF&E budget the pre-opening budgets so that'll probably add in the area of about probably another $300~~

million to $400 million in that project. *[forward-looking]* [5] That is opening the first phase of it which is the Sheraton Tower and Shangri-la Trader's Tower and almost the entire podium that opens in May of '09, as we talked about in prior calls. *[forward-looking]* [6] And then the St. Regis and Sheraton Hotel Towers are roughly in the fourth quarter of '09 that's the time period for that. *[forward-looking]*

[7] Turning to parcels seven and eight, we're awaiting, we have our piling rigs on site. [8] We're waiting any day now to get our permits to commence pilings. [9] The project it includes the Swiss Hotels, Fairmont, Raffles, (inaudible) Conrad complex, this complex is about 6200. *[unchallenged statement of management's plans and objectives]* [10] And that's again about 6200 total rooms. [11] This is a larger building yet. [12] About 13.9 billion square feet. *[unchallenged statement of management's plans and objectives]* [13] Again similar statistic to hard construction costs, which includes the designers, the nonowner FF&E (inaudible) slot machines, et cetera, is about $3.7 billion, roughly $266 a foot *[forward-looking]*, and [14] that we're looking at opening at the end of 2010. [forward-looking] [15] It's a rough schedule, but we think we can make that we have site consolidation unlike that which we have five or six—yes, it's a one phase opening that entire project. *[forward-looking]* [ [16] And again, we're just waiting for the permits [17] then hopefully we'll start piling this month. *[forward-looking]* [18] The rigs are there, the contracts are left and we're ready to go.

[19] Parcel three we're still in the final design phase, and [20] then we hope to start piling in the second quarter. *[vague optimism]* [21] And that's about a 4000 room project *[unchallenged statement of management's plans and objectives]* with Intercontinental, Holiday Inn and Cosmopolitan which is (inaudible). [22] About, right now the current design is about 6.4 million square feet. [23] Hard construction costs, and this is a broader estimate than the others. [24] The other ones are closer to the [inaudible] because we've had much more, pretty extensive design on the other projects. [25] Currently we're looking at again for just the construction, architecturals and nonowner FF&E about $1.65 million. *[forward-looking]* [26] And that we're looking to open up in the second quarter of '11. *[forward-looking]* [27] And again hope to start piling that this spring. *[forward-looking]* [28] So it's roughly the same time frame as the, or –

[29] And then Singapore. Singapore project I was there last week, [30] it's unbelievable project. It's going to be magnificent, [inaudible] rooms. *[unchallenged statement of management's plans and objectives]* [31] This project is 2700 rooms, we talk about the size of the building because you hear what the government allows us to build, that's roughly 5.5 million square feet, 5.7 million square feet, but the actual building including land, it doesn't—the state doesn't include in that calculation the building is actually about 9.1 million square feet. *[unchallenged statement of management's plans and objectives*] [32] Currently we're looking at the hard construction costs of roughly $3.4 billion. *[forward-looking]* [33] This build is coming in at roughly $372 a square foot, and [34] it's a magnificent building. *[vague optimism, puffery]* [35] I went through the whole process

of constructing it. [36] ~~It's going to be something else.~~ *[vague optimism, puffery]*
[37] And that is end phased for the end of '09 and we continue to hold that schedule at this point in time.

¶ 337. [Weidner:] Yes, I think everyone knows that the market is tight right now. It would be very difficult to go and raise those monies now. [3] Fortunately we have enough to be able to carry us through a period of time to allow us to reapproach the markets as we think they will become more favorable.

\* \* \*

[4] ~~I think we will always have access to capital with the kinds of developments that we're developing and with the ways that we operate. I think it's a matter of cost and right now the cost in the market place are kind of beyond where we would like them to be, obviously. So it's a combination.~~ *[forward-looking]*

\* \* \*

[Henry:] [7] We've been fortunate to have timed the market appropriately and in our favor over the last several years as we've raised money. We haven't over raised but we certainly haven't [under-raised] and we do have a fair amount of liquidity available to use.

\* \* \*

[9] And I think we're in reasonably good shape, Celeste, to manage our way through this process and maintain the kind of liquidity that we have available to us.

\* \* \*

[10] We have multiple avenues that are open to us today.

