1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6          **DISTRICT OF NEVADA**
7
8   FRANK J. FOSBRE, JR.,  Individually and on      )    Case No.  2:10-cv-00765-APG-GWF
    Behalf of All Others Similarly Situated,       )    **Consolidated with:**
9                                                  )    Case No.:  2:10-cv-01210-APG-GWF
                 Plaintiff,                        )
10                                                 )
    vs.                                            )    <u>**ORDER**</u>
11                                                 )
    LAS VEGAS SANDS CORP., *et al.*,               )
12                                                 )
                 Defendants.                       )
13  _____        )

14          This matter is before the Court on Plaintiffs' Sealed Motion to Compel Production of

15  Documents (#170), filed on July 31, 2015.  Defendants filed their Sealed Opposition (#176) on

16  August 17, 2015 and Plaintiffs filed their Sealed Reply (#179) on August 27, 2015.  The Court

17  conducted a hearing in this matter on September 3, 2015.

18                              <u>**BACKGROUND**</u>

19          The factual allegations in this case are discussed in Order (#189) and will not be repeated

20  here except as necessary to explain the Court's decision.  In their instant motion, Plaintiffs seek an

21  order compelling Defendants Las Vegas Sands Corp. ("LVS"), Sheldon Adelson and William

22  Weidner to produce (1) documents withheld or redacted on the basis of the attorney-client privilege

23  that were disclosed to employees of The Goldman Sachs Group, Inc. ("Goldman Sachs") and

24  Jefferies, LLC ("Jefferies"); (2) documents withheld or redacted on the basis of the attorney-client

25  privilege that do not appear to have been made for the purpose of obtaining legal advice; and (3)

26  documents clawed-back or not produced by Defendants containing information on lost profits at the

27  Palazzo Resort Hotel Casino ("Palazzo") that appear to have been disclosed in prior litigation.

28  Plaintiffs also request that LVS be ordered to withdraw its assertion of attorney-client privilege over

documents that were produced to Plaintiffs by Goldman Sachs and redacted by Goldman Sachs at the direction of LVS.

## DISCUSSION

**1.   Whether Goldman Sachs' and Jefferies' employees were the functional equivalent of employees of LVS.**

"An eight part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) unless the protection be waived.

*United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).  The party asserting the privilege has the burden of proving each essential element of the privilege.  *Id.*

As a general rule, the attorney-client privilege is waived if the communication is voluntarily disclosed to a third party.  *Harter v. CPS Security (USA),* Inc., 2013 WL 3108947, *6 (D.Nev. June 18, 2013), citing *United States v. Zolin*, 809 F.2d 1411, 1415 (9th Cir. 1987), *rev'd on other grounds by* 491 U.S. 554 (1989)*.  See also Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D.Cal. 2007); *Avocent Redmond Corp. v. Rose Electronics, Inc.*, 516 F.Supp.2d 1199 (W.D.Wash. 2007).  Plaintiffs argue that Defendants waived the attorney-client privilege with respect to communications that were voluntarily disclosed to employees of Goldman Sachs or Jefferies.  Defendants argue, however, that the Goldman Sachs and Jefferies employees were the functional equivalent of LVS employees and are therefore within the scope of protection afforded by the attorney-client privilege.

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  The privilege recognizes that sound legal advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Company v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 683 (1981).  In *Upjohn*, the Court rejected the "control group test" which restricted the attorney-client privilege to communications between a corporation's

attorneys and its senior management employees who play a substantial role in deciding and directing a corporation's legal response.  The Court stated that the control group test "overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* 449 U.S. at 390, 101 S.Ct. at 683.  "In the corporate context, . . . it will frequently be employees beyond the control group . . . who will possess the information needed by the lawyers." 449 U.S. at 391, 101 S.Ct. at 683.  The control group test "frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation." 449 U.S. at 392, 101 S.Ct. at 684. Whether the attorney-client privilege applies to attorney communications with the corporation's employees must be decided on a case-by-case basis.  449 U.S. at 396, 101 S.Ct. at 686.  Relevant factors include whether (1) the communication concerned matters within the scope of the employee's corporate duties, (2) the employee was aware that the communication was for purposes of the corporation obtaining legal advice, and (3) the communication was intended to be confidential.  449 U.S. at 394, 101 S.Ct. at 685.

In *In re Bieter Company*, 16 F.3d 929 (8th Cir. 1994), the Eighth Circuit decided an issue left open by *Upjohn*, in holding that the attorney-client privilege can be applied to communications between a corporation's attorney and independent contractors or consultants who are the "functional equivalent" of corporate employees.  The court stated that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.*, at 937-38.  The court had no difficulty in finding that the independent contractor-consultant in that case was the functional equivalent of an employee. The court stated:

> Klohs has been involved on a daily basis with the principals of Bieter and on Bieter's behalf in the unsuccessful development that serves as the basis for this litigation.  Bieter was formed with a single objective and Klohs has been intimately involved in the attempt to achieve that objective.  As Bieter's sole representative at meetings with potential tenants and with local officials, he likely possesses the information that is possessed by no other.  As the initial retainer agreement he

entered into with Bieter indicates, it retained him "to provide advice and guidance regarding commercial and retail development based upon [his] knowledge of commercial and retail business in the State of Minnesota," just as one would retain an outside accountant for her knowledge of, say, the proper accounting practices and taxation concerns of partnerships. There is no principled basis to distinguish Kloh's role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation. *See Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682, Sexton, *supra*, at 498. As we understand the record, he was in all relevant respects the functional equivalent of an employee. (citation omitted).

*Bieter*, 16 F.3d at 938.

In *United States v. Graf*, 610 F.3d 1158-59, the Ninth Circuit adopted the functional equivalent doctrine set forth in *Bieter*. Graf served as a "consultant" to a health insurance company. Although he had no official title with the company, Graf regularly communicated with insurance brokers and others on behalf of the company, marketed its insurance plans, managed its employees, and was the company's voice in its communications with counsel. *Id.*, at 1157. The court noted that the only reason that Graf served as a consultant rather than as an employee was that an administrative order barred him from acting as the company's agent or employee. On this record, the Ninth Circuit had no difficulty in holding that Graf was the functional equivalent of an employee. *Id.*, at 1159.

