# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| FRANK J. FOSBRE, JR., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LAS VEGAS SANDS CORPORATION, SHELDON G. ADELSON, and WILLIAM P. WEIDNER,<br><br>Defendants. | Case No. 2:10-cv-00765-APG-GWF<br><br>**ORDER (1) GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, (2) DENYING AS MOOT MOTION TO STRIKE EXPERT, (3) DENYING MOTION TO STRIKE REPLY, AND (4) GRANTING MOTION TO FILE SUPPLEMENT**<br><br>(ECF Nos. 193, 195, 196, 248, 256) |

I set forth the facts of this class action in a prior order and I will not repeat them here except where necessary. ECF No. 55. In brief, defendant Las Vegas Sands Corporation ("LVS") operates resorts and gaming properties in Las Vegas, Macao, and Singapore. Plaintiffs contend they purchased LVS stock at artificially high prices between August 2, 2007 and November 5, 2008 because during that period LVS allegedly made various false and misleading public statements about its development plans and liquidity. Plaintiffs bring claims under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against defendants LVS, Sheldon Adelson, and William Weidner, and under section 20(a) of the Act against Adelson and Weidner for "control person" liability.

The defendants move for summary judgment, arguing they did not make any misrepresentations, they did not act with scienter, and the plaintiffs cannot show loss causation. They also contend some statements are not actionable as forward-looking or puffery. Finally, Weidner disputes that he is a control person. The plaintiffs respond that the defendants made false and misleading statements throughout the class period and acted with scienter. The plaintiffs argue they can show loss causation through their expert. Finally, they contend Weidner is a control person because he was LVS's chief operating officer and a member of the board, managed LVS's executives, and oversaw major LVS operations.

1  **I. LEGAL STANDARD**

2          Summary judgment is appropriate if the pleadings, discovery responses, and affidavits

3  demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to

4  judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the

5  outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

6  (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict

7  for the nonmoving party." *Id.*

8          The party seeking summary judgment bears the initial burden of informing the court of the

9  basis for its motion and identifying those portions of the record that demonstrate the absence of a

10  genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden

11  then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine

12  issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.

13  2000).  I view the evidence and reasonable inferences in the light most favorable to the non-

14  moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

15  **II. ANALYSIS**

16          The elements of section 10(b) and Rule 10b-5 violations are:

17          (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a
           connection between the misrepresentation or omission and the purchase or sale of
18          a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;
           and (6) loss causation.

19

20  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) (quotation omitted).

21  Rule 10b-5 prohibits "only misleading and untrue statements, not statements that are incomplete."

22  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis omitted).  This

23  is because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be

24  additional details that could have been disclosed but were not." *Id.*  Instead, a statement that is

25  incomplete is actionable only if it is misleading.  "[I]n other words it must affirmatively create an

26  impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*

27  Consequently, the plaintiffs must present evidence raising a genuine issue of fact that the

28

defendants' statements were "misleading or untrue, not simply [that] the statements were incomplete." *Id.*

Additionally, section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," and "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011). "[S]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 875 (9th Cir. 1994) (quotation omitted).

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). Conduct is reckless if it involves "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quotation omitted). "Scienter requires either deliberate recklessness or conscious recklessness—a form of intent rather than a greater degree of negligence." *Id.* (quotation omitted). The "objective unreasonableness of the defendant's conduct" may "raise an inference of scienter," but "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Id.* (quotation omitted).

Loss causation means "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To meet this element, the plaintiff must show "that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss." *Erica P. John Fund, Inc.*, 563 U.S. at 812 (emphasis omitted). To establish the causal link between the misrepresentation and the loss, the plaintiff must show "that the defendant's share price fell significantly after the truth became known." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quotation omitted).

1    A plaintiff thus must show that the market "learned of and reacted" to the alleged fraud,

2  "as opposed to merely reacting to reports of the defendant's poor financial health generally." *Id.*

3  at 1063.  The mere fact that a stock's price was inflated on the date it was purchased due to a

4  misrepresentation "does not necessarily mean that the misstatement is the cause of a later decline

5  in value." *Erica P. John Fund, Inc.*, 563 U.S. at 812.  Rather, a price decline "could instead be the

6  result of other intervening causes, such as changed economic circumstances, changed investor

7  expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.* at 812-

8  13 (quotation omitted); *see also Dura Pharm., Inc.*, 544 U.S. at 343 (referring to the "tangle of

9  factors affecting price").  "If one of those factors were responsible for the loss or part of it, a

10  plaintiff would not be able to prove loss causation to that extent . . . even if the investor purchased

11  the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected

12  in that price." *Erica P. John Fund, Inc.*, 563 U.S. at 813.

13    The plaintiff need not show that a misrepresentation was the only reason for the price

14  decline so long as the plaintiff establishes it was a substantial cause. *In re Daou Sys., Inc.*, 411

15  F.3d 1006, 1025 (9th Cir. 2005).  Nor must the plaintiff show the defendant admitted or was

16  found to have committed fraud before loss causation can be established. *Metzler*, 540 F.3d at

17  1064.  Additionally, the "market need not know at the time that the practices in question

18  constitute a 'fraud,' nor label them 'fraudulent.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376,

19  392 (9th Cir. 2010).

20    Loss causation is a "context-dependent inquiry." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200,

21  1210 (9th Cir. 2016) (quotation omitted).  "Because loss causation is simply a variant of

22  proximate cause, . . . the ultimate issue is whether the defendant's misstatement, as opposed to

23  some other fact, foreseeably caused the plaintiff's loss." *Id.* (internal citation omitted).

24    In addition to these elements, the Private Securities Litigation Reform Act ("PSLRA")

25  contains a safe harbor provision that "exempts, under certain circumstances, a forward-looking

26  statement." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir.

27  2014).  A forward-looking statement is "any statement regarding (1) financial projections, (2)

28

plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (quotation omitted).  "The safe harbor applies if the forward-looking statement is '. . . identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1058 (quoting 15 U.S.C. § 78u-5(c)(1) & citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010)). Additionally, the safe harbor applies to a forward-looking statement even if it is not identified as such and is not accompanied by cautionary language, "unless the statement was 'made with actual knowledge . . . that the statement was false or misleading.'" *Id.* (quoting 15 U.S.C. § 78u-5(c)(1). When determining whether a statement that has both forward-looking and non-forward-looking portions falls within the safe harbor, I examine the challenged statements "as a whole." *Id.* at 1059.

I previously set forth which statements in the second amended complaint ("SAC") were actionable following the defendants' motion to dismiss. ECF No. 118.  I now address each in turn.[1]

### 1.  SAC ¶ 289

An August 1, 2007 press release announcing LVS's earnings for the second quarter of 2007 contained the following alleged misrepresentations by Weidner:

> **We have continued to execute our development plans for the Cotai Strip in all areas.**  We recently commenced our international marketing programs, which are designed to transform Macao into a multi-night stay international destination . . . .
>
> We have advanced the leasing of our retail space on the Cotai Strip . . . . Our convention, tour and travel, and corporate meetings businesses are each ready to begin operations concurrently with the grand opening of The Venetian Macao. **In addition, our construction, design and development work on each of our other six sites on the Cotai Strip continued to progress**, and we continued to

---

[1] The plaintiffs make no argument at the summary judgment stage regarding paragraphs 333, 358, 362, 374, 387, and 398 of the SAC.  The defendants therefore are entitled to summary judgment as to these allegations.

> advance our master-plan to develop a complementary trade-fair, convention, and leisure destination on Hengqin Island, in Zhuhai of the People's Republic of China and adjacent to the Cotai Strip.  Finally, we completed a $5.0 billion credit facility which simplified our administrative reporting requirements and significantly increased our flexibility to move quickly to take advantage of emerging development opportunities worldwide.

ECF No. 198-17 at 10.[2]

The plaintiffs contend Weidner's statements about executing development plans and that construction, development, and design work on the Cotai Strip continued to progress were false and misleading when made because LVS did not execute its plan to obtain bank financing for these projects in 2007 to ensure timely completion of Cotai Strip projects.  They also argue LVS did not execute its own building plans and failed to prepare cost budgets and viable designs for the Cotai Strip developments.

The defendants respond that these statements were not false or misleading when made because LVS was executing development plans on the Cotai Strip and work was progressing on those projects.  The defendants argue that the plaintiffs' theory rests on LVS failing to disclose that its capital expenditures for its development projects were lower than an undisclosed internal capital expenditure budget and failing to obtain financing according to an internal timeline.  The defendants argue they had no duty to disclose these internal plans and none of their statements misled investors, particularly when considered in light of the public disclosures LVS made about these topics.

The plaintiffs have not presented evidence raising an issue of fact that Weidner's August 1, 2007 statements were false or misleading when made.  As of August 2007, LVS was executing its development plans, and its construction, development, and design work continued to progress. LVS expended $1.5 billion for construction and development activities in Macao in the first nine months of 2007 and made progress on its various projects there. ECF Nos. 198-28 at 45; 198-14 at 5; 198-17 at 13; 198-19 at 10, 30; 198-25 at 17; 198-36 at 56, 59.  LVS opened the Venetian

---

[2] The bolded language represents the portions of the allegations that remain pending following my order on the defendants' motion to dismiss. *See* ECF No. 118.

Macao less than four weeks later and a hotel tower at Sands Macao the following month.[3] ECF Nos. 198-37 at 74; 198-26 at 4. It had submitted plans to the Macao government for other sites and had commenced construction on some of those developments. ECF Nos. 198-15 at 10, 26; 198-19 at 10, 30. LVS disclosed that it did not yet have all the necessary Macao government approvals for all of its planned developments but it had commenced construction or pre-construction for projects 5, 6, 7, and 8 on the Cotai Strip. ECF Nos. 198-37 at 9-11; 198-46 at 2, 4.

The plaintiffs' contention that Weidner's August 1, 2007 statements were false rests on (1) LVS's failure to meet an internal timeline to obtain new bank financing for the Macao developments by the third quarter of 2007, (2) LVS's failure to expend funds on Macao development consistent with an internal capital expenditure budget, and (3) LVS's failure to disclose it had no viable designs for sites 7, 8, and 3. However, none of these theories raises an issue of fact as to the falsity of Weidner's statements.

In early 2007, it was LVS's objective to obtain bank financing in late 2007. *See* ECF No. 224-86 at 89. But there is no evidence that new financing had to be in place as of August 1, 2007. Rather, LVS's executives and its external financial advisors believed such financing could be completed well into 2008. *See* ECF Nos. 197-30 at 38-39, 41-46, 52; 197-32 at 68; 224-64 at 12-13; 224-67 at 45. Additionally, LVS employees testified that Cotai Strip development did not slow due to a lack of available financing even after this date. *See* ECF Nos. 198-141; 224-86 at 81-83.[4] The plaintiffs have presented no evidence of any particular project or development milestone that was not performed as of August 1, 2007 due to the new Macao financing not being in place by that date. As discussed above, over a billion dollars had been expended on Macao development in 2007 up to that point and major projects were nearing completion.

---

[3] LVS also opened the Four Seasons Hotel and Shoppes in Macao and a performance theater inside the Venetian Macao a year later. ECF No. 198-76 at 2.