¶ 342. [1] ~~Existing restricted and unrestricted cash balances at our Macao subsidiaries, operating cash flows from the Sands Macao and The Venetian Macao and available borrowing capacity under the Macao credit facility, together with funds made available under our U.S. senior secured credit facility,~~ [2] ~~will be used to fund current development and construction costs for the Cotai Strip development activities in the short term.~~ [3] ~~However, we will need to arrange additional debt and/or equity financing in the near term to continue to fund our design, development and construction activities at the remaining Cotai Strip development projects.~~ [4] ~~We expect to complete this refinancing in 2008.~~ *[Part [1] is nonsensical without the already-stricken parts [2]–[4].]*

[5] ~~In the near term, we will continue to borrow significant amounts under our existing and future bank credit facilities as we fund our global construction and development projects.~~ *[forward looking]*

¶ 343. ~~Macao developments would cost "approximately $12.0 billion, which includes the cost of constructing The Venetian Macao."~~ *[forward-looking]*

1    ¶ 345. ~~Sands Bethworks is currently expected to open in summer 2009 and will be built at an estimated cost of approximately $600.0 million.~~ *[forward-looking]*

2
3    ¶ 348. [Q-Joseph Greff:] Okay. Then one final question and I will let someone ask some
4    additional questions. Just along the lines of internal forecasts, obviously in the press, with regard to one of the lawsuits out there, there's this idea that, internally, there's a document
5    that you lowered internal forecasts for 2008. I will leave it as broad as that, but do you want to comment on that?

6    [A-Weidner:] That was mostly including first-quarter, or this quarter results. That was a
7    *revenue* number relating to internal forecasts that mostly included updates based on this quarter. So it's in the numbers, it's baked in the numbers.

8
9    ¶ 350. [Weidner:] ~~In Asia, our efforts to transform Macao into Asia's premier business and
10   leisure destination continue to move ahead. The strong and consistent visitation to the Cotai Strip's anchor property, The Venetian Macao, and the solid early performance of the
11   property's hotel, retail, and group meeting businesses, reflect that we are continuing to deliver on the fundamental goal and commitment we share with the people of Macao — the
12   transformation of Macao into Asia's premier business and leisure destination. The recent announcements by the government of Macao regarding gaming regulation appear to be
13   consistent with that vision and support our conviction that the execution of our Cotai Strip development strategy will deliver significant economic benefits to Macao and the entire
14   region, as well as industry-leading returns to our shareholders.~~

15
16   ¶ 352. [Weidner:] [1] ~~While our VIP gaming volumes were down sequentially due to the
17   increasingly competitive environment that has developed in this market segment over the last few months~~ *[unchallenged statement]*, [2] ~~we have taken actions that we believe will
18   enable us to grow both our share of the market and our cash flow generated from this segment of our business in the future.~~ [3] ~~We remain confident that the world-class
19   product offerings of The Venetian Macao, together with our continuing investments along the remainder of the Cotai Strip, will allow us to deliver industry-leading returns and
20   superior financial performance.~~

21   *  *  *

22   [4] ~~While the results of the Sands Macao clearly reflect the increasingly competitive
23   environment on the Macao peninsula,~~ ~~we remain pleased with both the competitive resilience and the long-term market positioning of the Sands.~~ *[vague optimism, remainder
24   is unchallenged]* [5] ~~The introduction of high-quality competitive product, including The Venetian Macao on the Cotai Strip, has been~~ ~~significant~~ in the last year, *[vague optimism,
25   remainder is unchallenged]* [6] ~~but will slow dramatically from this point forward, particularly on the Macao Peninsula.~~ *[unchallenged]* [7] ~~In the face of this competition,
26   the Sands continues to generate~~ ~~strong~~ ~~cash flow and~~ ~~market-leading~~ ~~cash-on-cash returns.~~
27   *[vague optimism, remainder is unchallenged]* [8] ~~While admittedly down year over year,~~
28

[9] ~~both our VIP and mass volumes reflect healthy play, and our visitation statistics remain strong.~~ *[vague optimism, remainder is unchallenged]* [10] ~~Looking ahead, we expect to further reduce the cost structure at the Sands Macao as we allocate our human resources more efficiently across the larger asset and revenue base of The Venetian Macao, the Four Seasons Macao, and additional properties on the Cotai Strip.~~

¶ 354.  Our construction, design and development work on each of our other six sites on the Cotai Strip has continued to progress, with our second Cotai Strip property, the Four Seasons Macao, which is adjacent to The Venetian Macao, ~~scheduled to open this summer~~.

¶ 356.  [Weidner:]  ~~In The Venetian Macao's second full quarter of operation, we experienced strong visitation, healthy ADR and occupancy statistics, additional progress in our corporate and group meetings business, solid retail sales figures and healthy Non-Rolling Chip gaming volumes.~~

¶ 358.  In Bethlehem, Pennsylvania we continue to advance our construction activities on Sands Bethworks. Erection of the casino steel began on schedule in February with approximately 60% of the structure now completed. The concrete foundations for both the parking garage and retail mall have been completed and the garage steel erection has now begun. The 124-acre integrated destination resort, located on the site of the former Bethlehem Steel plant, is on the I-78 corridor in eastern Pennsylvania, with 17.2 million people, including the lucrative northern New Jersey and New York metropolitan markets, residing within a 75-mile radius. ~~The property will feature in its first phase a hotel, retail space, 5,000 slot machines, a multipurpose event center, and a variety of dining and entertainment options~~.