Plaintiffs argue that the roles played by Goldman Sachs' and Jefferies' employees in this case are not comparable to those of the consultants in *Bieter* or *Graf* and, therefore, do not support a finding that they were the functional equivalent of LVS employees. Plaintiffs state that "[s]imply because Goldman provided investment banking services to LVS does not automatically render **every** Goldman employee identified on the withheld and redacted emails the functional equivalent of an LVS employee." *Motion (#170), pg. 7.* Plaintiffs rely on *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113-114 (S.D.N.Y. 2005) which rejected the argument that a financial advisor was the functional equivalent of an employee; *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-cv-585, 2014 U.S. Dist. LEXIS 175552, at *8 (S.D.N.Y. Dec. 19, 2014), which held that a marketing firm hired to assist in a complicated product roll-out was not the functional equivalent of an employee; and *In re Currency Conversion*

4

*Antitrust Litig.*, MDL No. 140, M 21-95, 2003 U.S. Dist. LEXIS18636, at *7-*8 (S.D.N.Y. October 21, 2003), which held that a consulting company that provided computing services, consulting services and other support services to credit card issuers was not the functional equivalent of an employee. The court stated that the consultant's "role is akin to that of an accountant or other ordinary third party specialist, disclosure to whom destroys the attorney client privilege."

The court in *Export-Import Bank* adopted the following narrow construction of the functional equivalent doctrine:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, *In re Bieter*, 16 F.3d at 933-34; *Ross*, 2004 WL 67221, at *4, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, *In re Bieter*, 16 F.3d at 938; *In re Copper Market*, 200 F.R.D. at 219; *Ross*, 2004 WL 67221, at *4, and whether the consultant is likely to possess information possessed by no one else at the company, *In re Bieter*, 16 F.3d at 938.

232 F.R.D. at 113.

The court was concerned that if the functional equivalent doctrine were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring deal, the exception would swallow the basic rule set forth in *United States v. Arthur Young & Co.*, 465 U.S. 805, 817, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1989), that there is no privilege protecting communications between clients and their accountants. *Id.*, 232 F.R.D. at 114. In following this narrow approach, the court in *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, U.S. Dist. LEXIS 175552, 2014 WL 7238354, *2, noted that the Second Circuit has not adopted the functional equivalent doctrine, and the court had doubts that it would endorse such an approach. The court in *In re Currency Conversion Antitrust Litig.*, 2003 U.S. Dist. LEXIS18636 (S.D.N.Y. October 21, 2003) also applied the narrow approach to the doctrine.

Other courts, however, have adopted a broader approach in applying the functional equivalent doctrine. *In re Flonase Antitrust Litigation*, 879 F.Supp.2d 454, 459 (E.D.Pa. 2012) states in this regard:

> Based on the underlying purpose of the attorney-client privilege, several courts have adopted a broad practical approach to determining

5

whether an independent consultant is the functional equivalent of an employee. *See e.g. U.S. ex rel. Strom v. Scios, Inc.*, NO. C05-3004, 2011 WL 4831192, at *4 (N.D.Cal. Oct. 12, 2011) ("[T]he dispositive question is the consultant's relationship to the company and whether by virtue of that relationship he possesses information about the company that would assist the company's attorney's in rendering legal advice."); *U.S. ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03:-167, 2009 WL 5033940, at *4 (S.D.Ohio Dec. 11, 2009) ("As long as the independent contractor has a role similar to that of an employee . . . , communications between the contractor and attorneys for purpose of seeking legal advice are privileged."); *Stafford Trading, Inc. v. Lovely*, No. 05-4868, 2007 WL 611252, at *7 (N.D.Ill. February 22, 2007) ("The court adopts this balanced approach . . . , limiting the privilege to those instances where . . . [the independent consultant] confidentially communicated with . . . counsel for the purpose of obtaining or providing legal advice."). In *Federal Trade Commission v. GlaxoSmithKline*, the D.C. Circuit took a practical approach and held that confidential communications involving consultants were entitled to privilege because they involved the rendering of legal advice and "corporate counsel worked with these consultants in the same manner as they d[id] with full time employees; . . . and acted as a team with full-time employees . . . and . . . became integral members of the team assigned to deal with issues [that] . . . were completely intertwined with [GSK's] litigation and legal strategies." 294 F.3d 141, 147-48 (D.C.Cir. 2002) (alteration in original) (internal quotation marks omitted).

The court in *In re Flonase* stated that the broad practical approach comports with the purpose of the attorney-client privilege as set forth in *Upjohn* and also reflects the reality that "'corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes.'" *Id.*, at 460, quoting Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 269 (5th ed. 2007). By contrast, the narrow approach is "'too restrictive' to be realistic in today's marketplace where businesses frequently hire contractors and still expect to be able to seek legal advice.'" *Id.*, quoting *Fry*, 2009 WL 5033940, at *4 n. 1.

In *Stafford Trading, Inc. v. Lovely*, the plaintiff company retained Goldman Sachs to locate potential purchasers for the company and to assist in facilitating the transaction. In upholding the plaintiff's assertion of the attorney-client privilege with respect to communications with Goldman Sachs employees, the court rejected the concern expressed in *Export-Import* that the functional equivalent doctrine would swallow the rule that communications between a client and his accountant are not privileged. The court stated that Goldman Sachs was clearly acting on behalf of

the company, not the public at large.  Although Goldman Sachs serves a multitude of clients, all of the parties involved considered the communications involving counsel to be confidential and they were treated as such.  The court stated that "[m]any courts have recognized that, in today's market place, attorneys need to be able to have confidential communications with investment bankers to render adequate legal advice. *See Calvin Klein Trademark Trust v. Wachner*, 124 F.Supp.2d 207, 209 (S.D.N.Y. 2000)."  2007 WL 611252, at *5.  This Court agrees with those courts that have adopted the broad practical approach in applying the functional equivalent doctrine.  *Stafford Trading* is particularly instructive because the services undertaken by Goldman Sachs in that case were similar to the services it provided on behalf of LVS in this case.