[4] *See also* ECF No. 224-62 at 7 (June 2008 email from LVS Senior Vice President of Finance Scott Henry stating that LVS was "running out of cash to fund our Cotai projects near the end of Q3 (September) [2008] . . . .") and 57 (Jean-Francois Astier from Lehman Brothers stating that LVS is "funded until Q3-2008").

The plaintiffs also fail to present evidence that Weidner was aware of any development failure. Weidner testified that he relied on reports from other LVS employees, as well as his own visits to the sites, to support his statements that the projects were progressing. ECF No. 198-143 at 5. He also avers that he acted in good faith and with no intent to deceive investors. *Id.* at 6-7. The plaintiffs thus also fail to raise a genuine issue of material fact as to Weidner's scienter for these alleged misstatements.

Further, Weidner's statements said nothing about the availability of financing or LVS's undisclosed internal objective to obtain new Macao financing by the end of the third quarter of 2007. LVS disclosed its actual credit facilities. *See, e.g.*, ECF No. 198-16 at 5-6. The market was already aware that LVS would need additional funding to complete Cotai Strip development. *See* ECF No. 198-5 at 11 (disclosing in February 2007 that LVS "will need to arrange additional debt financing" to fund Cotai Strip development). While in hindsight the exercise of better business judgment may have called for LVS to seek financing for both the Singapore and Macao projects earlier or more expeditiously than it did, this is a securities fraud case, not one for breach of fiduciary duty.

As to LVS's failure to meet its internal, undisclosed capital expenditure plan, LVS disclosed actual capital expenditures to investors. *See, e.g.*, ECF Nos. 198-50 at 11; 198-63 at 14. LVS executives explained that the internal capital expenditure budget was constantly evolving, as were the projects themselves, and the internal budget contained inflated numbers to account for contingencies. *See* ECF Nos. 197-35 at 26-27; 198-141 at 3; 224-86 at 122; 238-3 at 30-32. Thus, the failure to expend the amounts set forth in the internal budget did not necessarily reflect a failure to execute development progress. *See* ECF Nos. 198-141 at 3 (explaining that LVS began constructing Sites 5 and 6 but did not receive final government approval to construct components of these sites until the spring of 2008 and LVS never received approvals for Sites 7, 8, or 3 during the class period so LVS took only preliminary design and construction steps as to those sites); 224-86 at 122 (stating the internal budget amounts were "just holding spots for numbers to think through what we may have to do. It doesn't mean [those funds] are committed."); 237-8 at 21-22

(explaining that the budget numbers were placeholders based on designs for cash planning purposes but not reflective of what final project expenditures might be).  Weidner said nothing about whether the Cotai Strip capital expenditures were meeting internal, undisclosed projections or budgets nor did he have an obligation to do so. *See In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052 (9th Cir. 1993) (companies are not required to disclose internal projections); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (company that disclosed a projected drop in sales was under no obligation to disclose the extent of that expected drop).

Neither the plaintiffs nor the defendants present evidence of construction documents, such as a master schedule for construction, work orders, change orders, or invoices to show what work was completed (or not completed) as compared to what should have been completed by any particular date.  The plaintiffs have presented no evidence of any particular project or development milestone (1) that was not performed as of August 1, 2007 due to the failure to expend the amount set forth in the internal budget and (2) that was not disclosed to investors.  Instead, the plaintiffs assume that because the internally budgeted amount was not expended, project development was not progressing.  That is insufficient to raise an issue of fact.

Finally, as to Site 3, the plaintiffs present evidence that at some point LVS determined its designs for Site 3 were not viable because the proposed building was too expensive to give a good return on investment. *See* ECF No. 224-86 at 124-25.  However, the plaintiffs do not present evidence that as of August 1, 2007, Weidner knew that Site 3 had no viable design.  Additionally, LVS had previously disclosed to the market that Site 3 was still being designed. ECF No. 198-14 at 21.

The plaintiffs have not presented evidence raising an issue of fact that this alleged misrepresentation was false or misleading when made or that Weidner acted with scienter.  Accordingly, the defendants are entitled to summary judgment as to this allegation.

### 2.  SAC ¶ 296

On August 27, 2007, a Bloomberg article reported the following:

**Las Vegas Sands won't slow down its development in Macau, the company's president and chief operating officer, William Weidner, said in an interview today.**

"We think it's a big mistake," Weidner said of Wynn's strategy. . . . He didn't elaborate.

ECF No. 198-20 at 2.

The plaintiffs contend this statement was false when made because LVS had already slowed its development in Macao due to its failure to (1) obtain the bank financing; (2) execute the capital expenditure budget; and (3) formulate viable designs for Sites 7, 8, and 3. For the same reasons already explained with respect to the first alleged misrepresentation, the plaintiffs fail to present evidence raising an issue of fact that this statement was false or misleading when made. Additionally, this is a forward-looking statement about management's plans and objectives for future operations that falls within the PSLRA's safe harbor provision. *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1058-59. Even if this statement could be construed as partially non-forward-looking to the extent it is a reflection of current development plans, viewing the statement as a whole, Weidner is referring to future plans to continue Macao development without a slowdown. The plaintiffs present no evidence that Weidner made this statement with actual knowledge that it was false or misleading. *See id.* (citing 15 U.S.C. § 78u-5(c)(1)). The defendants therefore are entitled to summary judgment on this allegation.

### 3. SAC ¶¶ 300,[5] 302

Prior to November 1, 2007, the Straits Times reported Weidner as saying that building costs for LVS's Singapore gaming resort may be as much as 40 percent higher than projected. During the November 1, 2007 earnings call, LVS Executive Vice President Brad Stone made the following statements in response to a question about the capital budget for development in Singapore:

We're working our way through that, Joe. **We have some challenges in Singapore, in terms of the cost structure that is happening in that country. I think it's well documented that certain materials—I think at one point Bill**

---

[5] The plaintiffs do not allege the statements in paragraph 300 were false. Instead, they contend these statements provide context for the allegedly false statement by LVS Executive Vice President Brad Stone as alleged in paragraph 302 of the SAC. ECF No. 223-2 at 3.

**[Weidner] was misquoted as saying, you know, the costs are up 40%. There are items and line items in our construction budget, particularly as it relates to concrete and things of that and sand because of raw materials that are up significantly.**

We're dialing in on that now. . . . but we think that, as we work our way through, we are finding that certain aspects, particularly superstructures of the building, we are paying a premium for, whereas many of the things like mechanical/electrical finishes and all are being rationally priced in the marketplace. . . . but we're working through those issues as we speak.

ECF No. 198-26 at 15.

The plaintiffs contend this statement was false because Weidner was not misquoted, as overall costs were up in Singapore and the defendants knew it. The plaintiffs thus contend Stone's attempted correction was misleading. The defendants respond that Weidner was in fact misquoted, as he was referring only to certain costs and not the overall cost. They thus assert Stone's statement that Weidner was misquoted was not false or misleading at the time it was made.

Shortly after the Bloomberg article was published, Weidner stated that the article's reference to a total cost overrun of 40% was a misquote and that he was referring only to certain components, such as sand and stone, that were up 20 to 40%. ECF No. 224-47 at 2. Thus, the statement that Weidner was misquoted and that costs of certain materials were up 40% was true. Stone testified that it was not misleading to correct the misquote because only a third of the Singapore project had been bid out at that time and thus it was too early to determine whether the entire project would result in 40% higher costs. ECF No. 197-34 at 5-8.

However, prior to November 1, LVS employees discussed that they were wary of correcting the misquote because in fact costs were rising in Singapore and it could be that the total cost would be "very similar or perhaps even higher than those quoted in the article." ECF No. 224-47 at 2; *see also id.* at 6; ECF Nos. 224-6 at 11; 224-81 at 70. Stone was included on some of these email strings in which the employees discussed that LVS had to "be careful not to say anything that will radically contradict what we are likely to say in the next several months when we reveal a broad budget change." ECF Nos. 224-47 at 2, 6; 224-6 at 11. Total project costs ultimately were more than 40% higher than originally projected. ECF No. 197-34 at 5-6.

1    Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find

2    Stone's statement that Weidner was misquoted was misleading.  "[A] statement that is literally

3    true can be misleading and thus actionable under the securities laws." *Reese v. BP Expl. (Alaska)*

4    *Inc.*, 643 F.3d 681, 692 (9th Cir. 2011) (quotation omitted).  Although literally true, a reasonable

5    jury could find that Stone's correction would leave a reasonable investor with the impression that

6    only certain costs in Singapore were up when in fact LVS insiders discussed the fact that they

7    shortly would have to disclose that overall costs were up 20 to 40% but that they did not want to

8    make that disclosure at the time. ECF Nos. 224-6 at 11 ("[T]he less we say on this subject, the

9    better, given that we are not in a position to comment specifically on the revenue side of the

10   equation."); 224-47 at 6 ("[W]e don't want to talk broad budget increase before we have [the]

11   ability to tie table capacity increase to it . . . .").  Stone avers that he acted in good faith and

12   without intent to deceive the market. ECF No. 198-141.  But a reasonable jury could find that

13   Stone was at least consciously reckless in making the statement because he received the emails

14   where LVS employees discussed that "revised budget numbers work out" to a 40% total cost

15   increase and suggested not commenting on the issue or contesting the reporter's analysis because

16   LVS likely would have to "reveal a broad budget change" consistent with that total cost estimate

17   in the coming months. ECF Nos. 224-6 at 11; 224-47 at 2, 6.

18        However, the plaintiffs have not raised an issue of fact on loss causation in relation to this

19   statement.  The plaintiffs' expert, Dr. Steven Feinstein, does not identify any corrective disclosure

20   related to a revelation that total Singapore development costs were 40% higher than initially

21   projected. *See* ECF No. 196-1 at 52-54.  LVS revealed rising anticipated total costs for the

22   Singapore development in February and May 2008. ECF Nos. 198-37 at 11 (stating expected

23   costs to be "in excess of $4.0 billion"); 198-50 at 11 (stating costs expected to be "in excess of

24   $4.5 billion").  These dates are not identified as disclosure events in Feinstein's event study.  The

25   only disclosure event that touches on this subject is the August 22, 2008 downgrade by Bank of

26   America. ECF No. 196-10.  In the downgrade, Bank of America discusses the fact that LVS will

27   need approximately $400 million from the U.S. credit facility in Singapore or it will need to raise

28

additional debt due to the terms of the Singapore credit facility. *Id.* at 2, 6.  Bank of America also stated that these needs "would be higher if the $4.5B budget [for the Singapore development] is increased for any reason." *Id.*  The Bank of America downgrade was based on funding needs and potential funding gaps, not on a disclosure that costs at the Singapore development were more than previously revealed to the market. *Id.* at 4, 6.  Rather, the downgrade utilized the projected total cost amount of over $4.5 billion that LVS had already disclosed to the market.

The plaintiffs therefore have not presented evidence raising a genuine issue of fact that the market learned of and reacted to a revelation that the total costs of the Singapore development would be 40% higher than initially projected. *See Metzler*, 540 F.3d at 1062.  The plaintiffs cannot rely on a theory that this statement artificially inflated the stock price without also showing a loss after the relevant truth was revealed. *See Erica P. John Fund, Inc.*, 563 U.S. at 812-13.  I therefore grant the defendants' summary judgment motions with respect to this alleged misrepresentation.