¶ 360.  [Weidner:]  ~~In Las Vegas, despite a more challenging economic environment, The Venetian delivered solid results, and we opened The Palazzo, completing our master plan of the largest integrated destination resort in the world. We have now set the stage for strong growth and industry-leading returns in the Las Vegas market for years to come.~~ *[vague optimism; remainder is unchallenged]*

¶ 362.  [Weidner:]  [1] Both business and leisure visitors have contributed to ~~strong~~ hotel rate and ~~solid~~ occupancy statistics, reflecting the appeal of our product offering and the significant interest from around the region in the ~~world-class~~ amenities of our integrated resort. [2] Our corporate meeting and convention businesses, although hindered somewhat by a lack of transportation infrastructure, are enjoying significant amounts of repeat business. [3] Our entertainment offerings have been well received throughout the region, driving significant visitation to Macao. [4] Our mass gaming volumes continue to grow and are the largest of any single property in Macao today, reflecting the popularity and acceptance of our product offering to this important market segment.  *[vague optimism]*

¶ 364.  [1] Yes, I can take you through. [2] I mean, we mentioned the Four Seasons property opening early in the third quarter. [3] The budget on that is intact, as we discussed at the

investor day. [4] ~~[S]ites five and six continue to move towards their spring, the first phase of spring of '09 opening for the Shangri-La Traders and First Sheraton Tower, again with the second Sheraton tower and St. Regis, and the St. Regis apartments opening towards the end of the year~~. [5] Again, that project is roughly in the same budgetary state. [6] It seems to be tracking on very well.

[7] [S]ites seven, eight and Site three, as Bill mentioned in the conference call, we are ready to start work on Sites seven and eight. [8] We have the rigs there. [9] We've just been frustrated because of some challenges within the government, based upon the scandal that happened here in an area that related to the public works department. [10] There has definitely been a slowing in the pace around Macao of approvals. [11] So we are anxiously waiting to get through that. [12] Again, that's a project whose budget is still a work in progress as we go through and take the conceptual design and work on pricing it. [13] So we really don't have reports specifically on that project.

[14] And on Site three, it's very similar. [15] [S]ite three is somewhat behind seven and eight. [16] We have filings in for all these projects with the government. [17] Again we're just waiting for the government to right itself in such a way that we can get to some more normal development cycle.

[18] In Singapore, that project is progressing ~~very well~~. *[vague optimism]* [19] I was there about a week and a half ago and spent some time on the site. [20] You know, if you look at pictures of it, everyone has to realize that there's actually several floors underground. [21] We're coming out of the ground with the towers now. [22] ~~You know, we have a very aggressive goal of the end of next year in the fourth quarter of '09~~. [23] We are working basically 24/7 on that project where we are allowed with the government. [24] That's just a ~~fantastic~~ project. *[vague optimism]* [25] We are still in the range that we've been talking about ~~in the $4.5 billion, $4.6 billion range including the land all in costs on that project~~.

[26] Bethlehem is progressing ~~nicely~~. *[vague optimism]* [27] Steel is being erected very aggressively now. [28] ~~Our goal is to get that opened by the third quarter of next year~~. [29] Again, that project is consistent budgetarily with what we expressed at the investor conference day back in February. [30] I think that's the main projects we've discussed.

[31] Oh, the condo tower is also moving along ~~nicely~~. *[vague optimism]* [32] Again, that's certainly on the same budget that we discussed at the investor day.

¶ 366. ~~[Adelson:] [1] This is Sheldon. [2] Last time I talked [to our head of—the president of Asia over there], I talked to him last night our time, and I'm on the East Coast right now until tomorrow. [3] I'm told that there was a separate committee that was formed by the Macao government, and the committee decided—there's no guarantees on this, but it appears as though they wanted to take a different approach and call us something else other than residential. [4] But they've concluded the only approach that everybody can be~~

1   happy with is a co-op approach, like New York, where people buy into the shares of the

2   company with the right to use a particular apartment. [5] So without any guarantees, it
    sounds more encouraging that we will be allowed, if it goes through in the near future, to

3   move the property into a separate condo regime and be able to sell co-op address.

4   [Q-Lawrence Klatzkin:] [6] You still think $2,000 a foot makes sense?

5   [A-Adelson:] [7] We have no reason to believe that what we estimated in the past should
    be changed at this time. [8] We stopped takings orders at 100, stopped taking—we didn't

6   take orders, we took indications of interest. [9] Some time ago, when we knew it wasn't—

7   we don't want the interest to get stale. [10] So we stopped taking expressions of interest.
    [11] I think we're going to start up again very soon.