During the time period from late 2007 to late 2008, Defendants were dealing with the crisis in the world financial markets and the need for LVS to raise substantial funds (ultimately in excess of $2 billion) to support its extensive business operations and development projects in the United States, Macao and Singapore, and to avoid insolvency.  Based on the Court's review of the Defendants' exhibits, *Opposition Exhibits (#177)*, it is reasonably clear that Goldman Sachs acted in the role of financial advisor to the upper echelon of LVS's management, including its chief executive officer (CEO), Defendant Sheldon Adelson, and LVS's Board of Directors, in providing different financing options and making recommendations to LVS as to which avenues to pursue in raising the necessary funds.  As Defendants note, Goldman Sachs representatives attended LVS Board of Directors meetings during which they discussed financing alternatives and made recommendations to the Board.  *See Opposition Exhibits (#177), Exhibits 18-24.*  LVS specifically retained Jefferies to evaluate and render opinions to the non-management directors of the Board of Directors of LVS as to whether a proposed purchase by the Adelson family of $475 million of convertible notes in September 2008 and the Adelson family's participation in the public offering of stock in November 2008 were fair, from a financial point of view, to LVS.  *See Opposition Exhibits (#177), Exhibits 27-31.*

Plaintiffs point out that Defendants have not asserted the attorney-client privilege with respect to LVS attorneys' communications with other investment bankers, including Lehman Brothers and Citigroup, and have failed to demonstrate why communications with Goldman Sachs

should be privileged when no such assertion has been made with respect to other investment bankers. Defendants respond that "[w]hile Lehman and Citigroup made presentations to LVS with respect to financing alternatives, neither worked with the Company as Goldman did to assess LVS's financing needs or to develop strategies for meeting those needs. As just one example, unlike Goldman, neither Lehman nor Citigroup participated in LVS Board Meetings to discuss financing alternatives." *Opposition (#176), pg. 15.* Based on the exhibits provided by Defendants, the Court finds that the relationship between LVS and Goldman Sachs was not an "arms-length" negotiation between a prospective borrower and a prospective lender during which various proposals were exchanged. The Court also finds that Jefferies acted as a financial advisor to the non-management members of LVS's Board with respect to the financial transactions with the Adelson family. The fact that Defendants have not asserted the attorney-client privilege with respect to communications with other investment banks is not inconsistent with Defendants' position that Goldman Sachs and Jefferies personnel acted in the capacity of financial advisors to LVS and/or its directors, which qualifies them as the functional equivalent of employees.

Plaintiffs also argue that the assertion of the functional equivalent doctrine is inconsistent with Goldman Sachs' disclaimer of any fiduciary or agency relationship in the September 28, 2008 contract with LVS. *See Motion Exhibits (#177), Exhibit 40, LVSC0398205-8.* The purpose of this provision appears to have been to preclude LVS from asserting claims for breach of fiduciary duty against Goldman Sachs. The contract states in this regard that the "Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such a fiduciary duty or relationship." *Id.* Defendants argue that there is no requirement that a consultant be a fiduciary in order for the functional equivalent doctrine to apply.

Corporate officers or key managerial employees generally owe a fiduciary duty to their employer. *Aquent LLC v. Stapleton*, 65 F.Supp.3d 1339, 1348 (M.D.Fla. 2014). It is less clear whether lower level employees owe fiduciary duties to the employer and if so, what the scope of those duties are. *See Garden Catering-Hamilton v. Wally's Chicken Coop*, 30 F.Supp.3d 117, 135 n. 15 (D.Conn. 2014) (noting that some courts have concluded that low level at-will employees do not owe a fiduciary duty to their employers, while other courts hold that all employees owe a

fiduciary duty to the employer, but that the nature and scope of a lower level employee's duty is more limited).  To the extent that Nevada law governs this issue, it appears that employees, in general, owe a duty of loyalty to their employer.  *See Metlife Bank, N.A. v. Evergreen Moneysource Mortg.* Co., 2010 WL 2541729, *2 (D.Nev. June 17, 2010), citing *White Cap Industries, Inc. v. Ruppert*, 67 P.3d 318, 31920 (Nev. 2003).

The existence of a fiduciary relationship is certainly relevant in deciding whether a contractor or consultant is the functional equivalent of an employee.  An independent consultant who performs managerial or decision-making duties for a corporation is likely to be considered a fiduciary and is also likely to qualify as the functional equivalent of an employee.  *See In re Bieter* and *Graf, supra.*  On the other hand, *Upjohn* makes clear that attorney communications with lower level employees, who are not fiduciaries or whose fiduciary duties are limited, may also be within scope of the employer's attorney-client privilege.  As *In re Flonase* states, the dispositive question in applying the functional equivalent doctrine is whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice.  Although the consultant's disavowal of a fiduciary or agency relationship with the company is a factor to be considered, it does not alone preclude a finding that the contractor or consultant was the functional equivalent of an employee.  Here, Goldman Sachs' relationship with LVS was that of a financial advisor in developing its complex financing strategy.  This supports a finding that Goldman Sachs' personnel performing these duties were the functional equivalent of LVS employees.