### 4.  SAC ¶ 306

In a press release attached to LVS's November 1, 2007 Form 8-K, Weidner made the following alleged misrepresentation:

> **With the Venetian Macao now successfully open, we have continued to steadily execute our development, marketing and promotional plans for the Cotai Strip, Macao, Hong Kong and the wider region**.

ECF No. 198-25 at 12-13.

The plaintiffs' first argument for why this statement is false is the same as above regarding the failure to secure financing, with the added argument that by November 2007 the defendants knew that LVS needed to do a parent-level capital raise to address LVS's funding needs due to tightening credit markets.[6]  For the reasons explained above, the plaintiffs have not

---

[6] The plaintiffs also argue the statement is false because by November 1, 2007, the defendants knew that LVS had failed to monetize condominium sales in Cotai.  But the market could not have been misled because it was aware that LVS did not have approval to sell condominiums in Cotai. ECF No. 198-26 at 13.

1   presented evidence raising an issue of fact that this statement was false on the theory that Cotai

2   development was not progressing because no new bank financing was already in place.

3         LVS's outside advisors were recommending a parent-level capital raise in 2007. ECF No.

4   224-71 at 37.  But LVS's advisors believed bank financing without a parent-level capital raise

5   was feasible well into 2008. *See* ECF No. 197-30 at 40, 42-46, 52 (Jean-Francois Astier from

6   Lehman Brothers testifying that a new Macao credit facility of $7 to $8 billion was feasible in

7   December 2007, January 2008, and March 2008).  Additionally, the evidence shows that the

8   banks were not requiring a parent-level capital raise as a condition precedent to new Macao

9   financing until July 31, 2008. ECF No. 224-24 at 28.  Again, while LVS may have been well

10  served by taking its advisors' recommendation to do a parent-level capital raise in late 2007, this

11  is a securities fraud case, not an evaluation of the defendants' business judgments.

12        The plaintiffs also assert that by November 1, 2007, the defendants knew that LVS was

13  not executing its build plans because it failed to expend the funds in the internal undisclosed

14  capital expenditure plan and it lacked viable designs.  As to the internal capital budget, that

15  argument fails for the reasons outlined above.  Additionally, to the extent the failure to expend

16  these funds impacted Cotai development schedules, that must be evaluated in the context of the

17  information LVS released in conjunction with this statement.  During its November 1, 2007

18  earnings conference call, LVS disclosed to investors that it had pushed back the opening dates for

19  various projects. *Compare* ECF No. 198-14 at 21 (projected opening dates as of May 2007) *with*

20  ECF No. 198-26 at 7 (projected opening dates as of November 1, 2007).[7]  Moreover, progress

21  was being made.  For example, in September 2007, LVS filed for approval from the Macao

22  government to begin piling work on Sites 7 and 8. ECF No. 224-65 at 21.

23

24

___

25        [7] The plaintiffs contend the defendants knew that Sites 5 and 6 would open later than they told the

26  market but the exhibits they rely on do not support that contention. *See* ECF Nos. 224-27 at 5 (stating Cotai Strip "opening dates significantly delayed" but not specifying the delayed dates) *and* at 8, 10, 20 (no mention of a late 2009 opening date for Sites 5 and 6); 224-77 at 27 (same); 224-81 at 81 (stating that the

27  opening dates for Sites 5 and 6 were "pushed back by a year" but not indicating new projected opening

28  date).  As mentioned above, LVS disclosed delayed opening dates for its projects on November 1, 2007.

The plaintiffs also argue this statement was false because LVS lacked viable designs for Sites 7, 8, and 3, and knew that the costs were prohibitive to build these developments but failed to disclose those facts, instead telling the market LVS continued to execute its plans for the Cotai Strip.  However, as discussed above, work was continuing to progress on these sites and the market was aware that Site 3 was still in the design phase.

Finally, the plaintiffs contend this statement is false because the Venetian Macao opening was not a success, as it did not meet LVS's expectations and did not contribute needed resources for timely completion of Cotai Strip developments.  However, Weidner stated only that the Venetian Macao had successfully opened.  The Venetian Macao in fact opened on August 28, 2007. ECF No. 198-25 at 11.  The plaintiffs do not dispute Weidner's statements in the same press release that the resort received positive reviews and had 3.9 million guests in the first 65 days of its operation. *Id.*  LVS also disclosed actual operating numbers, including rolling chip volume; non-rolling chip table games drop; win percentages; slot handle and win percentage; and hotel, retail, and food and beverage revenues. *Id.* at 16; *see also* ECF No. 197-30 at 49-50 (Astier of Lehman stating Venetian Macao had opened successfully and that the successful opening positively impacted LVS's ability to obtain a loan from Asian banks in early 2008).  Weidner made no comment about whether or how much the Venetian Macao's earnings would contribute to the funding of other developments nor did he have an obligation to do so to make his statements not misleading.  The defendants therefore are entitled to summary judgment as to this allegation.

### 5.  SAC ¶ 312

In the November 1, 2007 earnings conference call, Adelson made the following alleged misrepresentation:

> I'd like to repeat, a quarter does not a trend make. . . .
>
> **[T]here is nothing structural, there's nothing fundamental that's changed anything.**  We just didn't have a good quarter, that's the end of it.  We think that a bad quarter is not lasting.  We'll see what's going on in April, things are up . . . sorry, October.  When things are up, things are up good.  It's just the nature of the business.  It makes a good trading opportunity for day traders and hedge funds.

ECF No. 198-26 at 19.  The plaintiffs contend this statement was misleading because Adelson failed to disclose the negative impact the Venetian Macao's poor results were having on LVS's efforts to obtain financing or to fund development for other Cotai Strip projects.

The plaintiffs misconstrue Adelson's statement.  Read in context, Adelson was not commenting on the Venetian Macao, financing, or Cotai Strip development.  Rather, a market analyst asked about the hold at the Venetian in Las Vegas that was much lower than in recent years. ECF No. 198-26 at 18.  The analyst asked if there was "something structurally different about what happened this quarter . . . ?" *Id.*  Stone responded that there was "nothing fundamental.  The volume was good.  We just—it just seemed like we couldn't win a bet, particularly in the month of August." *Id.* at 19.  Adelson chimed in to say that this was "the nature of the business" and "[s]ome quarters are good; some quarters are not so good." *Id.*  He then made the challenged statements above. *Id.*  Because Adelson was not discussing the topics the plaintiffs contend make this statement false or misleading, and the plaintiffs do not allege that the statement Adelson made was false or misleading based on what he was actually discussing, the defendants are entitled to summary judgment as to this statement.

### 6.  SAC ¶ 326

In a January 4, 2008 press release, Weidner made the following alleged misrepresentation:

**Our Marina Bay Sands development remains on track for a late 2009 opening . . . .**

ECF No. 198-30 at 9.

The plaintiffs contend this statement was false because Weidner knew the Marina Bay Sands development was not on track for a late 2009 opening, as a third party consultant warned LVS in October 2007 that the project was likely to be delayed 6 to 9 months with a completion date of June 2010.  The plaintiffs also assert LVS internally projected the Marina Bay Sands would be delayed by six months and would not generate net income until the end of the third quarter of 2010.

1    The defendants respond that the only evidence the plaintiffs offer in support is the opinion

2  of a third party consultant and there is no evidence Weidner saw this opinion.  They also argue

3  this is a non-actionable forward-looking projection.

4    The plaintiffs rely on an October 2007 report prepared by WT Partnership, which opined

5  that the Marina Bay Sands project was "likely to be delayed in overall completion by periods of

6  six (6) to nine (9) months with significant corresponding consequential cost implications,"

7  resulting in a completion date of June 2010. ECF No. 224-79 at 41.  They also rely on a financing

8  model prepared by and shared among LVS employees which shows the Marina Bay Sands with

9  no net cash from operating activities until the third quarter of 2010. ECF No. 224-13 at 6-7.

10    The plaintiffs present no evidence that Weidner saw either of these documents before he

11  made his statement on January 4, 2008.  Nor have they presented evidence of any other document

12  Weidner saw that would have suggested to him that the Marina Bay Sands was not on track to

13  open in late 2009.  Thus, they have not presented any evidence on scienter.  Moreover, under the

14  PSLRA's safe harbor provision, the plaintiffs must present evidence raising an issue of fact that a

15  forward-looking statement like this one regarding a future opening date was made with actual

16  knowledge that it was false or misleading.  The plaintiffs have not presented evidence that

17  Weidner actually knew the Marina Bay Sands would have a later opening date at the time he

18  made the statement.  The defendants therefore are entitled to summary judgment with respect to

19  this statement. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i) & (ii) (stating that for a natural person to be

20  liable, that person had to have actual knowledge of falsity and that for a business entity to be

21  liable, the statement must be made by or with the approval of an executive officer and that officer

22  must have actual knowledge of falsity).

23    7.  SAC ¶ 329

24    In the February 4, 2008 earnings press release, Weidner made the following alleged

25  misrepresentation:

26    **Our construction, design and development work on each of our other six sites
    on the Cotai Strip has continued to progress** . . . .

27

28

ECF No. 198-33 at 9.

The plaintiffs contend this statement was false based on the same arguments considered and rejected above regarding the failure to spend the internally budgeted capital expenditure amounts. The plaintiffs also argue the statement was false because the defendants did not tell investors that costs for the projects were greater than previously disclosed.

Weidner stated only that work on each of the sites continued to progress. He said nothing about the extent of that progress or whether that progress was consistent with internal, undisclosed capital expenditure budgets. Weidner also said nothing about the costs of those projects. The plaintiffs have not presented any evidence that work on the various sites did not continue to progress. The defendants described the progress on the investor conference call that same day, including the fact that LVS was still awaiting Macao government approvals for Sites 7 and 8, and that Site 3 was still in the design phase. ECF No. 198-34 at 10-11. The market thus had context to evaluate what kind of progress was being made at the various sites. The plaintiffs have not presented evidence raising an issue of fact that this statement was false or misleading when made. The defendants therefore are entitled to summary judgment with respect to this allegation.

### 8. SAC ¶ 337

During a February 11, 2008 investor conference, Weidner and LVS Senior Vice President of Finance Scott Henry made the following alleged misrepresentations:

> [Weidner:] Yes, I think everyone knows that the market is tight right now. It would be very difficult to go and raise those monies now. **Fortunately we have enough to be able to carry us through a period of time to allow us to reapproach the markets as we think they will become more favorable.** . . .
>
> [Henry:] **We've been fortunate to have timed the market appropriately and in our favor over the last several years as we've raised money. We haven't over raised but we certainly haven't [under-raised] and we do have a fair amount of liquidity available to use. . . . And I think we're in reasonably good shape, Celeste, to manage our way through this process and maintain the kind of liquidity that we have available to us. . . . We have multiple avenues that are open to us today.**

ECF No. 198-36 at 68-69.