8
    [Q-Lawrence Klatzkin:] [12] Okay, great. Thanks, Sheldon.
9
    [A-Adelson:] [13] Listen, there's—one is a hope and the other is the other is—realism and
10  in this case they could coincide.

11  *[The statements in ¶ 366 are inactionable in their entirety because falsity is not*

12  *sufficiently pled.  The statements do not say what Plaintiffs think they do.  The*
    *statements do not state that the proceeds from apartment sales will fund ongoing*
13  *construction.]*

14
    ¶ 368.  [A-Weidner:] [1] On the financing front for Macao, I think the message, Steve, is the
15          same that we delivered during our investor day – is that we're *[immaterial without the*

16          *following phrase]* [1a] we intend to finance our needs for the Macao properties that are
            under construction and to be developed in an offshore transaction, predominantly
17          anchored by Asian banks and other global banks that have a large operation and lending

18          capacity in Asia, similar to what we did in Singapore. [2] I've been having very active
            conversations with a number of our bigger banks and even some of our medium and
19          smaller sized banks, and the level of interest and level of enthusiasm there is actually quite

20          good. [3] Hopefully, by the next quarter conference call, we will be able to have more
            indicative direction in terms of the size of what that financing might be and what it may
21          cost us.

22  ¶ 370.  So our goals have to be twofold. One, translate more visitation in the gaming win, drive

23          more visitation to the gaming floor itself, and then adjusting our VIP commissions so we
            drive both more revenue and more EBITDA or cash flow out of that market.

24
    ¶ 371.  [A-Weidner:] [1] We probably are not going to broadcast what we're going to do on a
25          conference call, so I think that's fairly short. *[unchallenged]* [2] I'll just – we're going to

26          act and react to the market as we see fit and appropriate.

27          [A-Adelson:] [3] I would just like to mention that don't disregard the possibility of these
            commission rates eventually going down as the supply of gaming capacity decreases.
28          [4] If it does contract as the government has indicated, they are going to consider—if it

    31

~~does contract, it will take the leverage away from the guys who were demanding greater commissions.~~ [5] ~~Hopefully—and just the increase in demand and reduction of supply, it will create a different . . . .~~ *[Falsity not sufficiently pled as to part [3]. Adelson merely warns that commission rates could go down; this general warning could not be reasonably relied upon by investors.]*

¶ 372.   [A-Stone:] [1] ~~Again, I don't have the breakout directly of all the—I don't think we want to get into that.~~ [2] ~~I would say that obviously, as commissions go up, you know, the profit margin is going down.~~ [3] ~~Our goal is to drive enough volume as we—and being competitive, we are kind of caught in the switches.~~ [4] ~~Our rates went up but they didn't go up enough, so we encourage some expenses, additional expenses, but we didn't drive enough volume through the door.~~ [5] ~~That won't happen again.~~ *[Parts [3] and [5] are forward-looking. The remainder is unchallenged.]*

¶ 374.   [A-Henry:] [1] ~~I think, Joe, as far as required funding necessary to completion, you know, a portion of that is expected to be generated by a combination of cash flow that comes from operations as well as from the sale of residences — is what we are forecasting internally.~~ [2] I don't think we share those internal estimates because we don't want to give forward forecasts for those properties.

[3] The balance, the balance that we're talking about and focusing on to take us out to completion of all of our funding requirements and goes out through 2011. [4] Actually, some of the costs you can leak into 2012 because of the way construction contracts and contractor payment schemes are practiced in that part of the world. [5] ~~It is several billion dollars.~~ [6] ~~I think what we indicated during our investor day was we require approximately an incremental $4 billion to get us to what we believe is completion and a fully-funded program over in Macao.~~

[Q-Joseph Greff:] [7] ~~That $4 billion is inclusive or after the benefit of the sale of residential stuff, right?~~

[A-Henry:] [8] ~~Yes, that is correct.~~

*[The newly-struck portions are immaterial without the previously-struck forward-looking portions.]*

¶ 375.   [Q-Robert Armstrong:] Just to continue the conversation of financing, how committed are you to getting the $4 million [*sic*] incremental you're going to need in Macao through banks? Is equity an option, or are there other options out there, just on the assumption that credit market might be turbulent over the upcoming months?

[A-Henry:] We are evaluating a number of different alternatives. Equity is not one of those. We believe that we have ample access to the credit markets, and our primary focus is on the bank markets. We are in reasonably advanced conversations with folks, so our

level of confidence around bank capacity and interest in the part of the world is high – and specially for our brand and our projects.

[Q-Robert Armstrong:] Okay. The rates you are discussing are within the range of what your previous expectations might have been?