Plaintiffs note that Defendants have withheld 202 emails, as well as an unknown number of attachments that were sent to or received from employees of Goldman Sachs.  Defendants also redacted 11 documents that were disclosed to Goldman Sachs.  In addition, Goldman Sachs redacted approximately 12 emails that it produced to Plaintiffs based on Defendants' assertion of the attorney-client privilege.  Plaintiffs state that 17 Goldman Sachs employees are identified in the withheld and redacted documents.  With respect to Jefferies, Defendants have withheld approximately 29 emails, as well as attachments involving 10 Jefferies employees.  *Motion (#170),*

*pgs. 4-5, 7-8.*  Plaintiffs argue that Defendants have the burden of demonstrating that each of the Goldman Sachs and Jefferies employees, who participated in or received allegedly confidential attorney-client communications, was the functional equivalent of an LVS employee.  Plaintiffs rely on *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 633 (D.Nev. 2013), in which the court stated that with respect to each consultant, it would have to make an individual determination as to whether the consultant was the functional equivalent of an employee.  Defendants dispute that they must individually demonstrate that each Goldman Sachs and Jefferies employee was a *de facto* employee of LVS.  Defendants argue that cases have upheld application of the doctrine with respect to a consulting firm and do not require a demonstration that each employee of the consulting firm, who received attorney-client communications, qualified as the functional equivalent of the corporate client's employee.

*Upjohn* recognized the need for a corporation's attorney to communicate confidentially with the corporation's employees in order to render competent legal advice.  Not every attorney communication with an employee, however, is automatically privileged.  Application of privilege to communications with corporate employees must be determined on a case-by-case basis.  *Upjohn*, 449 U.S. at 394, 101 S.Ct. at 685.  In a case such as this where attorney communications were disclosed to numerous employees of Goldman Sachs and Jefferies, there must be some showing that the employees were involved in the performance of services with which the attorney communications were concerned, that the employees were aware that the communications were for purposes of providing or obtaining legal advice, and that the employees understood the communications were intended to be confidential.

It is not surprising that Goldman Sachs and Jefferies assigned numerous employees to work on financial projects or transactions as substantial as those involved in this case.  There may also have been legitimate reasons for all of these employees to participate in or be privy to legal advice from LVS's attorneys.  Plaintiffs are no doubt aware through discovery of the identities and roles of the key Goldman Sachs and Jefferies employees who were involved in advising LVS.  The Court, however, is not familiar with each employee who participated in or received communications with LVS's attorneys.  Defendants' privilege log does not provide information that would allow the

Court to determine whether each employee was properly within the scope of the privilege. Rather than find waiver of the privilege on this basis, however, it is more appropriate to require Defendants to supplement their privilege log and demonstrate the applicability of the privilege to the individual employees. Such supplementation should include a description of the duties or role of the individual Goldman Sachs and Jefferies employees to demonstrate that they were proper participants in, or recipients of, confidential attorney communications, and that they understood the communications were for purposes of obtaining legal advice, and were intended to be confidential.

### 2. Whether some of the allegedly privileged communications concerned business advice rather than legal advice.

Defendants' privilege log states as the basis for withholding many of the emails, that the emails request or provide legal advice "regarding financial matters." *Motion (#170), Exhibit 1, Defendants' Privilege Log.* There is no reason to doubt that in the course of developing and deciding which financing alternatives to pursue, Defendants sought and obtained legal advice, including, but not limited to, advice relating to compliance with securities laws. Plaintiffs argue, however, that some of the withheld emails do not appear to have been made for purposes of obtaining legal advice because LVS's attorneys did not participate in the email exchanges, and/or because they appeared to concern business, rather than legal matters.

*Henderson Apartment Venture, LLC v. Miller*, 2011 WL 130013, *9 (D.Nev. March 31, 2011) notes that special problems arise in applying the attorney-client privilege in a corporate context. "Corporate counsel clearly qualifies as an attorney for purposes of the attorney-client privilege. However, corporate counsel can also act in dual roles. Communications by corporate counsel providing business advice are not covered by the privilege." *Id. Premiere Digital Access, Inc. v Central Telephone Company*, 360 F.Supp.2d 1168, 1174 (D.Nev. 2005) states that where the client is a corporation, "any advice sought by its representatives will obviously be, on some level, for purposes of how the corporation should conduct its business. However, . . . where . . . the primary purpose of the communication is to discern the legal ramifications of a potential course of action, that communication is for a "legal purpose."" Conversely, a communication is "not privileged 'where the principal purpose for making the communication' was not to secure legal

11

advice but to secure what was 'essentially a business service.'" *Genentech, Inc. v. Trustees of the Univ. of Pennsylvania*, 2011 WL 5079531, *2 (N.D.Cal. October 24, 2011), quoting *In re Micropro Sec. Litig.*, 1988 WL 109973, at *2 (N.D.Cal. Feb. 26, 1988).

Whether a particular communication was primarily for the purpose of obtaining or providing legal advice can only be determined by evaluating the communication itself. The courts in *Premiere Digital* and *Genentech* were required to determine whether inadvertently produced emails were protected by the attorney-client privilege. The courts, therefore, had the opportunity evaluate the contents of the communications in making the privilege determinations. In *Henderson*, the court, after reviewing a sample of the communications *in camera*, determined that a significant number of plaintiff's assertions of privilege were invalid and that it was therefore necessary to conduct *in camera* review "of all 127 documents" listed on plaintiff's privilege log to determine whether they were privileged. In this case, the Court has no basis, at this point, to find that Defendants are asserting attorney-client privilege with respect to business advice, rather than legal advice. As stated hereinafter, the Court will grant limited *in camera* review to determine whether the privilege is or is not being properly asserted.

**3.    Whether Defendants waived the attorney-client privilege by alleging that they relied on the advice of others.**

In their answers to Plaintiffs' seconded amended complaint, Defendants alleged as an affirmative defense that any alleged misstatements or omission by them "were based in good faith and in reasonable reliance upon the work, opinions, information, representations and advice of others upon whom they were entitled to rely." *LVS Defendants' Answer to Second Amended Complaint (#121), Eleventh Affirmative Defense; Defendant Weidner's Joinder to LVS Defendants' Answer to Second Amended Complaint (#122)*. In a letter to Plaintiffs' counsel dated June 1, 2015, the LVS Defendants withdrew their Eleventh Affirmative Defense, but stated that as part of their general denials and defense "they relied in good faith upon information provided by others in making the statements that are challenged in this action." *Motion (#170), Exhibit 47.* On the same date, Defendant Weidner notified Plaintiffs that he does not intend to assert the advice of counsel defense, but "may present evidence that he relied in good faith upon information provided by others.