1    The plaintiffs argue these statements were false or misleading when made because LVS
2    knew it was running out of money, the U.S. bank credit markets were tight, and the Asian bank
3    credit markets were also tightening.  The plaintiffs also assert that by this date, Adelson had not
4    approved a parent-level capital raise and such a capital raise was necessary to secure a new
5    Macao credit facility.  The plaintiffs further contend that LVS did not have a fair amount of
6    liquidity because the existing Macao credit facility could not fund the development of Sites 5, 6,
7    7, 8, and 3.  The plaintiffs argue the U.S. credit facility also did not have enough money to fund
8    development because the borrowing capacity under that facility was limited due to a downward
9    trend in EBITDAR,[8] which would impact how much LVS could borrow under that facility's
10   leverage ratio covenant.

11       The defendants respond that Weidner's statements were true because LVS did have funds
12   to carry it for a period of time because it could use the investment basket in the U.S. credit facility
13   to fund Cotai Strip development.  They also assert that LVS re-approached the credit markets in
14   the spring and summer of 2008 as Weidner said it would.  Additionally, they argue that LVS had
15   already disclosed it did not have financing to complete the entire Cotai Strip development, so
16   investors were aware of the risk that LVS would not be able to secure financing for the whole
17   development.

18       As to Henry's statements, the defendants contend that LVS had multiple avenues available
19   to raise funds because LVS's advisors told it that a new $8 billion Macao credit facility was
20   feasible.  They assert that even if some advisors thought a new facility of that size would be
21   challenging to obtain, none told LVS that it could not be done.  The defendants further argue that
22   LVS had other financing options available to it even if Adelson refused to consider convertible
23   debt, including a bridge facility and high yield bonds.

24

25

---

26       [8] Adjusted EBITDAR means "earnings before interest, income taxes, depreciation, amortization,
     pre-opening expense, development expense, other income (expense), loss on disposal of assets, rental
27   expense, corporate expense and stock-based compensation expense included in general and administrative
     expense." ECF No. 198-19 at 19.
28

To support their claim that Weidner's statement was false or misleading, the plaintiffs present internal emails from LVS's financial advisors.  In those emails, the advisors discuss their opinions that LVS should raise equity along with debt financing and that the Asian debt markets may not have the appetite to loan LVS the amount of money it needed to complete Cotai Strip development. *See* ECF Nos. 224-23 at 31, 41; 224-65 at 2.  However, the plaintiffs present no evidence that Weidner or Stone saw these emails before they made their statements on February 11, 2008.[9]

There is evidence that LVS's outside financial advisers were recommending to LVS that it conduct a parent-level capital raise as far back as January 2007. ECF Nos. 224-61 at 36; 224-62 at 60; 224-63 at 12-13; 224-67 at 32-34, 38, 42; 224-71 at 30.  But opinions that LVS should do a parent-level capital raise or may have difficulty[10] raising Asian bank financing does not render Weidner and Henry's statements false or misleading, as opposed to a difference of opinion.  Other advisors continued to believe that the Macao financing was still feasible and the banks continued to tell LVS it was feasible before and after February 2008. *See* ECF Nos. 224-63 at 12 (December 2007 Lehman presentation stating that a "new Macau Credit Facility of $7-8 billion is certainly feasible in 2008 but is likely to be materially more expensive than the existing facility"); 224-65 at 3 (January 19, 2008 email from Astier discussing his meeting with LVS management and stating the "consensus is to move full speed ahead with a new Macao bank deal . . . with the goal of raising $8 billion by the end of Q3"); 197-11 at 4 (March 2008 Lehman presentation stating "Lehman Brothers believes that LVS can raise a new . . . Credit Facility (US$7 billion) to fund its continued expansion in Macao and refinance outstanding debt").  There is no evidence any bank told LVS prior to the February 11, 2008 investor conference that Macao bank financing was not

---

[9] According to one email, several international banks told Goldman Sachs that they told Henry they had hit their aggregate risk limits. ECF No. 224-23 at 41.  But that email contains multiple levels of inadmissible hearsay.

[10] One email states that Henry and another LVS executive, Bob Rozek, had expressed their opinion to a Goldman Sachs advisor that the Macao refinance would be difficult. ECF Nos. 224-23 at 41; 224-13 at 39.  But this does not raise an issue of fact that Henry's statements that LVS had multiple avenues available to it was false or misleading.

1  available or that a parent-level capital raise was a condition precedent to a new Macao bank

2  finance deal.

3     The evidence shows LVS did have liquidity to carry it for a period of time and it did re-

4  approach the credit markets as Weidner stated. *See, e.g.*, ECF Nos. 197-32 at 81; 198-22 at 2;

5  224-61 at 44.  The plaintiffs assert that downward trending EBITDAR might have limited LVS's

6  ability to drawn down the full amount of the U.S. credit facility by the end of the third quarter in

7  2008.  But LVS had up to $1.1 billion dollars to draw on as of the beginning of February 2008

8  and it expected to use approximately $700 million for Macao funding through the second quarter

9  of 2008. ECF No. 224-66 at 53.  Weidner's statement that LVS had liquidity to carry it for a

10 period of time thus was not false or misleading.

11    As to Henry's statement that LVS had multiple avenues open to it, the evidence shows

12 that outside advisors were consulting with LVS about various means of raising funds, including

13 bank debt financing, convertible notes, bridge financing, and high yield bonds. *See* ECF Nos.

14 197-32 at 42; 224-64 at 4-6; 224-65 at 3; 224-67 at 38, 40.  Additionally, LVS could tap the U.S.

15 credit facility.  Adelson's opposition to convertible notes, which was only one of those options,

16 does not render Henry's statement false or misleading.

17    Moreover, viewing these statements as a whole and in context, they are forward-looking

18 financial projections, managements' plans or objectives for the future, and assumptions related to

19 these topics.  For the same reasons that the statements are not false or misleading, there is no

20 evidence Weidner and Henry spoke with actual knowledge of falsity.  The market was aware that

21 LVS needed to raise funds to complete Cotai Strip development and that there was a risk LVS

22 might not obtain those funds.  The defendants therefore are entitled to summary judgment on the

23 February 11, 2008 statements of both Weidner and Henry.

24          9.  SAC ¶ 348

25    During an April 30, 2008 earnings conference call, Weidner made the following alleged

26 misrepresentation:

27    [Q-Joseph Greff:] Okay.  Then one final question and I will let someone ask some
       additional questions.  Just along the lines of internal forecasts, obviously in the
28     press, with regard to one of the lawsuits out there, there's this idea that, internally,

1    there's a document that you lowered internal forecasts for 2008.  I will leave it as
     broad as that, but do you want to comment on that?

2    [A-Weidner:] **That was mostly including first-quarter, or this quarter results.**
     **That was a revenue number relating to internal forecasts that mostly included**
3    **updates based on this quarter.  So it's in the numbers, it's baked in the**
     **numbers.**

4    ECF No. 198-45 at 23.

5           The plaintiffs contend this statement was false because internal LVS documents show that

6    the number mentioned during Weidner's testimony in the referenced lawsuit was a $312 million

7    reduction in EBITDAR for the year, not revenue for the first quarter.  The defendants respond

8    that the question on the conference call did not specify the number in question was $312 million

9    and LVS's first quarter revenue was down by approximately $300 million.  They thus contend

10   Weidner's statement was true.  They also assert that the market was not misled by Weidner's

11   statement because EBITDAR is calculated by subtracting expenses from revenue, and thus

12   analysts adjusted their EBITDAR calculations in response to Weidner's comments.  The

13   defendants also object to the admissibility of the referenced newspaper article as hearsay.

14          On March 25, 2008, Adelson, Weidner, and others received a revised 2008 operating plan

15   that showed a comparison between the then-current operating plan and the January 2008 version

16   of the operating plan. ECF No. 224-88 at 2.  The updated version included the "actual run-rate of

17   the first quarter" and showed a decrease of $312 million in total EBITDAR for 2008. *Id.* at 2-3;

18   *see also* ECF Nos. 224-1 at 22; 224-2 at 22.  In its January 2008 operating plan, LVS projected

19   revenues for the first quarter of 2008 would be $1.446 billion. ECF No. 224-1 at 26.  LVS

20   reported actual revenue results for the first quarter of 2008 as $1.148.2 billion. ECF No. 198-50 at

21   38.  LVS's actual revenue results thus were approximately $300 million less than had been

22   internally forecasted.

23          In April 2008, the press reported that during a trial in a lawsuit between LVS and a Hong

24   Kong businessman, Richard Suen, Weidner "stated in open court that the company is projecting

25   '$312 million less than was forecasted in 2008.'" ECF No. 224-80 at 19.  The press reported that

26   "Weidner did not specify whether the figure referred to earnings or revenue, and was reminded by

27   lawyers not to discuss the figures in open court." *Id.*

28

The day after Weidner's alleged misrepresentation on the conference call, Bear Stearns issued an analysis stating that "[m]anagement also noted that the internal document that was referenced last week in the Las Vegas Review Journal in the Richard Suen lawsuit references 1Q08 revenue shortfall, and nothing more than that." ECF No. 224-78 at 26.  Based on the financial information LVS revealed on April 30, Bear Sterns reduced its projected EBITDAR for 2008 to $1.25 billion. ECF No. 224-78 at 32.  LVS's internal March 2008 operating plan projected EBITDAR for 2008 as $1.441 billion. ECF No. 224-2 at 18.

I overrule the defendants' hearsay objection to the news article because it is non-hearsay. It is not being offered to prove the truth of the matter asserted (that LVS in fact internally lowered a forecast by $312 million) but because it gives context to the question on the April 30, 2008 conference call.  Greff specifically referred to the article and Weidner responded by saying "that" was a revenue number.

A reasonable jury could find Weidner's statement was false because the March 2008 operating plan decreased the internally projected EBITDAR for all of 2008 by $312 million, which is the number referenced in the news article about which Greff was asking.  A reasonable jury thus could find that it was not a revenue number and that was it not confined to the first quarter of 2008 but rather was a projected decrease in EBITDAR for the entire year.[11]  A reasonable jury also could find Weidner was at least consciously reckless in making the statement because (1) he knew the number referred to in the article was $312 million, (2) Greff was asking about the number referenced in the article, (3) Weidner was responding in a way that made it appear he was also referring to that number, and (4) that number was an EBITDAR forecast for the entire year, not a revenue number for the first quarter.

---

[11] The defendants argue that because revenue and EBITDAR are related, the market was not misled, as LVS's disclosures led market analysts to reduce their EBITDAR projections even more than LVS's internal projection. *Compare* ECF No. 224-2 at 18 *with* ECF Nos. 198-46 at 5; 198-47 at 4; 198-48 at 7; 224-78 at 32.  However, that does not preclude the possibility that analysts would have reduced their valuations even further if they had understood that LVS was internally projecting reduced EBITDAR for the entire year, instead of a revenue reduction for the first quarter.  Bear Stearns' statement that Weidner assured the market it was "nothing more" than a first quarter revenue number suggests that evaluations may have changed had Weidner disclosed it actually was a reduction in projected EBITDAR for the year.