[A-Henry:] Yes.

¶ 377. [Weidner:] ~~We had an interesting quarter, shall we say, and there are things happening in the marketplace and Macao that we are reacting to as we speak.~~ *[unchallenged statement of historical fact]*

[2] ~~We still are very bullish about the long-term direction for Macao about the encouraging comments by government in terms of the development of the more destination-style casinos in the future.~~ [3] ~~We are very bullish~~ about what's happening in our developments in Singapore and how Singapore is in fact coming along. [4] ~~Daily, we walk through the property here and look at the traffic counts and watch what's happening with the ramp-up of the Palazzo~~ *[unchallenged historical fact]*, so [5] ~~we're very confident that the combination of the Palazzo and the Venetian here will continue to make this the destination place here in Las Vegas overall.~~ *[vague optimism]*

¶ 379. [Q-Robin Farley:] [1] Great, thanks. I've got two questions. The first is, you know, you talked about focusing more on the profitability of your existing facilities and the timeline you gave for additional Cotai properties sounds like it's unchanged. When you talked about focusing on existing facilities in the near-term, is there some thought to delaying the openings of additional capacity at this point?

[A-Weidner:] [2] No, ~~I think, as I mentioned in the script, the intention is to continue to aggressively develop those properties as quickly as we can~~ *[The "No" remains, but the portion after the first comma is forward-looking.]*, but I mean, we need to make sure that we turn our efforts in the near term to make sure that, between now and significant completions in 2009, that we generate as much income in the near term as we can. [3] ~~So you know, we have an opportunity with the Four Seasons coming along,~~ *[forward-looking]* [4] and as I say, Brad is there in Macao now as we begin to more rationalize the cost structures there. [5] ~~Then as we ramp-up the Palazzo, I think it's more a matter of controlling the costs as that comes online, so we can deliver more EBITDA.~~ *[forward-looking]*

¶ 381. [1] ~~We held unrestricted and restricted cash and cash equivalents of approximately $855.4 million and $454.4 million, respectively, as of March 31, 2008.~~ *[unchallenged statement of historical fact]* [2] ~~We believe that our existing cash balances, operating cash flows from The Venetian Las Vegas and The Palazzo, future proceeds from the sale of The Shoppes at The Palazzo to GGP and the initial deposit proceeds from anticipated sales of our Las Vegas condominium units, which we expect to commence in the second half of 2008, together with our available borrowing capacity under the U.S. senior secured credit~~

facility, *[immaterial without the next phrase]* [3] ~~will be sufficient to fund the estimated development and construction costs for the Las Vegas condominiums and the Sands Bethworks projects during 2008. In addition, we believe that these funds will also enable us to fund our equity contribution requirement for the Marina Bay Sands project and provide additional capital to our Macao subsidiaries to fund a portion of our Cotai Strip development projects during this same time period.~~

¶ 382. [1] ~~Currently, we expect the cost to build our Cotai Strip developments to be approximately $12.0 billion, which includes the cost of constructing The Venetian Macao.~~ [forward-looking]  [2] ~~As of March 31, 2008, we have capitalized $3.37 billion in costs on the Cotai Strip.~~ *[unchallenged statement of historical fact]*

¶ 385. [Briggs, LVS's VP of Investor Relations:] [1] So it's clear that the development, the ~~critical mass~~ development in Cotai is happening as we speak and happening by the month. *[vague optimism]* [2] We're pressing forward with it very aggressively and [3] ~~looking forward to the opening of the Four Seasons here in the next couple of months.~~ *[forward-looking]*

¶ 387. [Briggs:]  Over 14 million people have been to the Venetian Macau since we opened it in September, about 2 million a month. ~~Very strong~~ hotel ADR and occupancy. Good group meeting business, et cetera. *[vague optimism]*

¶ 389. [Q-Unidentified Participant:]  ~~Maybe you could just quickly touch on the financing that you would raise to complete the development in the tower and where you are in that process (inaudible)?~~ *[unchallenged third party speaker]*

¶ 390. [A-Briggs:] [2] ~~Sure. We have been very public about~~ [3] ~~our intention to tap the bank markets in Asia, the debt market in Asia,~~ *[forward-looking]* [4] ~~and have been, we are in advance, the process advanced nicely~~ and we're deeply ~~engaged at this point.~~ *[vague optimism]* [5] ~~We have talked about an objective of approximately $4 billion to get us over the next 24 months in Macau, which gets us to the completion of Sites 5 and 6 and very, very close to the completion of 7 and 8~~ *[forward-looking]*, and [6] ~~we feel very, very good about that.~~ *[vague optimism]*