1    *Motion (#170), Exhibit 47.* Plaintiffs contend that by these assertions, Defendants have placed the

2    legal advice they received from their attorneys in issue and have waived the attorney-client

3    privilege.

4         The Ninth Circuit employs a three-prong test to determine whether a waiver of the attorney-

5    client privilege has occurred. First, the court considers whether a party is asserting the attorney-

6    client privilege as the result of some affirmative act. Second, the court examines whether the party

7    asserting the privilege through an affirmative act has put the privileged information in issue. Third,

8    the court evaluates whether allowing the privilege would deny the opposing party access to the

9    information vital to its case. *Harter v. CPS Security (USA),* Inc., 2013 WL 3108947, at *6, citing

10   *United States v. Amlani,* 169 F.3d 1189, 1195 (9th Cir. 1999). The court in *Harter* held that

11   defendant did not waive the attorney-client privilege when it alleged that it relied on the advice of its

12   management consultant, who also happened to be a lawyer. The court found that defendants had not

13   sought legal advice from the consultant in his capacity as a lawyer. *Id.*, at *7. In *McKeen-Chapin v.*

14   *Provident Savings Bank, FSB*, 2015 WL 502697, *9 (E.D.Cal. February 5, 2015), an FLSA action,

15   the plaintiff argued that the defendant waived the attorney-client privilege by asserting as an

16   affirmative defense that it classified plaintiffs as exempt employees in good faith. The defendant

17   did not allege, however, that it relied on the advice of counsel in making its good faith

18   determination. The court, citing *Harter*, held that defendant had not placed the advice of its counsel

19   in issue by asserting this good faith defense. *Id.*

20        Defendants allege only that they relied in good faith upon information provided by others.

21   They have not alleged that they relied on the advice of counsel. Because Defendants assert the

22   attorney-client privilege, they are also precluded from asserting reliance on the advice of counsel as

23   a defense at trial. In regard to what information Defendants may have "relied on in good faith,"

24   Plaintiffs have had the opportunity to inquire about this during discovery. Presumably Defendants

25   relied on financial advice received from Goldman Sachs and Jefferies which has been disclosed in

26   discovery. Defendants have not waived the attorney-client privilege by placing the advice they

27   received from counsel in issue.

28   . . .

1

**4.      Plaintiffs' request for *in camera* review.**

2      Plaintiffs request that the Court conduct an *in camera* review of the withheld documents if it

3   does not find a general waiver of the attorney-client privilege.  In *United States v. Zolin*, 491 U.S.

4   554, 572, 109 S.Ct. 2619, 2631 (1989), the Supreme Court established a minimum threshold

5   standard that must be met to justify *in camera* review of allegedly privileged communications to

6   determine if the crime-fraud exception applies.  In *In re Grand Jury Investigation*, 974 F.2d 1068,

7   1074-75 (9th Cir. 1992), the Ninth Circuit extended that standard to the issue of whether withheld

8   communications are within the scope of the attorney-client privilege.  The court stated: "To

9   empower the district court to review the disputed materials *in camera*, the party opposing privilege

10  need only show a factual basis sufficient to support a reasonable, good faith belief that *in camera*

11  inspection may reveal evidence that the information in the materials is not privileged." *Id.*, at 1075.

12  If the movant meets this threshold, then the decision to conduct *in camera* review rests in the sound

13  discretion of the district court as guided by the factors enumerated in *Zolin*.  *In re Grand Jury*

14  *Investigation*, 974 F.2d at 1075.  *Zolin* states that the district court may decide whether or not to

15  conduct *in camera* review in light of the facts and circumstances of the particular case, including,

16  among other things, the volume of the material the district court has been asked to review, and the

17  relative importance to the case of the allegedly privileged information.  491 U.S. at 472, 109 S.Ct. at

18  2631.  The third factor, the likelihood that the evidence produced through *in camera* review will

19  establish the crime-fraud exception, does not apply in this case.

20      Plaintiffs argue that *in camera* review in this case is warranted for the following reasons: (1)

21  Many of the withheld and redacted communications that include Goldman and Jefferies employees

22  do not appear to have been made for the purpose of obtaining legal advice.  (2)  Many of the

23  redacted documents contain communications in which no attorney was a party.  (3)  Other withheld

24  and redacted documents are directed to non-attorneys and only "CC" one or more attorneys.

25  Plaintiff argues that merely copying an attorney on a communication sent to several individuals does

26  not render the communication privileged.  *Motion (#170), at pgs. 17-18,* citing *Phillips v. Bard*, 290

27  F.R.D. at 630, and other cases.  (4)  In some communications, the redaction covers most of the

28  document so that it is difficult to make any determination as to whether the attorney-client privilege

applies without seeing the redacted portion of the document.

Plaintiffs also argue that Defendants have engaged in the unbridled assertion of the attorney-client privilege over documents that are indisputably not privileged.  As support for this assertion, Plaintiffs state that when they previously challenged Defendants' assertion of the attorney-client privilege to 57 documents, Defendants conceded that 46 of them had been improperly redacted and produced unredacted versions of the documents.  In their response to Plaintiffs' instant motion to compel, Defendants also withdrew privilege claims with respect to twenty-nine (29) withheld documents and to six other redacted documents.  *See Defendants' Opposition (#176), pg. 21, n. 20.* Plaintiffs have also cited examples of subsequently disclosed communications which they contend demonstrate that Defendants did not have a reasonable basis for asserting the attorney-client privilege.  *See Reply (#179), pg. 13, n. 15.*

Defendants argue that Plaintiffs have failed to meet the threshold burden to justify *in camera* review.  They argue that communications between non-lawyer employees which discuss legal advice provided by counsel or the seeking of legal advice are protected by the attorney-client privilege.  The fact that an attorney did not participate in the communication, or was not copied on it, does not mean it is not privileged.  Defendants also argue that Plaintiffs have not made any showing that the subject communications concerned business advice, rather than legal advice.  Finally, Defendants argue their withdrawals of privilege assertions to some documents demonstrates their good faith and reasonableness in asserting the attorney-client privilege.