However, the plaintiffs have not raised an issue of fact on loss causation in relation to this statement.  LVS disclosed actual EBITDAR results three times before the first disclosure event Feinstein identifies. *See* ECF Nos. 198-44 at 18; 198-63 at 19; 198-68 at 26.  Thus, the market had an opportunity to learn of and react to actual EBITDAR results multiple times before Feinstein's first disclosure event.  Moreover, Feinstein does not identify any corrective disclosure related to a revelation that Weidner was actually referring to a reduction in projected EBITDAR for the year. *See* ECF No. 196-1 at 52-54.  The plaintiffs therefore have not presented evidence raising a genuine issue of fact that the market learned of and reacted to a revelation that Weidner was referring to an EBITDAR projection rather than a first quarter revenue number.  The plaintiffs cannot rely on a theory that this statement artificially inflated the stock price without also showing a loss after the relevant truth was revealed.  I therefore grant the defendants' summary judgment motions with respect to this alleged misrepresentation.

### 10.  SAC ¶¶ 354, 364, 379

In an April 30, 2008 press release, Weidner made the following alleged misrepresentation:

> **Our construction, design and development work on each of our other six sites on the Cotai Strip has continued to progress**, . . . .

ECF No. 198-44 at 9.  On an April 30 earnings conference call, Stone and Weidner made the following alleged misrepresentations:

> [Stone:]  Yes, I can take you through.  **I mean, we mentioned the Four Seasons property opening early in the third quarter.  The budget on that is intact, as we discussed at the investor day. . . . Again, that project is roughly in the same budgetary state.  It seems to be tracking on very well.**
>
> **[S]ites seven, eight and [site] three, as Bill mentioned in the conference call, we are ready to start work on [sites] seven and eight.  We have the rigs there.**  We've just been frustrated because of some challenges within the government, based upon the scandal that happened here in an area that related to the public works department.  There has definitely been a slowing in the pace around Macao of approvals.  So we are anxiously waiting to get through that.  Again, that's a project whose budget is still a work in progress as we go through and take the conceptual design and work on pricing it.  So we really don't have reports specifically on that project.
>
> **And on [site] three, it's very similar.  [S]ite three is somewhat behind seven and eight.  We have filings in for all these projects with the government.**  Again we're just waiting for the government to right itself in such a way that we can get to some more normal development cycle.

. . .

[Q-Robin Farley:] Great, thanks. I've got two questions. The first is, you know, you talked about focusing more on the profitability of your existing facilities and the timeline you gave for additional Cotai properties sounds like it's unchanged. When you talked about focusing on existing facilities in the near-term, is there some thought to delaying the openings of additional capacity at this point?

[A-Weidner:] **No**, . . . .

ECF No. 198-45 at 14-15, 20.

The plaintiffs argue these statements about the progress and timing of the Cotai Strip developments were false and misleading based on the same arguments already rejected above. There is evidence that work continued to progress, as LVS expected to (and did) open the Four Seasons and a new theater at the Venetian in the summer or early fall of 2008, and LVS made substantial capital expenditures in Macao over the first three months of 2008. ECF Nos. 198-45 at 6-7; 198-50 at 25, 39; 198-76 at 2. Additionally, the statements must be taken in context, as the market was informed about the actual status of each project, including that LVS was awaiting approvals from the Macao government, that the opening of the Four Seasons was pushed back from June to early in the third quarter of 2008, and that the budget for Sites 7 and 8 was a work in progress based on a conceptual design.[12] ECF No. 198-45 at 7, 12 (stating that the "pace of approvals for development activities throughout Macao has slowed" and LVS "anticpate[d] some additional near-term slowdown"), 14-15 (giving status of various sites). The market thus was aware of the status of the various projects and the actual capital expenditures on those projects for the prior quarter.

The plaintiffs also argue that on April 11, 2008, Weidner received an email indicating that the design team involved in Sites 7, 8, and 3 would "stop henceforth until adequate resources are deployed to support the region." ECF No. 224-70 at 5-6. However, that email states only that

---

[12] The plaintiffs argue these statements were false because costs for the projects were rising and the defendants did not disclose that these costs were making the conceptual designs unworkable. There is evidence of rising costs in relation to the designs on Sites 3, 7, 8. ECF No. 224-28 at 8. However, Stone advised the market that the budget for Sites 7 and 8 was "still a work in progress as we go through and take the conceptual design and work on pricing it. So we really don't have reports specifically on that project." ECF No. 198-45 at 14-15. He also advised that Site 3 was similar and was trailing behind Sites 7 and 8. *Id.*

certain designers would focus on projects 2, 5, and 6.  The fact that certain designers would no longer work on Sites 7, 8, and 3 as of April 9, 2008, does not raise an issue of fact that statements on April 30, 2008 that the projects were progressing were false or misleading.  The defendants therefore are entitled to summary judgment on the allegations in paragraphs 354, 364, 379 of the SAC.

### 11.  SAC ¶¶ 368, 375

On the April 30, 2008 conference call, Henry[13] made the following alleged misrepresentations:

> [A-Henry:] **I've been having very active conversations with a number of our bigger banks and even some of our medium and smaller sized banks, and the level of interest and level of enthusiasm there is actually quite good.**
>
> . . .
>
> [Q-Robert Armstrong:] Just to continue the conversation of financing, how committed are you to getting the $4 million [*sic*] incremental you're going to need in Macao through banks?  Is equity an option, or are there other options out there, just on the assumption that credit market[s] might be turbulent over the upcoming months?
>
> [A-Henry:] **[W]e are evaluating a number of different alternatives.  Equity is not one of those.  We believe that we have ample access to the credit markets, and our primary focus is on the bank markets.  We are in reasonably advanced conversations with folks, so our level of confidence around bank capacity and interest in the part of the world is high – and specially for our brand and our projects.**

ECF No. 198-45 at 18, 26.

The plaintiffs contend these statements were false because internal LVS documents show that LVS was not in reasonably advanced conversations with banks and LVS did not have ample access to the credit markets.  However, Henry testified that he was in active conversations with banks and the plaintiffs present no evidence that he was not. ECF Nos. 197-32 at 35-36, 50, 57-58, 83-84, 86-87; 224-21 at 31, 49.  There is evidence that banks were expressing interest in

---

[13] The parties agree this statement was made by Henry, not Weidner as alleged in the SAC and as reflected on the earnings call transcript. ECF No. 223-2 at 10.  Weidner therefore cannot be liable for this statement unless he is a control person. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) ("To be liable, [the defendant] must have 'made' the material misstatements . . . .").

participating in the Macao financing deal during this time period. *See* ECF Nos. 197-8 at 9; 197-30 at 28; 198-37 at 3 & 197-12.  Similarly, Henry's statements that LVS was evaluating different alternatives but equity was not one of those currently under consideration were true. *See, e.g.*, ECF Nos. 224-21 at 41 (Goldman Sachs presentation to LVS about financing issues and options, including bridge facility, high yield notes, and convertible notes); 224-62 at 14 (April 11, 2008, email by Astier stating the LVS board was considering a convertible note offering and although Adelson had been opposed, "he is now warming up to the idea . . . .").

There is evidence that Adelson had a less optimistic view on the prospect of LVS obtaining Macao financing.  On April 6, 2008, Adelson sent a letter to Edmond Ho, Chief Executive of the Macao Government, in which Adelson stated that the Macao Strip project was "on the edge of failing." ECF No. 224-65 at 21.  Adelson requested Ho to take action on various matters, including issuing the approvals to start the pilings on Sites 7 and 8, to allow LVS to sell vacation suites, and not to allow other casinos to open in Macao. *Id.* at 21-23.  In this letter, Adelson stated that LVS's "ability to get dollars on Wall Street depend completely on our situation improving." *Id.* at 24.

Just a few days later, on April 9, 2008, Goldman Sachs gave a presentation to LVS regarding financing alternatives. ECF No. 224-21 at 31.  Goldman noted that "[c]urrent Company projections assume 2008 EBITDAR is expected to be approximately 23% off last bank syndication plan" and was projected to be off 36% in 2008, 40% in 2009, and 41% in 2010 "in large part driven by timing issues/project delays." *Id.* at 35, 38.  Goldman also stated that LVS "shows covenant breach[es] in 3Q08, 4Q0[8], 1Q09 and 2Q09," and "covenants remain tight through[out the] projection period." *Id.* at 35.  Goldman advised LVS that "[b]ank and bond markets remain challenging as liquidity has become more scarce and costly." *Id.* at 40.  Further, Goldman told LVS that although Asian banks "may have a stronger appetite for paper versus the U.S. and Europe," recent deals were downsized and had longer execution times. *Id.*  It also warned that the risks associated with a new bank credit facility were concerns about "[d]epth of the bank market" and "[t]iming of execution versus liquidity needs." *Id.* at 41.  Goldman thus

recommended LVS consider parent-level financing, and to "[c]ontinue working on a $6-$7 billion bank capital raise in Macao." *Id.* at 49.  Henry received a copy of the Goldman presentation. ECF No. 224-21 at 30.

On April 15, 2008, Weidner and Adelson received a memo from Henry and Rozek discussing hedging strategies in relation to the Singapore credit facility. ECF No. 224-61 at 48-52.  In relation to that topic, Henry and Rozek referenced the "overall weak condition of the global credit environment" and the "global credit crisis." *Id.* at 49-50.

That same day, Adelson sent a second letter to Ho. ECF No. 224-65 at 31.  In that letter, Adelson stated:

> It's all happening much faster than what we expected.  We just had a meeting with Goldman Sachs and conversations with several other investment banking firms.  It's very clear that there are two things that are affecting our ability to raise money and our standing in the credit markets.  1) Operating performance in Macao at the Sands and the Venetian.  2) The movement in the progress of our projected developments in Macao.  There is a further complication of a deteriorating economy in the US which has not yet spread to other parts of the world.  In addition, the availability of money in the credit markets has dried up.

*Id.* at 31.

Viewing this evidence in the light most favorable to the plaintiffs, a reasonable jury could find that LVS's internal views on its prospects of obtaining bank credit were not as optimistic as portrayed by Henry on the April 30 earnings call and Henry affirmatively created an impression of a state of affairs materially different than the one that actually existed.  Goldman's presentation highlighted the challenges of both (1) obtaining bank loans due to decreased available credit and LVS's poor EBITDAR results and projections, and (2) doing so in time to avoid a loan covenant default by the end of September given the longer execution times for Asian bank financing.  Henry internally referred to a global credit crisis just two weeks before the April 30 call.  And Adelson expressed the view that the credit markets were "dried up" following the Goldman presentation and discussions with other banks.[14]  A reasonable jury could find that Henry, as the

---

[14] Whether this was truly Adelson's view or whether he was exaggerating would be a question of fact for the jury.

person responsible for "guid[ing] LVS's efforts to secure financing for its developments in the U.S., Singapore, and Macao," was a participant in these discussions. ECF No. 198-138 at 3.