¶ 395. [Weidner:] [1] ~~Our second quarter results reflect both solid operating performance in Macao and Las Vegas and the measured execution of our global growth and development strategy.~~ [2] ~~In Asia, our efforts to transform Macao into Asia's premier business and leisure destination steadily march forward.~~ *["[P]remier business and leisure destination" is vague optimism; the remainder is immaterial without that phrase.]*

¶ 397. [Weidner:] [1] ~~As The Venetian Macao approaches its first-year anniversary, we're now making final preparations for the opening of our second destination resort on the Cotai Strip, the Four Seasons Macao,~~ [2] which will open about four weeks from tomorrow on ~~August 28.~~ *[Part [2] is forward-looking and true, as it did open that day; part [1] is unchallenged]*

\* \* \*

[3] ~~The opening of the Four Seasons Macao in just over four-weeks-from-tomorrow~~ *[forward-looking and true]* [4] ~~will take our service offering on the Cotai Strip to the next level~~ *[vague optimism]*

\* \* \*

[5] As you know, our strategy for the funding of the development of the Macao properties has always been on a phased approach. In the benefit of the phased approach is that the cash flows from each completed phase can support development costs associated with the next phase. [6] As we prepare to open the Four Seasons Macao and to turn our developments focused principally on sites 5 and 6, we're now entering the next phase of the funding cycle.

¶ 398.  [Weidner:]  [1] ~~The Venetian is what it is and the way that it was planned. It's a mass product, a high-end mass product. It's got arenas, it. Showrooms, it's got meeting space. It's got all-suite rooms~~ *[unchallenged statement of historical fact]*, but the intention always was to have your VIP market and your high-end market focused on the Four Seasons and The Venetian being the more mass and meeting product. [2] ~~So we're looking forward to the completion — the first real piece of the overall strip; and the ability to focus on market segments that we haven't had product or at least ideal product to attract.~~ *[forward-looking]*

¶ 401.  [Weidner:]  Let's now turn to our Asian operations. [2] ~~Our progress in establishing the Cotai Strip in Macao as Asia's Las Vegas moves steadily forward.~~ *["Macao as Asia's Las Vegas" is vague optimism.]*

\* \* \*

[3] We continue to make ~~great~~ progress on sites 5 and 6. *[vague optimism]* [4] It is while that continues – it is clear that the pace of approvals for development activities throughout Macao has slowed substantially.

[5] ~~Looking ahead, we anticipate further delays as Macao government takes strides to get its arms around the development implementation and enforcement of existing and proposed gaming regulations.~~ [6] While we wholeheartedly support the government's efforts in this area, we understand that one byproduct of those efforts is that the approval process for new developments will likely remain slow until the current administration is able to sort through these matters. [7] We will of course continue to do everything in our control to deliver our announced developments as expeditiously as possible. As I said before sites 5 and 6 remain on track to open their initial phase in mid-2009 and [8] ~~completed by the end of 2009.~~

¶ 404.  [Weidner:]  [1] ~~Hotel operations in July remained strong.~~ *[vague optimism]* [2] ~~Through the first 29 days in July, The Venetian has achieved 91% occupancy in July, while Palazzo~~

1   has achieved 95% with occupancy at a blended rate of about $210. *[unchallenged statement of historical fact]* [3] We consider that pretty good performance in July in this
2   marketplace. *[vague optimism]*

3   [4] That performance illustrates the flexibility of our service offering, the attractiveness of
4   our product itself and our ability to effectively respond to evolving market dynamics in Las Vegas. *[vague optimism]*

5   * * *

6
7   [5] We believe we have tremendous flexibility in how we fund those two projects
8   [Palazzo and Sands Bethworks], [6] should our currently domestic credit facilities and other funds current available prove inadequate to fund those projects to completion or
9   should we choose to supplement that domestic credit facility with additional liquidity at the corporate level.

10  ¶ 406.  [Adelson:] I'll tell you that about a month ago, I personally spoke with the head of sales
11          for the Four Seasons condo — I call them condos; it's the co-op project. And I asked him
12          whether or not the model — they call it a [show] flat — if the [show] flat was ready and the
            marketing materials are ready. He indicated to me that he had expressions of interest from
13          150 people. And, in talking to him and others, the 22 penthouses that are being offered,
14          they have such a high demand for that, that they think they're going to — they were
            proposing to take sealed bids on them. I suggested they do a live auction. So it certainly
15          indicates a strong demand. Of course, you never know till the [fat] lady sings. And, but
16          this is the indication.

17          And they've stopped taking expressions of interest, because they didn't know when they
            could deliver it. Without getting into any further detail, I would say that in the near future,
18          there will be a reason to announce that we'll be able start converting those expressions of
19          interest into orders.