Plaintiffs have satisfied the threshold showing to support *in camera* review of at least a portion of the documents that Defendants have withheld or redacted.  The documents at issue are primarily email communications and attachments thereto covering the period from April 13, 2007 to December 31, 2008.  *Motion (#170), Exhibit 1.*  Significant numbers of the emails involved exchanges between non-attorneys, which in some instances were copied to LVS attorneys but in other instances were not.  Communications between non-attorney employees for purposes of obtaining or relaying legal advice are protected by the attorney-client privilege.  *Applied Medical Resources Corp. v. Ethicon, Inc.*, 2005 WL 6567355, *2 (C.D.Cal. May 23, 2005).  *U.S. v. Chevrontexaco Corp.*, 241 F.Supp.2d 1065, 1077 (N.D.Cal. 2002).  *Applied Medical Resources*

1  states, however, that in the absence of any attorney linked to the documents or a more thorough

2  description of the legal advice involved, the party seeking production had met the minimal threshold

3  required for *in camera* review of the documents.  *Id.* The Court agrees with the analysis in *Applied*

4  *Medical Resources.*

5        Plaintiffs have also raised the issue whether some of the allegedly privileged

6  communications were for business, rather than legal purposes.  As noted in *Henderson Apartment*

7  *Venture*, 2011 WL 130013, at *9, communications between corporate employees and corporate

8  counsel can involve business or legal advice.  Where, as here, the communications occurred during

9  the course of business transactions and prior to litigation, there may be greater doubt as to whether

10  the communications were primarily for legal rather than business purposes.  Defendants' privilege

11  logs, while adequate to invoke the privilege, do not provide sufficient detail about the

12  communications to reliably determine that they primarily involved legal advice.  To the extent that

13  there are doubts whether the threshold for *in camera* review has been met, Defendants' withdrawal

14  of privilege assertions to a significant number of documents weighs in favor of *in camera* review.

15  While the Court does not want to discourage any party from withdrawing assertions of privilege

16  because of the fear that such a concession will be used as grounds for seeking *in camera* review of

17  other documents, Defendants' withdrawal of privilege assertions with respect to a significant

18  number of documents raises legitimate doubts about its care in asserting the attorney-client

19  privilege, and therefore supports a finding that the threshold for *in camera* review has been met.

20        Turning to the discretionary factors, the communications at issue relate to the advice or

21  recommendations made to Defendants by Goldman Sachs and Jefferies, and therefore, appear

22  relevant to the issues in this case.  Obviously, the materiality of these communications cannot be

23  determined without actually reviewing them.  The chief factor weighing against *in camera* review is

24  the volume of the material for which review is requested.  *Zolin* states that "we cannot ignore the

25  burdens *in camera* review places upon the district courts, which may well be required to evaluate

26  large evidentiary records without open adversarial guidance by the parties."  *Zolin*, 491 U.S. at 571,

27  109 S.Ct. at 2630.

28  . . .

16

According to Defendants, *in camera* review as requested by Plaintiffs will require review of more than 190 documents consisting of 3,259 pages. *Opposition (#176), pg. 20; Defendants' Response to Court's Request for Additional Information (#183).* Even accounting for repetition and boilerplate provisions in the email communications, the volume of material is substantial. In support of their argument that the court should deny *in camera* review, Defendants cite two cases in which the courts granted *in camera* review of a relatively small number of documents. *American Civil Liberties Union of Northern Calif. v. FBI*, 2015 WL 678231, at *3 (N.D.Cal. Feb. 17, 2015) (27 pages of documents) and *Genentech, Inc. v. Insmed Inc.*, 234 F.R.D. 667, 673 (N.D. Cal. 2006) (two documents). These cases establish nothing more than the review of a few documents is not burdensome and does not weigh against granting *in camera* review. Defendants also cite *Community House, Inc. v. City of Boise*, 2009 WL 1650463 (D.Idaho June 12, 2009) in which the court found that defendant's privilege logs, when combined with the list of city employees and their responsibilities, satisfied the requirements of Rule 26(b)(5) and enabled the plaintiff to assess the claims of privilege. The court therefore found that *in camera* review of potentially voluminous documents was not necessary. In *Laser Indus. v. Reliant Technologies*, 167 F.R.D. 417, 421 n. 6 (N.D.Cal. 1996), the court rejected *in camera* review for other reasons, but also noted that the court was being asked to examine a very large volume of documents. The court stated: "The larger the volume of documents reviewed *in camera*, the greater the potential harm to the privilege and the greater the burden on the court. These kinds of burdens consume finite judicial resources, resources that judges could otherwise be committing to other pressing obligations[.]" *Id.*

Plaintiffs cite cases in which courts have granted *in camera* review of substantial numbers of documents. In *Applied Medical Resources Corp. v. Ethicon, Inc.*, 2005 WL 6567355, *2 (C.D.Cal. May 23, 2005), 400 to 450 documents were in dispute. The court stated that *in camera* review was the most appropriate method for resolving the privilege dispute and that requiring the defendant to provide affidavits or a similar individualized showing would be unduly burdensome. The court, thus, shifted the analysis of the burden from that imposed on the court to that imposed on the party asserting privilege. The court also appointed a special master to perform the *in camera* review and required the plaintiff, the party who sought *in camera* review, to initially pay the special master's

fees with the potential for later cost-shifting to defendants. *Id.,* at *3. This order reduced the burden on the court. In *Ocean Mammal Institute v. Gates*, 2008 WL 2185180 (D.Haw. 2008) and *High-Tech Employee Antitrust Litig.*, 2013 WL 772668, (N.D.Cal. 2013), the courts granted *in camera* review of voluminous documents but did not discuss the discretionary factors in *Zolin* and, in particular, did not address the burden that *in camera* review imposes on the court. In *Coleman v. Schwarzenegger*, 2007 U.S.Dist. LEXIS 37193 (E.D.Cal. 2007), the court also granted *in camera* review of voluminous documents, but did not address the *Zolin* factors. The decision, instead, dealt with the inadequacy of the defendants' privilege logs and whether defendants had waived certain of the privileges. These cases obviously demonstrate that courts will grant *in camera* review even if it involves the review of voluminous documents.