However, viewing the statements as a whole and in context, Henry's comments were forward-looking statements accompanied by meaningful cautionary statements. *See* ECF Nos. 198-44 at 14 (identifying risks and referring to risks disclosed in other filings with the Securities and Exchange Commission); 198-45 at 4 (stating the call would contain forward-looking statements under the safe harbor and referring to the Form 8-K for specific risks). Part of Henry's comments could be considered non-forward-looking in the sense that he was expressing a current opinion about LVS's access to the credit markets. But contextually and considered as a whole, Henry's comments were financial projections about LVS's ability to obtain bank financing at some point in the future and related to assumptions regarding LVS's ability to obtain that financing. The market was aware that LVS did not have sufficient funding to complete Cotai Strip development and it was warned about the risk that LVS would not obtain financing for its various developments. *See* ECF Nos. 198-5 at 11 (identifying as a risk that LVS could not obtain financing for its development projects).

Moreover, the plaintiffs have not raised an issue of fact on loss causation in relation to these statements. In June and July 2008, the market learned of and reacted to rumors that LVS was not able to get $7 billion in Macao financing. *See* ECF Nos. 196-1 at 24-26; 224-24 at 26; 224-66 at 30. Feinstein's first disclosure event does not occur until August 2008 and he does not identify any corrective disclosure related to a revelation that as far back as April 30, LVS did not believe it had ample access to the credit markets. *See* ECF No. 196-1 at 52-54. The plaintiffs cannot rely on a theory that these statements artificially inflated the stock price without also showing a loss after the relevant truth was revealed. I therefore grant the defendants' summary judgment motions with respect to these alleged misrepresentations.

## 12.  SAC ¶ 385

On a June 2, 2008 conference call, Dan Briggs, LVS Vice President of Investor Relations, made the following alleged misrepresentation:

**So it's clear that the development, the . . . development in Cotai is happening as we speak and happening by the month. We're pressing forward with it very aggressively . . . .**

ECF No. 198-54 at 8.

The plaintiffs have not presented any evidence that as of June 2, 2008 LVS was not pressing forward with development on the Cotai Strip. They rely on the same arguments and evidence already rejected.[15] They also point to evidence suggesting the financing deal was facing obstacles and the budgets were in flux. *See* ECF Nos. 224-28 at 21; 224-29 at 2; 224-67 at 50. However, Briggs' statement says nothing about the prospects of the Macao bank finance deal or internal budget numbers. The defendants have presented evidence that development in Macao was continuing, with the Four Seasons and a new theater at the Venetian Macao set to open a few months later. *See* ECF No. 198-54 at 7-8; *see also* ECF No. 198-68 at 27, 52 (disclosing actual capital expenditures in Macao during the first six months of 2008). The defendants therefore are entitled to summary judgment on this alleged misrepresentation.

### 13.  SAC ¶ 397

On the July 30, 2008 second quarter earnings conference call, Weidner made the following alleged misrepresentations:

**As you know, our strategy for the funding of the development of the Macao properties has always been on a phased approach. In the benefit of the phased approach is that the cash flows from each completed phase can support development costs associated with the next phase. As we prepare to open the Four Seasons Macao and to turn our developments focused principally on sites 5 and 6, we're now entering the next phase of the funding cycle.**

ECF No. 198-64 at 8.

The plaintiffs contend these statements were false and misleading at the time they were made because LVS's strategy was to obtain a new credit facility that would finance all of the Cotai Strip developments with concurrent construction of those projects. However, the evidence does not support the plaintiffs' argument. Although LVS considered a new Macao credit facility

---

[15] The plaintiffs also rely on documents that post-date the statement. *See* ECF Nos. 224-26 at 60; 224-79 at 2.

sufficient to cover all development, the market was aware that LVS did not have the funds in

place to complete the Cotai Strip developments and that it obtained funding in phases. *See* ECF

Nos. 198-19 at 31; 198-28 at 31; 198-45 at 23; 198-143 at 5; 197-30 at 59-61.  The plaintiffs' own

exhibits show LVS engaged in phased financing. *See* ECF No. 224-71 at 37 (Goldman

presentation showing phased financing objectives in 2007); 224-86 at 88-89 (discussing phased

sequencing of financings in the United States, Singapore, and Macao).  Moreover, LVS disclosed

on the July 30 call that it was seeking financing in an amount that was less than needed to fully

complete Cotai Strip development and LVS would attempt to borrow more money at a later date.

*See* ECF No. 58 at 8, 16.  There is nothing false or misleading about these statements, particularly

given the context in which they were made.  The defendants therefore are entitled to summary

judgment on these alleged misrepresentations.

<u>14.  SAC ¶ 401</u>

On the July 30, 2008 second quarter earnings conference call, Weidner made the

following alleged misrepresentation:

> **We continue to make . . . progress on sites 5 and 6.**  It is while that continues – it is clear that the pace of approvals for development activities throughout Macao has slowed substantially.
>
> . . .  While we wholeheartedly support the government's efforts in this area, we understand that one byproduct of those efforts is that the approval process for new developments will likely remain slow until the current administration is able to sort through these matters.  We will of course continue to do everything in our control to deliver our announced developments as expeditiously as possible.  **As I said before sites 5 and 6 remain on track to open their initial phase in mid-2009** . . . .

ECF No. 198-64 at 8.

The plaintiffs contend these statements were false or misleading because Sites 5 and 6

were not on track to open until the fourth quarter of 2009.  However, the plaintiffs' evidence does

not raise an issue of fact as to these statements.  The plaintiffs rely on an October 2007 email

from Mark Strawn (LVS's Executive Director of Corporate Finance) saying Sites 5 and 6 were

pushed back a year from the last time LVS did an analysis but the email does not state when the

new projected opening date would be. ECF No. 224-81 at 81.  The plaintiffs also rely on a June

13, 2008 email from Strawn to LVS's outside bankers in which he provides a sources and uses model with a "delayed" case in which the opening dates and commencement of apartment sales for Sites 5 and 6 are pushed back one quarter. ECF No. 224-39 at 2.  But the exhibit does not show to which quarter this model was pushing the opening date. *Id.*

The plaintiffs also rely on a February 2008 model showing Sites 5 and 6 would not generate operating net cash flow until the fourth quarter of 2009. ECF No. 224-67 at 2-3. However, the date when a property produces net cash flow is not necessarily equivalent to an opening date.  Further, Strawn warned that the models were "still in draft form." *Id.* at 2.  In contrast, a July 16, 2008 Goldman presentation projected Sites 5 and 6 to be generating EBITDAR by the second quarter of 2009. ECF No. 197-22 at 18.  At best the plaintiffs have demonstrated competing projections about when those sites might open.

Further, the plaintiffs present no evidence that Weidner saw any documents projecting sites 5 and 6 would not open in mid-2009 before he made his statement on July 30.  Thus, they have not presented any evidence on scienter.  Moreover, under the PSLRA's safe harbor, the plaintiffs must present evidence raising an issue of fact that a forward-looking statement like this one regarding a future opening date was made with actual knowledge that it was false or misleading.  The plaintiffs have not presented evidence that Weidner actually knew Sites 5 and 6 would have a later opening date at the time he made the challenged statement.  The defendants therefore are entitled to summary judgment with respect to this allegation.

### 15.  SAC ¶ 404

On the July 30, 2008 second quarter earnings conference call, Weidner made the following alleged misrepresentation:

> **We believe we have tremendous flexibility in how we fund those two projects [Palazzo and Sands Bethworks], should our current domestic credit facilities and other funds currently available prove inadequate to fund those projects to completion or should we choose to supplement that domestic credit facility with additional liquidity at the corporate level.**

ECF No. 198-64 at 9.

The plaintiffs contend this statement was false or misleading because LVS had no flexibility on how to fund these projects.  Specifically, the plaintiffs contend the U.S. credit facility was overburdened with funding Macao projects, LVS was about to hit its leverage covenant ratio and thus could not borrow more under that facility, and Adelson was refusing to approve a parent-level capital raise or a convertible equity offering that would improve parent-level liquidity to pay for these projects.  The defendants respond that Weidner was specifically referring to a situation where the U.S. credit facility was not available to fund these projects, and thus much of the plaintiffs' arguments do not apply.  They also argue Weidner had a reasonable basis for his belief that LVS had other options to increase liquidity at the parent level, including convertible notes.

On May 21, 2008, Goldman Sachs gave a presentation about LVS's financing alternatives. ECF No. 224-66 at 2.  In that presentation, Goldman noted that LVS "projects it may require a liquidity event before the end of 2Q08." *Id.* at 5.  Goldman advised that while Asian banks were more interested in extending credit than U.S. banks, "the market is not deep enough to satisfy complete liquidity needs." *Id.*  Goldman recommended raising funds through convertible or high yield notes or a bridge facility, followed by a later attempt to raise funds for Macao development. *Id.*

In June 2008, the majority of the LVS board of directors, including Weidner, favored doing a convertible note offering and doing so quickly. ECF No. 224-22 at 51, 53.  However, Adelson did not approve it. *Id.* at 53.

On June 30, 2008, Henry sent an email to Adelson and Weidner (among others) stating that LVS was "within 3 months of running into a liquidity crisis." ECF No. 224-62 at 7.  Henry noted that he had "mentioned at the last three board meetings" that LVS was "running out of cash to fund our Cotai projects near the end of Q3 (September) and need[s] to secure short term interim financing asap." *Id.*  Henry suggested several options, including a convertible note or high yield bond offering at the parent level, a cash infusion from Adelson, or some form of equity offering at the parent level. *Id.*  Henry further indicated that he did "not believe a bridge loan

1   from our banks is achievable at this time" and that the high yield option also would not serve

2   LVS's needs because that market had "gotten much worse." *Id.*

3         On July 16, 2008, Goldman Sachs gave a presentation recommending LVS "immediately

4   raise at least $1.5 billion of capital" to fund, among other things, $1 billion for "U.S. Restricted

5   Group operational flexibility." ECF No. 224-66 at 45.  Goldman also presented plans for high

6   yield debt and convertible debt offerings, along with proposed financing timelines. *Id.* at 45-46.

7   Goldman suggested July 21 as the date to announce that LVS was launching the Macao bank

8   financing and that LVS planned to access the capital markets. *Id.* at 46.  Goldman also identified

9   two windows for LVS to issue securities: August 4th and September 1st. *Id.*  By July 21, LVS

10  had not announced it planned to access the capital markets nor was the Macao financing

11  launched.

12        On July 25, Rosenberg from Goldman Sachs emailed Henry, stating that Rosenberg had

13  told Weidner that if Adelson had decided not to access the capital markets at the parent level then

14  it would be "best to say nothing at all . . . ." ECF No. 224-72 at 44.  Rosenberg expressed the

15  opinion that it was likely that Adelson had not approved accessing the capital markets, and

16  although he wished that the advice to do a parent-level capital raise was followed, "we have to

17  deal with reality." *Id.*

18        Weidner's statement that LVS believed it had "tremendous flexibility" in how it funded

19  the Palazzo and Sands Bethworks was not false or misleading when made.  LVS had received

20  multiple presentations and held discussions about possible financing options, including a cash

21  infusion from Adelson and convertible notes.  Although Adelson had not yet approved any

22  particular option, that does not mean the options did not exist.

23        Additionally, viewing the statements as a whole and in context, Weidner's comment was a

24  forward-looking statement accompanied by meaningful cautionary statements. *See* ECF Nos.