20          *[The newly-struck portions of ¶ 406 are inactionable because falsity is not sufficiently
            pled. Adelson touted the supposedly high demand and readiness of the marketing*
21          *materials, not that sales would happen anytime soon or would fund ongoing*
22          *construction. He also included sufficient cautionary language to render the statement
            immaterial.]*

23  ¶ 408.  [Q-Felicia Hendrix:] And then final question. Just you guys seem very optimistic about
24          the financing progress that you're making in Asia. Just wondering, is there any chance to
25          augment that? There might be – Sheldon, you might issue some equity or sell some
            equity?

26
27          [A-Adelson:] There will be no equity sold at these levels.

            * * *
28

[Q-Celeste Brown:] First, can you talk further about this domestic liquidity, particularly given, Sheldon, your comment just now that there would be no more equity issued at these levels?

[A-Adelson:] Could you explain – could you repeat that question, please?

[Q-Celeste Brown:] Bill talked about increasing the liquidity in the US market. And you mentioned you wouldn't be raising equity. Can you just discuss how the liquidity would be increased at the parent if you're not issuing equity?

[A-Adelson:] Well, we want to maintain our flexibility that we see various options out there. We do have quite a bit of flexibility, but at this stage of the game, I can't get into any of the details because obviously we don't want to upset markets or move markets. But we're evaluating various alternatives to put additional liquidity in the corporate parent level. Now, let me say, I don't know if you were around nine years ago in 1999, Celeste.

[Q-Celeste Brown:] I was covering media then.

[A-Adelson:] But, in 1999, we had a slow opening and a slow ramp-up because of the construction problems we had with [Bobus], the builder, and everybody was saying to me, Sheldon we may need $50 million, please tell us you're going to put it in, put it aside in an escrow account and tell us that everything is going to be safe. And I said no, I am not going to do that, but I can tell you this, the payment that will be made.

And the reason why I didn't do that is because I wanted the market to accept Sheldon Adelson's verbal commitment, that his word is something to rely upon.

A friend of mine says, that, as all of you that know me know that I don't equal the height of Yao Ming or LeBron James or any of the basketball players. Ming isn't here but [LeBron] James and Kobe Bryant and other top players are here in Macao. However, one of my closest friends says, Sheldon, don't worry about your height. You're the tallest person I know when you stand on your wallet. And I'm saying right now, the Company will not have liquidity problems. Need I say more?

[Q-Celeste Brown:] So you're saying you'll backstop the Company if need be in worst-case?

[A-Adelson:] I don't want to – my lawyers have – let me put it this way. My lawyers have cautioned me what I can say and what I cannot say. However, as I said back in '99 we're not going to have any problems, and I will say again. We're not going to have any problems.

¶ 410.  [Q-Lawrence Klatzkin:] [1] And then budget wise, are we still looking 5 and 6, around $3.3 billion plus land? And the Singapore around $4.5 billion plus land, not including land, I mean?

[A-Stone:] [2] I think the – when we talked about the projects and we talked about these at investor days, for sites 5 and 6, we classified the $3.3 billion, $3.4 billion as hard costs. There are still preopening costs on top of that and certain other costs. But it's in line with what we've talked about in other investor days. So, nothing has changed for example since February in terms of our budgets on 5 and 6.

[Q-Lawrence Klatzkin:] [3] Okay. And Singapore is still $4.5 billion?

[A-Stone:] Singapore – we haven't commented on lately. We're still trying to get our hands around that, I don't want to comment until I really feel sure about that number.

*[The Court does not strike the statements in ¶ 410 because they are phrased in the present tense and seem to refer to the then-current budgets rather than expected future costs and capital expenditures. However, the statements ultimately may not be actionable if Defendants demonstrate that the present-tense statements are actually projections of future costs and expenditures, or that they are not the type of statements that investors should reasonably rely upon.]*

¶ 412. [Adelson:] [1] There's something I want to say concerning the development in Macao. First of all, let me say that the fundamentals of our Company have not changed. [2] Contrary to what everybody – to some of the rumors that have been going around, we're moving forward with our development pipeline aggressively. [3] It is acknowledged that the approval for 7 and 8 – we don't need 3 because that's the land we already own and we paid the premium for that. I believe we've paid the premium. [Seven] and 8 has been delayed and we have also done some more redesign.

[4] But, ~~our intention go forward with that~~, [5] which I am led to believe, and I may have an answer within the next week, I can't guarantee it but I may – [6] ~~I hope to have an answer on when we could start 7 and 8.~~ [7] We've done groundwork, we haven't done foundation – we have done ground work. [8] We leave about $100 million in the financing package so that we could continue site development on 7, 8, and 3.