In *Henderson Apartment Venture, LLC v. Miller*, 2011 WL 1300143, *8, *9 (D.Nev. March 31, 2011), the court granted *in camera* review of voluminous email communications between corporate employees. Before doing so, however, the court first ordered the plaintiff to produce a representative sample of 10% of the allegedly privileged documents for *in camera* review. Based on that initial review, the court found that plaintiff had improperly asserted the attorney-client privilege, and the court therefore "reluctantly concluded" that *in camera* review of all 127 documents listed on plaintiff's privilege log was necessary. This Court will follow a similar approach.

In their motion, Plaintiffs identified five (5) redacted email communications between non-attorney representatives of LVS and Goldman Sachs in which no attorneys participated. *Motion (#170), pg. 14, n. 11.* Plaintiffs identified an additional thirty-two (32) withheld email communications in Defendants' privilege logs which indicated no attorney involvement. *Id., pg. 14, n. 12.* Plaintiffs also identified two (2) redacted emails and sixteen (16) withheld email communications between non-attorneys that were cc'd to attorneys. *Id., pg. 18, n. 14.* Defendants have withdrawn their privilege claims to many, but not all of these withheld or redacted documents. *Opposition (#176), pg. 21, n. 20.* The Court will therefore order Defendants to submit for *in camera* review, the remaining documents identified in footnotes 11, 12 and 14 of Plaintiffs' motion to which Defendants still assert the privilege. The Court will also grant *in camera* review of the

withheld documents relating to LVS attorney Dylan Williams, who Plaintiffs claim was not employed in an attorney capacity during a significant period during 2007-2008. *Motion (#170), pg. 20.*

If *in camera* review of the foregoing documents indicates that Defendants improperly asserted the attorney-privilege in a manner that calls into question the reasonableness of their assertion of attorney-client privilege to the remaining documents, then the Court will consider granting additional *in camera* review which may include the appointment of a special master in the manner done in *Applied Medical Resources Corp. v. Ethicon, Inc.*, 2005 WL 6567355, at *3.

**5.    Plaintiffs' request for documents related to lost earnings before interest, taxes, depreciation and amortization ("EBITDA") caused by the delayed opening of the Palazzo.**

Plaintiffs seek to compel Defendants to produce documents relating to lost "earnings before interest, taxes, depreciation and amortization" (EBITDA) allegedly caused by the delayed opening of Defendants' Palazzo property in Las Vegas.  This includes an order compelling Defendants to produce a lost earnings report, dated October 14, 2008, that was prepared during prior litigation with the assistance of counsel.  That report was disclosed during discovery in this case, but was "clawed back" by Defendants after they realized it contained attorney opinion work product.  Defendants argue that LVS's lost earnings related to the delayed opening of the Palazzo is irrelevant to the claims in this case and, even if relevant, that LVS has not waived its work-product doctrine/privilege with respect to the October 14, 2008 report.

According to the exhibits attached to Plaintiffs' motion, Malcolm Drilling Company ("Malcolm") was hired to perform part of the foundation work for the Palazzo and was terminated from that project in March 2006.  Malcolm filed suit against the general contractor, Taylor International Corp. and Lido Casino Resort, LLC (an affiliate of LVS) in April 2006.  Lido alleged a counterclaim against Malcolm for lost hotel/casino profits caused by delays resulting from Malcolm's defective work.  *Motion (#170), Exhibit 79,* docket entries from *Malcolm Drilling Co., Inc. v. Taylor International Corp. and Lido Casino Resort, LLC*, Case No. A520945, District Court, Clark County Nevada ("*Malcolm Drilling Litigation*").  The lawsuit was settled in August 2009.  *Id.* Lido served supplemental answers to interrogatories in the *Malcolm Drilling Litigation* in July

2007, in which it alleged EBITDA damages caused by delay in the amount of $135,059,352. *Motion (#170), Exhibit 77.* Malcolm filed a motion for partial summary judgment on January 30, 2008 in which it stated that Lido was alleging that Malcolm "should be responsible for lost hotel/casino profits associated with 124 days of overall Project delays, and assert a claim for consequential delay damages that is apparently now priced in a range of $92.8 million." *Id., Exhibit 78.* As indicated above, the lost EBITDA report that LVS's counsel clawed back was dated October 14, 2008. No information has been provided that this report was disclosed by Lido in the *Malcolm Drilling* litigation or that it was the basis for a later computation of damages in that litigation.

Plaintiffs argue that LVS's alleged lost EBITDA relating to the delayed opening of the Palazzo is directly relevant to its claims in this case. Plaintiffs allege that "LVS needed the Palazzo operations to generate substantial adjusted EBITDA in order to maintain compliance with the Company's U.S. loan covenants that would become effective in Q3-08. Complaint ¶¶ 176-177. However, as alleged in the Complaint, the delayed opening at the Palazzo and its subsequent underperformance affected LVS's ability to maintain compliance with its U.S. credit facility loan covenants and reduced LVS's borrowing capacity under the U.S. credit facility. *Id.*¶¶ 178-181, 184-188. Accordingly, the Report is directly relevant to the claims in this case." *Motion (#170), pgs. 22-23.*