25  198-63 at 15; 198-64 at 4.  Part of Weidner's comment could be considered non-forward-looking

26  in the sense that he was expressing a current opinion about LVS's flexibility to fund the Palazzo

27  and Sands Bethworks.  But contextually and considered as a whole, Weidner's comment was a

28

financial projection about LVS's ability to increase parent-level liquidity and avoid a covenant

default on the U.S. credit facility at some point in the future, and was related to assumptions

regarding financial projections and management's plans and objectives for future operations.

Moreover, the plaintiffs have not presented evidence that Weidner knew his comment was

actually false.  LVS in fact had multiple options available to it but had not yet decided which

option to choose.  The defendants therefore are entitled to summary judgment with respect to this

allegation.

<u>16.  SAC ¶¶ 408, 414</u>

On the July 30, 2008 second quarter earnings conference call, Adelson made the following

alleged misrepresentations:

[Q-Felicia Hendrix:] And then final question.  Just you guys seem very optimistic about the financing progress that you're making in Asia.  Just wondering, is there any chance to augment that?  There might be – Sheldon, you might issue some equity or sell some equity?

[A-Adelson:] **There will be no equity sold at these levels.**

. . .

[Q-Celeste Brown:] First, can you talk further about this domestic liquidity, particularly given, Sheldon, your comment just now that there would be no more equity issued at these levels?  . . .  Bill talked about increasing the liquidity in the US market.  And you mentioned you wouldn't be raising equity.  Can you just discuss how the liquidity would be increased at the parent if you're not issuing equity?

[A-Adelson:] **Well, we want to maintain our flexibility that we see various options out there.  We do have quite a bit of flexibility**, but at this stage of the game, I can't get into any of the details because obviously we don't want to upset markets or move markets.  But **we're evaluating various alternatives to put additional liquidity in the corporate parent level.**  Now, let me say, I don't know if you were around nine years ago in 1999, Celeste?

. . .

[A-Adelson:] But, in 1999, we had a slow opening and a slow ramp-up because of the construction problems we had with [Bobus], the builder, and everybody was saying to me, Sheldon we may need $50 million, please tell us you're going to put it in, put it aside in an escrow account and tell us that everything is going to be safe.  And I said no, I am not going to do that, but I can tell you this, the payment that will be made.

And the reason why I didn't do that is because I wanted the market to accept Sheldon Adelson's verbal commitment, that his word is something to rely upon.

A friend of mine says, that, as all of you that know me know that I don't equal the height of Yao Ming or LeBron James or any of the basketball players.  Ming isn't here but [LeBron] James and Kobe Bryant and other top players are here in Macao.  However, one of my closest friends says, Sheldon, don't worry about your

height.  You're the tallest person I know when you stand on your wallet.  **And I'm saying right now, the Company will not have liquidity problems.  Need I say more?**

[Q-Celeste Brown:] So you're saying you'll backstop the Company if need be in worst-case?

[A-Adelson:] I don't want to – my lawyers have – let me put it this way.  My lawyers have cautioned me what I can say and what I cannot say.  However, as I said back in '99 we're not going to have any problems, and I will say again.  **We're not going to have any problems.**

. . .

[Q-Robin Farley:] I wonder if you could give us some numbers that aren't usually available until the Q is filed but that would just give us a sense of liquidity, sort of where you are drawn down on different credit facilities?  And the question is not to diminish Sheldon's height when he stands on his wallet, but just to get the information.

. . .

[A-Henry:] Robin, are you looking just for the specific debt balances at each of our various entities or levels?  What specifically are you looking for?

[Q-Robin Farley:] Specifically the credit facilities – what's drawn down and what's available in terms of liquidity today.

[A-Henry:] I have the drawn amounts in front of me.  I don't have the exact remaining availabilities.  But I can give you the drawn amounts at each of the various levels. And of course . . .

[A-Adelson:] Scott, I mean you're going to go into the analysis of the entire balance sheet and our debt structure; it's going to use up the rest of the time for everybody else.  **So the bottom line is that we have plenty of flexibility and whatever liquidity we need we're going to have.**

ECF No. 198-64 at 13, 19-20.

Adelson's statements that no equity would be sold and that LVS was considering various other alternatives to raise liquidity at the parent level were indisputably true.  LVS was considering various alternatives but issuing equity at the parent level was not one of the options then under consideration.  For the same reasons discussed above with respect to Weidner's statements, Adelson's comments that LVS had plenty of flexibility and would not have a liquidity problem were not false or misleading at the time they were made and were inactionable forward-looking financial projections and assumptions related to financial projections and management's plans and objectives for future operations.

Additionally, as to scienter, Adelson avers that he believed his statements were accurate and that when he said there would be no liquidity problem, he was referring to "a potential breach of the leverage ratio covenant in the $5 billion U.S. senior secured credit facility." ECF No. 198-

135 at 5.  The plaintiffs have not presented evidence that Adelson knew when he made the challenged statements that they were actually false or that some analysts would interpret his comments to mean he would personally backstop the entire Cotai Strip development.  The defendants therefore are entitled to summary judgment on these allegations.

### 17.  SAC ¶ 410

On the July 30, 2008 second quarter earnings conference call, Stone made the following alleged misrepresentation:

> [Q-Lawrence Klatzkin:] And then budget-wise, are we still looking 5 and 6, around $3.3 billion plus land?  And the Singapore around $4.5 billion plus land, not including land, I mean?
>
> [A-Stone:] **I think the – when we talked about the projects and we talked about these at investor days, for sites 5 and 6, we classified the $3.3 billion, $3.4 billion as hard costs.  There are still preopening costs on top of that and certain other costs.  But it's in line with what we've talked about in other investor days.  So, nothing has changed for example since February in terms of our budgets on 5 and 6.**

ECF No. 198-64 at 15-16.

The plaintiffs contend this statement was false because costs at Sites 5 and 6 were rising and LVS failed to disclose that fact.  The defendants respond that the hard costs were roughly the same, Stone lacked scienter, and this is an inactionable forward-looking statement.

On both the investor day call and the July 30th call, Stone was referring to the hard construction costs as being approximately $3.3 billion and that there were other costs on top of that. *See* ECF Nos. 198-34 at 10; 198-36 at 55; 198-64 at 15-16.  The exhibits the plaintiffs rely on show construction costs and consulting fees in line with these estimates throughout the period. *See* ECF Nos. 224-22 at 8; 224-77 at 22; 224-74 at 46; 224-78 at 17; 224-80 at 12.

However, the budget for construction costs on Sites 5 and 6 had gone up by $232 million while the budget for fixtures, furniture, equipment, and pre-opening expenses was reduced by $200 million. ECF No. 197-34 at 22-23.  Stone approved that budget increase. *Id.* at 23.  Stone testified at his deposition that the "net change" in increased costs thus was $32 million. *Id.* at 32.

Even if a reasonable jury could find Stone's statement false or misleading, the plaintiffs have not raised an issue of fact on loss causation in relation to this statement.  Feinstein does not

identify any corrective disclosure related to a revelation that the budget for Sites 5 and 6 was at least $32 million and up to $232 million higher than disclosed on July 30.  *See* ECF No. 196-1 at 52-54.  The plaintiffs cannot rely on a theory that these statements artificially inflated the stock price without also showing a loss after the relevant truth was revealed.  Additionally, Stone's statements about cost projections for a development under construction are forward-looking statements accompanied by meaningful cautionary statements.  I therefore grant the defendants' summary judgment motions with respect to these alleged misrepresentations.

### 18.  SAC ¶¶ 412, 416

On the July 30, 2008 second quarter earnings conference call, Adelson made the following alleged misrepresentations:

> **There's something I want to say concerning the development in Macao.  First of all, let me say that the fundamentals of our Company have not changed.  Contrary to what everybody – to some of the rumors that have been going around, we're moving forward with our development pipeline aggressively.**  It is acknowledged that the approval for 7 and 8 – we don't need 3 because that's the land we already own and we paid the premium for that.  I believe we've paid the premium.  **[Seven] and 8 has been delayed and we have also done some more redesign.**
>
> But, ~~our intention go forward with that,~~[16] which I am led to believe, and I may have an answer within the next week, I can't guarantee it but I may – ~~I hope to have an answer on when we could start 7 and 8.~~  We've done groundwork, we haven't done foundation – we have done ground work.  **We leave about $100 million in the financing package so that we could continue site development on 7, 8, and 3.**
>
> And we've also left – and this is important.  We've put into the $5-plus billion financing package an accordion feature ~~that will allow us in two phases to take down $1 billion,~~ which is exactly what we did with lots 5 and 6.  So, we started off to get the pilings done, which take a few hundred million now for 7 and 8 and we start on the foundation and stuff.
>
> **So, things haven't changed there.  It's taken us time to get approval.  We're doing some redesign because of the cost of construction of the . . . design we have is high so we're tweaking that design.**
>
> . . .
>
> [Q-William Lerner:] Last one, hi, Scott, when we've talked in the past, or we've talked in the past you guys have intimated that you needed an incremental US $3 billion to US $4 billion to build out the next 24 months in Cotai.  And then as I do the back of the envelope for the $5.25 billion that you need—that you're saying you'll raise, which includes, obviously, a refi, you get to obviously a $2 billion

---

[16] Statements that are stricken through represent portions of the statement that I previously determined were not actionable. *See* ECF No. 118.

incremental number to build out Cotai.  Did something change?  Is there sort of an apples and orange or did I miss something on the accordion [feature] or what am I thinking?

[A-Adelson:] The accordion feature is in addition to that $5.25 million.

[Q-William Lerner:] Okay, so that's the spread then?

[A-Stone:] Not really. . . .

[A-Henry:] That doesn't get us all the way there, Bill . . . .

[A-Adelson:] ~~It gets us to the point that we operate at~~ the manner in which we did 5 and 6.  We did the groundwork, we did the foundations, the primers, etc.  We got it out of the ground and now here we are refinancing it.  . . .  **So, as I said, nothing fundamentally has changed in this Company**.  Those people who thought that we wanted to go on again, what I am borrowing money for when I'm going to have a negative carry for another few months?  If we've got an accordion feature that we can pick up another $1 billion as time moves on, then what's the rush?  I want to open it as quickly as humanly possible.

We've got to get over two things.  One is the permitting, one is the redesign.

ECF No. 198-64 at 16, 25-26.

The plaintiffs contend these statements were false or misleading because in fact work on Sites 7, 8, and 3 was coming to a halt.  There is some evidence that prior to this statement, LVS was slowing work on Sites 7, 8, and 3.  For example, in a July email exchange among LVS personnel discussing financing and spending at the Cotai sites, Henry stated that his "understanding is that the spend on 7, 8 and 3 should be taken to zero." ECF No. 224-79 at 2.[17] However, Adelson's statements on the conference call must be taken in context.  Adelson informed the market that LVS still lacked approvals from the Macao government on Sites 7 and 8 and that those sites were being redesigned because the current design was too costly. Additionally, during this same exchange, the market was advised that LVS was seeking a smaller financing package that would finance only preliminary work on Sites 7, 8, and 3, and the new financing would not fully fund the entire Cotai Strip development.  The statements therefore were not false or misleading when made.  The defendants are entitled to summary judgment in relation to these statements.