[9] And we've also left – and this is important. We've put into the $5-plus billion financing package an accordion feature [10] ~~that will allow us in two phases to take down $1 billion,~~ [11] which is exactly what we did with lots 5 and 6. [12] So, we started off to get the pilings done, which take a few hundred million now for 7 and 8 and we start on the foundation and stuff. [13] ~~And by that time, the other properties will be open and we'll be able to generate more income and borrow money besides just going on a project financing basis.~~

[14] So, things haven't changed there. It's taken us time to get approval. We're doing some redesign because of the cost of construction of the ~~magnificent~~ design we have is high so we're tweaking that design. *[vague optimism]* [15] ~~And we're optimistic that we'll be – I'm optimistic that we'll be able to get an approval to that in the very near future.~~ *[vague optimism]*

¶ 414.   [Q-Robin Farley:] I wonder if you could give us some numbers that aren't usually available until the Q is filed but that would just give us a sense of liquidity, sort of where you are drawn down on different credit facilities? And the question is not to diminish Sheldon's height when he stands on his wallet, but just to get the information.

* * *

[A-Henry:] Robin, are you looking just for the specific debt balances at each of our various entities or levels? What specifically are you looking for?

[Q-Robin Farley:] Specifically the credit facilities – what's drawn down and what's available in terms of liquidity today.

[A-Henry:] I have the drawn amounts in front of me. I don't have the exact remaining availabilities. But I can give you the drawn amounts at each of the various levels. And of course . . . .

[A-Adelson:] Scott, I mean you're going to go into the analysis of the entire balance sheet and our debt structure; it's going to use up the rest of the time for everybody else. So the bottom line is that we have plenty of flexibility and whatever liquidity we need we're going to have.

¶ 416.   [Q-William Lerner:] [1] Last one, hi, Scott, when you've talked in the past, or we've talked in the past, ~~you guys have intimated that you needed an incremental US $3 billion to US $4 billion to build out the next 24 months in Cotai. And then as I do the back of the envelope for the $5.25 billion that you need – that you're saying you'll raise, which includes, obviously, a refi, you get to obviously a $2 billion incremental number to build out Cotai~~. Did something change? Is there sort of an apples and orange or did I miss something on the accordion [feature] or what am I thinking?

[A-Adelson:] [2] The accordion feature is in addition to that $5.25 million.

[Q-William Lerner:] [3] Okay, so that's the spread then?

[A-Stone:] [4] Not really. . . .

[A-Henry:] [5] That doesn't get us all the way there, Bill . . . .

[A-Adelson:] [6] ~~It gets us to the point that we operate at~~ [7] the manner in which we did 5 and 6. We did the groundwork, we did the foundations, the primers, etc. We got it out of the ground and now here we are refinancing it. [8] ~~And that's the way it will happen with 7 and 8. . . . . [A]ccordion feature that allows us to continue seamlessly~~.

* * *

[9] So, as I said, nothing fundamentally has changed in this Company. Those people who thought that we wanted to go on again, what I am borrowing money for when I'm going to

have a negative carry for another few months. [10] ~~If we've got an accordion feature that we can pick up another $1 billion as time moves on, then what's the rush? I want to open it as quickly as humanly possible.~~

[11] We've got to get over two things. One is the permitting, one is the redesign. [12] ~~And both of those at best will take at least a quarter.~~

[A-Stone:] [13] ~~Well the realities are, the spend at the beginning of the project, these construction projects, is very slow. You're sitting there drilling holes and pouring concrete for months and months and months. It's not till you start getting out of the ground that you start accelerating your spending. So, there's no need to go out and raise this kind of money.~~ [14] ~~We're not going to have need for significant money until the latter, second part of next year.~~

*[The last sentence of part [13] is struck as forward-looking because the truth or falsity of the need to raise money cannot be discerned until some point in the future. The remainder of part [13] is struck as unchallenged and unnecessary for context.]*

¶ 419. [1] The Company held restricted and unrestricted cash and cash equivalents of approximately $801.8 million and $173.1 million, respectively, and had construction payables of approximately $805.0 million as of June 30, 2008. [2] The Company is currently evaluating various strategies that would provide additional liquidity and flexibility at the parent company level, [3] which could be used to support its U.S. senior secured credit facility and the Company's current and future development plans, including the funding requirements related to its development projects. [4] ~~If the Company is not able to obtain additional financing when necessary or on terms acceptable to the Company, it may elect to slow or suspend its ongoing development activities until such financing or other sources of funds become available.~~

¶ 420. [1] ~~In Macao, the estimated cost to build the Company's Cotai Strip developments (including The Venetian Macao) is approximately $12.0 billion~~ *[forward-looking]*, [2] ~~of which the Company has capitalized approximately $4.05 billion as of June 30, 2008.~~ *[unchallenged statement of historical fact]*

¶ 422. *Bloomberg* reports that Adelson and other LVS executives dismissed concerns that a slowing economy or restrictions on visitors to Macao would impact Macao's results.