Defendants argue, however, that the delay that was caused by Malcolm's breach of contract "occurred prior to March 2006 and was both fully disclosed and fully taken into account in the Company's internal EBITDA forecasts prior to the start of the class period." *Opposition (#176), pg. 26.* Defendants state that in its Form 10-Q report filed in November 2005, LVS disclosed its then current belief that the Palazzo would open in "mid-2007." *Opposition Exhibits (# 177), Exhibit 32.* In its Form 10-Q report filed in November 2006, LVS estimated the opening date for the Palazzo to be in "fall of 2007." *Id., Exhibit 33.* In its Form 10-Q report filed in May 2007, LVS estimated the opening date for the Palazzo to be in "late 2007." *Exhibit 34.* Finally, in an earnings conference call on August 1, 2007, the day before the beginning of the Class Period in this case, LVS disclosed that Palazzo was expected to open to the public on December 20, 2007. *Exhibit 35.* Defendants argue that "before the Class Period in this case even began, the Company and the public were aware

1    of the delay from the events at issue in the *Malcolm Drilling* litigation.  Thus, the requested

2    *Malcolm Drilling* documents, which  purportedly would show how much the company would have

3    earned had the Palazzo opened in "mid-2007," are simply irrelevant to this case." *Opposition*

4    *(#176), pgs. 26-27.*

5         The Court set forth the general rules regarding relevancy under Rule 26(b)(1) in *Order*

6    *(#189)* and refers the parties to that discussion with respect to the relevancy issue raised here.

7    Plaintiffs' claims in this lawsuit are not premised on LVS's alleged failure to disclose the delayed

8    opening of the Palazzo.  If that were the claim, then LVS's public statements regarding the expected

9    opening date of the property would refute it.  Plaintiffs, however, allege that the delayed opening of

10   the Palazzo in 2007, and the accompanying loss of earnings, contributed to LVS's liquidity crisis

11   and, in turn, to its failure to inform the public of the extent of that crisis or to timely obtain equity

12   investment to stave off financial collapse.  *Second Amended Complaint (#87)*, ¶¶ 176-188.  Given

13   these allegations, LVS's calculation of the amount of its lost EBITDA due to the delayed opening of

14   the Palazzo appears relevant under the broad standard of Rule 26(b)(1).  Plaintiffs' request for

15   production of documents relating to the lost EBITDA claim appear to be reasonably within the

16   scope of Request for Production Nos. 9 and 29.  *See Motion (#170), pg. 26.*  The Court therefore

17   concludes that Plaintiffs are entitled to obtain non-privileged documents in Defendants' possession,

18   custody and control relating to its lost EBITDA claim in the *Malcolm Drilling Litigation.*

19        The Court is not persuaded, however, that Defendants have waived the attorney-client

20   privilege or work-product doctrine privilege with respect to the October 14, 2008 report.  Rule

21   502(a) of the Federal Rules of Evidence provides that when disclosure is made in a federal

22   proceeding and waives the attorney-client privilege or work-product protection, the waiver extends

23   to an undisclosed communication or information in a state or federal proceeding only if (1) the

24   waiver is intentional, (2) the disclosed and undisclosed communication or information concern the

25   same subject matter, and (3) they ought in fairness be considered together.  The evidence presented

26   to this Court shows that 15 months before the October 14, 2008 report, Lido provided a computation

27   of its lost EBITDA claim in the amount of $135,059,352.00.  Sometime prior to January 30, 2008,

28   Lido apparently provided another calculation of its lost EBITDA claim in the amount of $92.8

1  million.  There is no showing that the information contained in the later October 14, 2008 report

2  was used in preparation of a subsequent computations of damages.  It is also unknown whether Lido

3  disclosed an expert witness to testify about its lost EBITDA damages and whether the expert was

4  provided with the facts or data set forth in the October 14, 2008 report to prepare his or her opinion.

5  Fed.R.Civ.Pro. 26(b)(4)(C) provides that Rule 26(b)(3)(A) and (B) protect communications between

6  a party's attorney and expert witnesses, except to the extent that the communications identify facts

7  or data that the party's attorney provided and that the expert considered in forming the opinions to

8  be expressed, or identified assumptions that the expert relied on in forming the opinions to be

9  expressed.  Accordingly, the Court will not order production of the October 14, 2008 report at this

10  time.  Production of the report may be required pursuant to Rule 502(a) if it is shown that the

11  information in the report was the basis for a subsequent lost EBITDA computation of damages

12  produced in the *Malcolm Drilling Litigation*.

13  <u>**CONCLUSION**</u>

14  **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel Production of Documents

15  (#170) is **granted**, in part, and **denied**, in part, as follows:

16  1.  The Court denies Plaintiffs' motion insofar as it requests production of all allegedly

17  privileged attorney-client communications in which Goldman Sachs and Jefferies employees

18  participated or were recipients.  LVS is required, however, to supplement its privilege logs to

19  include a description of the duties and roles of the individual Goldman Sachs and Jefferies

20  employees to demonstrate that they were proper participants in, or recipients of, confidential

21  attorney-client communications, that they understood the communications were for the purpose of

22  obtaining legal advice and were intended to be confidential.

23  2.  The Court grants Plaintiffs' motion for *in camera* review to the extent of determining

24  the applicability of the attorney-client privilege to the documents identified in footnotes 11, 12, and

25  14 of Plaintiffs' Motion to which the Defendants still assert the privilege, and with respect to

26  withheld documents relating to communications by or with LVS attorney Dylan Williams.

27  3.  The Court grants Plaintiffs' motion to compel production of nonprivileged

28  documents in Defendants' possession, custody, or control relating to its claim for lost EBITDA in

1   the *Malcolm Drilling Litigation*.  The Court however, denies Plaintiffs' motion for production of the

2   October 18, 2008 report to which Defendants have asserted the attorney-client privilege and/or

3   work-product doctrine.

4         **IT IS FURTHER ORDERED** that Defendants shall comply with the provisions of this

5   order within fourteen (14) days from its filing unless the time for compliance is extended by

6   stipulation of the parties or further order of the Court.

7         DATED this 14th day of January 2016.

8

9

                                    _____

10                              GEORGE FOLEY, JR.
                            United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28