---

[17] Other evidence post-dates the statement and thus does not show the statement was false when made. *See* ECF No. 224-71 at 41-42 (August 20 email where another company was complaining about not being informed that the project on Sites 7 and 8 was being delayed or cancelled).

1

### 19.  SAC ¶ 419

2    In LVS's August 11, 2008 Form 10-Q, Adelson made the following alleged

3    misrepresentation:

4    [LVS] held restricted and unrestricted cash and cash equivalents of approximately
     $801.8 million and $173.1 million, respectively, as of June 20, 2008.  [**The**

5    **Company is] currently evaluating various strategies that would provide**
     **additional liquidity and flexibility at the parent company level, which could**

6    **be used to support its U.S. senior secured credit facility and [the Company's]**
     **current and future development plans, including the funding requirements**

7    **related to its development projects.**

8    ECF No. 198-68 at 54-55.  The plaintiffs contend this statement was false because LVS knew it

9    must provide liquidity at the parent level to address the imminent loan covenant violations and to

10   obtain bank financing.  This statement was true when made as LVS was considering various

11   alternatives to raise liquidity at the parent level. *See* ECF No. 224-66 at 45-46.  Additionally,

12   LVS disclosed in the same document that it would need to achieve increased levels of EBITDAR,

13   decrease the rate of spending on its development projects, or obtain additional financing at the

14   parent level, among other options, to avoid violating the leverage ratio covenant on its U.S. credit

15   facility. *Id.* at 54.  Thus, this statement was not false or misleading when made and the defendants

16   are entitled to summary judgment as to this allegation.

17   ### 20.  SAC ¶ 422

18   Paragraph 422 of the SAC alleged the following:

19   On August 29, 2008, Bloomberg reported that Adelson spoke to reports in Macao
     and said LVS would consider spending $12 billion to build a strip of casinos in

20   India similar to the Macao project.  Adelson and other LVS executives dismissed
     concerns that a slowing economy or restrictions on visitors to Macao would impact

21   Macao's results.

22   ECF No. 87 at 196.  In my prior order identifying which portions of the SAC survived dismissal,

23   I identified the portion of this allegation that remained pending as follows:

24   ***Bloomberg*** **reports that Adelson and other LVS executives dismissed concerns**
     **that a slowing economy or restrictions on visitors to Macao would impact**

25   **Macao's results.**

26   ECF No. 118 at 40 (emphasis added).

27

28

1    The August 29 Bloomberg article does not contain the above alleged misrepresentation.

2    ECF No. 198-77.  Consequently, the defendants move for summary judgment on this allegation

3    on the ground that no such statement was made in the Bloomberg article as alleged. ECF No. 195

4    at 81 n.28.  The plaintiffs respond that the SAC did not allege this misrepresentation appeared in

5    the Bloomberg article. ECF No. 223 at 81.  They argue that the SAC alleged only that the first

6    allegation in paragraph 422 was in the Bloomberg article.  They assert the misrepresentation

7    about dismissing Macao concerns appeared in other news reports. *Id.* (citing ECF Nos. 224-91;

8    224-93; 224-95).  The defendants reply that the plaintiffs cannot seek to amend the SAC now to

9    avoid summary judgment.

10    The SAC did not identify any source other than the Bloomberg article for the alleged

11    misrepresentation related to dismissing Macao concerns. ECF No. 87 at 196.  This allegation

12    would not have survived dismissal under Federal Rule of Civil Procedure 9(b) without reference

13    to the Bloomberg article because it would not have identified the when or where of the

14    misrepresentation.  Additionally, in their opposition, the plaintiffs for the first time identify a

15    direct quote by Adelson that they contend is false or misleading. ECF No. 223 at 81 (citing a Las

16    Vegas Review Journal article quoting Adelson as stating "our entire strategy avoids the

17    possibility of an economic slowdown, a recession").  The plaintiffs thus are effectively attempting

18    to amend the SAC in their summary judgment response.

19    The deadline to amend the pleadings has long since expired. ECF No. 64 at 2.  The

20    plaintiffs could have moved to amend to correct or add allegations but were not diligent in doing

21    so.  They therefore have not met Rule 16's good cause standard for amending the scheduling

22    order. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006); *see*

23    *also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).

24    Even if plaintiffs could show good cause to amend the scheduling order, I would exercise

25    my discretion to deny leave to amend under Rule 15. *Gardner v. Martino*, 563 F.3d 981, 990 (9th

26    Cir. 2009); *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (listing factors to

27    consider as: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of

28

1    amendment, and (5) whether plaintiff has previously amended his complaint")).  The plaintiffs

2    have unduly delayed amendment, as they should have known from the outset where the alleged

3    misrepresentation appeared.  There is no explanation for why they have not amended previously

4    to correct or add allegations to this paragraph.  By pleading the way they did, the plaintiffs led

5    both this court and the defendants to believe the alleged misrepresentation was in the Bloomberg

6    article.   Consistent with that reading of the SAC, in responses to interrogatories, the plaintiffs

7    identified the August 29, 2008 Bloomberg article as the source for the allegation. ECF Nos. 216-4

8    at 22; 216-5 at 20.  They thus perpetuated this understanding of the SAC.  The failure to amend

9    the SAC or to correct the interrogatory responses have prejudiced the defendants because

10   discovery has closed and they never received an accurate indication of the basis for this allegation

11   so that they could explore it during discovery.  Even if amendment were not futile, these other

12   factors outweigh granting leave to amend at this late date.

13          Moreover, the plaintiffs had a duty under Rule 26(e) to correct an earlier discovery

14   response when they learned the response was incorrect.  There is no evidence in the record before

15   me that the plaintiffs amended their interrogatory responses to identify the articles cited in their

16   opposition (as opposed to the Bloomberg article) as the basis for this allegation.  Under Rule

17   37(c)(1), if a party fails to provide information as required by Rule 26(e), the party is not allowed

18   to use that information to supply evidence on a motion, or hearing, or at trial, unless the failure

19   was substantially justified or is harmless.  The disclosing party bears the burden of showing that

20   the failure to disclose was substantially justified or harmless. *See Yeti by Molly, Ltd. v. Deckers*

21   *Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

22          Even if a party cannot show harmlessness or substantial justification, I am not required to

23   exclude evidence as a sanction. *Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586,

24   594 (D. Nev. 2011).  When excluding evidence would "amount[ ] to dismissal of a claim, the

25   district court [is] required to consider whether the noncompliance involved willfulness, fault, or

26   bad faith." *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012).  I have wide

27   discretion in determining the appropriate sanction. *See Yeti*, 259 F.3d at 1106.  In making that

28

1  determination, I consider: (1) "the public's interest in expeditious resolution of litigation;" (2)

2  "the court's need to manage its docket;" (3) the risk of prejudice to the party seeking sanctions;

3  (4) "the public policy favoring disposition of cases on their merits;" and (5) "the availability of

4  less drastic sanctions." *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

5       The plaintiffs have not shown their failure to correct their interrogatory responses was

6  substantially justified or harmless. The plaintiffs are at fault for their inaccurate interrogatory

7  responses. It is unclear why the plaintiffs' interrogatory responses refer to the Bloomberg article

8  when simply reading it would show it did not contain the alleged misrepresentation. As discussed

9  above, the failure to correct the responses was not harmless because that deprived the defendants

10  of the opportunity to conduct meaningful discovery on the allegation.

11       The ability to correct the interrogatory responses was entirely within the plaintiffs' control

12  but they did not do so. This case has been pending since 2010. The SAC has been the operative

13  complaint since 2012. The public's interest in expeditious resolution of litigation and the court's

14  need to manage its docket weigh in favor of excluding the new newspaper articles, even though

15  that effectively results in dismissal as to this allegation. The risk of prejudice to defendants

16  likewise weighs in favor of excluding the evidence. The parties have expended tremendous

17  resources in discovery and preparing extensive summary judgment briefing. To reopen discovery

18  over this single allegation because of the plaintiffs' errors would prejudice the defendants at this

19  late stage of the litigation. The public policy favoring disposition of cases on their merits weighs

20  against excluding the evidence. And a less drastic sanction, such as reopening discovery, is not

21  appropriate. Given how long this case has been pending, the substantial resources already

22  expended, and the late stage of this ligation, the availability of this less drastic sanction is

23  outweighed by the other considerations favoring exclusion of the evidence.

24       Accordingly, the plaintiffs are left with their interrogatory responses that the basis for the

25  alleged misrepresentation in paragraph 422 of the SAC is the August 29 Bloomberg article.

26  Because that article does not contain any such misrepresentation, the defendants are entitled to

27  summary judgment on this allegation.

28

1

        21.  Summary

2

        The plaintiffs have failed to raise an issue of fact as to each alleged misrepresentation as

3

more fully explained in this order.  Because there are no remaining claims, Weidner's argument

4

that he is not a control person is moot.  The defendants' motion to exclude Feinstein is also moot.

5

I will deny the plaintiffs' motion to strike appendix B to the defendants' reply and I will grant the

6

plaintiffs' motion to supplement.

7

        22.  Motion to Compel

8

        On September 27, 2016, I held a hearing on the defendants' objections to Magistrate

9

Judge Foley's ruling on the plaintiffs' motion to compel. *See* ECF Nos. 269, 270.  I ordered that

10

the defendants would have to produce (1) any analyses done for Adelson personally, as opposed

11

to LVS, regarding LVS's liquidity, access to credit, prospects for completing development, and

12

stock valuation during the class period; and (2) the files of Yasmin Lukatz to the extent she has

13

relevant documents that have not already been produced. ECF No. 270 at 21-24.  I stayed

14

production, however, because resolution of the summary judgment motions could render

15

production moot. *Id.*  Although it is unlikely that any documents would alter the rulings in this

16

matter, I will order the defendants to produce these two categories of documents within 30 days

17

of the date of this order.  However, I will not delay entry of judgment and I refer the parties to

18

Federal Rule of Appellate Procedure 4 for when a notice of appeal must be filed.

19

**III.  CONCLUSION**

20

        IT IS THEREFORE ORDERED that defendant William P. Weidner's motion for

21

summary judgment **(ECF No. 193) is GRANTED**.  The clerk of court shall enter judgment in

22

favor of the defendants and against the plaintiffs.

23

        IT IS FURTHER ORDERED that defendants Sheldon G. Adelson and Las Vegas Sands

24

Corporation's motion for summary judgment **(ECF No. 195) is GRANTED**.

25

        IT IS FURTHER ORDERED that the defendants' motion to exclude testimony **(ECF No.**

26

**196) is DENIED as moot**.

27

28

1      IT IS FURTHER ORDERED that the plaintiffs' motion to strike **(ECF No. 248) is**

2   **DENIED**.

3      IT IS FURTHER ORDERED that the plaintiffs' motion to supplement **(ECF No. 256) is**

4   **GRANTED**.

5      IT IS FURTHER ORDERED that my September 27, 2016 verbal order requiring

6   defendants Adelson and LVS to produce additional documents is **rescinded**. *See* ECF No. 270 at

7   23:13-25.

8      DATED this 3rd day of January, 2017.

9

10                          _____
                            ANDREW P. GORDON
11                          UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28